BILAL A. ESSAYLI
United States Attorney
CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division
IAN V. YANNIELLO (Cal. Bar No. 265481)
GREGORY W. STAPLES (Cal. Bar No. 155505)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
     1400/1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3667/3535/0813
     Facsimile: (213) 894-0142
     E-mail:    ian.yanniello@usdoj.gov
                gregory.staples@usdoj.gov
                daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>DURK BANKS,<br>　aka "Lil Durk,"<br>　aka "Mustafa Abdul Malak,"<br>　aka "Blood,"<br><br>　　　　Defendant. | No. CR 24-621(B)-MWF-6<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT BANKS' MOTION TO DISMISS INDICTMENT |

　　　Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ian V. Yanniello, Gregory W. Staples, and Daniel H. Weiner, hereby files its opposition to defendant's motion to dismiss the First Superseding Indictment.

//

//

This filing is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 19, 2025                 Respectfully submitted,

                                          BILAL A. ESSAYLI
                                          United States Attorney

                                          CHRISTINA T. SHAY
                                          Assistant United States Attorney
                                          Chief, Criminal Division

                                          */s/*
                                          IAN V. YANNIELLO
                                          GREGORY W. STAPLES
                                          DANIEL H. WEINER
                                          Assistant United States Attorneys

                                          Attorneys for Plaintiff
                                          UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

I.   INTRODUCTION....................................................1

II.  BACKGROUND......................................................2

     A.   Defendant's Control and Leadership of OTF.................2

     B.   Defendant's Deadly Rivalry with T.B.......................3

     C.   The Indictment and Defendant's Attempt to Flee the
          Country...................................................4

     D.   The First Superseding Indictment..........................5

     E.   The Government Obtained the Second Superseding
          Indictment After Defendant Attempted to Promote a
          False Narrative that He Was Indicted and Detained
          Because of His Music......................................6

III. DEFENDANT'S MOTION TO DISMISS IS MOOT AND MERITLESS............7

          1.   The SSI Moots Defendant's Motion.....................7

          2.   Defendant Fails to Show Any Misconduct or
               Prejudice............................................9

     B.   Defendant's Request for Grand Jury Transcripts is Also
          Moot and Meritless.......................................11

IV.  CONCLUSION....................................................13

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                     PAGE

CASES:

Costello v. United States,
  350 U.S. 359 (1956) ............................................... 11

Hamling v. United States,
  418 U.S. 87 (1974) ................................................ 12

United States v. Baver,
  2023 WL 3022495 (D. Utah Apr. 20, 2023)............................ 8

United States v. Black,
  733 F.3d 294 (9th Cir. 2013) ...................................... 7

United States v. Buffington,
  815 F.2d 1292 (9th Cir. 1987) ..................................... 12

United States v. Douglas Oil,
  441 U.S. 211 (1979) ........................................... 11, 13

United States v. Herrera,
  2016 WL 11637163 (C.D. Cal. Aug. 4, 2016) ......................... 8

United States v. Hulen,
  879 F.3d 1015 (9th Cir. 2018) ..................................... 8

United States v. Landeros,
  748 F. App'x 135 (9th Cir. 2019) .................................. 7

United States v. Murray,
  751 F.2d 1528 (9th Cir. 1985) ................................. 12, 13

United States v. Nez,
  2013 WL 2302036 (D. Ariz. May 24, 2013) ........................... 8

United States v. Owen,
  580 F.2d 365 (9th Cir. 1978) ...................................... 7

United States v. Plummer,
  941 F.2d 799 (9th Cir. 1991) .................................. 12, 13

United States v. R. Enterprises, Inc.,
  498 U.S. 292 (1991) ............................................... 12

**TABLE OF AUTHORITIES (CONT'D.)**

DESCRIPTION                                                                    PAGE

United States v. Rogers,
  751 F.2d 1074 (9th Cir. 1985) .................................... 7

United States v. Sells Eng'g, Inc.,
  463 U.S. 418 (1983) ............................................. 12

United States v. Tangen,
  2016 WL 3676451 (E.D. Wash. July 7, 2016) ........................ 8

STATUTES:

18 U.S.C. § 1958(a)................................................. 4

18 U.S.C. §§ 2261A(2)(A)....................................... passim

RULES:

Fed. R. Crim. P. 6(e)............................................. 12

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant is charged with murder-for-hire, stalking resulting in death, and other crimes arising from a premeditated, execution-style murder that occurred on a busy streetcorner in Los Angeles.  Among other things, the indictment charges that defendant directed and financed six hitmen to travel across the country to hunt and kill his rival, T.B.  Once the co-conspirators arrived in Los Angeles, the hitmen used two vehicles to stalk T.B. for hours before ambushing T.B.'s vehicle at a gas station in broad daylight, killing S.R.

On April 18, 2025, defendant filed a motion seeking to dismiss the First Superseding Indictment ("FSI"), taking issue with an introductory allegation that alleged defendant commercialized S.R.'s murder through certain violent rap lyrics about greenlighting a murder.  (Dkt. 135 at 1-3; 10 at n.1.)  As set forth below, defendant's claim that his music prompted his indictment here is categorically false, as evidenced by the return of the Second Superseding Indictment ("SSI") --- which removed the disputed introductory allegation and contains no reference to defendant's violent lyrics.

The grand jury's return of the SSI makes it clear: defendant is not on trial for his lyrics or his music; he is on trial because he directed, orchestrated, and financed the brazen murder plot at issue in this case.  Accordingly, defendant's motion should be denied because it is moot following the SSI.  But even if mootness does not apply (it does), the motion fails to cite any legitimate basis to dismiss the indictment or unseal grand jury transcripts --- particularly in this murder case where witnesses and their family

1

members have already been threatened.[1]  Indeed, the compelling need to continue protecting witnesses alone justifies denying defendant's meritless request to unseal the sensitive proceedings before the grand jury.

## II. BACKGROUND

### A. Defendant's Control and Leadership of OTF

Defendant is the leader of a Chicago-based organization called "Only the Family," or OTF. (Dkt. 147 [SSI][2] at Introductory Allegation ¶ 1.)  The SSI alleges that in addition to producing hip hop music, OTF is comprised of individuals who engaged in violence, including murder and assault, at defendant's direction. (Id.)  In furtherance of his control of OTF and to exact revenge on his rivals, defendant is alleged to have placed "bounties on individuals that he and other OTF members wanted to kill, including T.B." (Id. at Count One, ¶ B.1; see also Dkt. 105, Ex. 2 [Under Seal] at 12-13 (describing bounties).)

In addition to directing violence against his rivals, defendant and OTF members are also alleged to have engaged in witness intimidation. (See Dkt. 105, Ex. 2 [Under Seal] at 18-19).  For

---

[1] In connection with defendant's detention hearing, the government submitted evidence related to certain threats to witnesses in this case. (See Dkt. 105 [Government's December 2024 Brief in Support of Defendant's Detention], Ex. 2 [Under Seal] at 18-19.)  On May 14, 2025, defendant filed an appeal of Judge Donahue's detention order to this Court, which will be heard on the same date as defendant's motion to dismiss (June 2, 2025).  The government will submit its opposition to defendant's appeal by May 27, 2025, which will incorporate Ex. 2 from Dkt. 105.

[2] Unless otherwise noted, the factual allegations are based on the SSI. As discussed below, the SSI is materially similar to the FSI except: (1) the SSI contains an additional charge against all defendants, namely, stalking resulting in death, in violation of 18 U.S.C. §§ 2261A(2)(A), (B), 2261(b)(1); and (2) the government removed the disputed introductory allegation that referenced defendant's rap lyrics.

2

example, evidence collected in this case shows defendant allegedly placed a bounty to solicit the murder of a family member of a witness, and that another OTF member called the family member of a witness in an alleged effort to intimidate the witness. (See id.)

**B. Defendant's Deadly Rivalry with T.B.**

As alleged in the SSI, in November 2020, D.B., a high-ranking OTF member and close friend of defendant, was murdered following a physical altercation with T.B. at a nightclub in Atlanta, Georgia. (SSI at Introductory Allegation ¶ 3.) After the murder, defendant made clear, in coded language, that he would pay a bounty to anyone who took part in killing T.B. for his role in D.B.'s murder. (Id.)

On August 18, 2022, defendant and his co-conspirators learned that T.B. was in Los Angeles. (Id. at Count One, Overt Act 2.) In response, defendant allegedly orchestrated and financed his co-conspirators' travel to Los Angeles to kill T.B. (Id. at Overt Acts 3-7). Indeed, around the time that a Chicago-based co-conspirator booked flights for five of the hitmen to travel from Chicago to California for the murder, defendant attempted to conceal his involvement by telling the co-conspirator, "Don't book no flights under no names involved wit me." (Id. at Overt Act 6.) As those five co-conspirators traveled to Los Angeles, defendant and another co-conspirator traveled on a private jet to the Los Angeles area. (Id. at Overt Act 3.)

After arriving in Los Angeles, defendant's co-conspirators used two cars to track, stalk, and kill T.B., as T.B. drove around Los Angeles with his entourage, including S.R. (Id. at Overt Acts 15-22). After hours of stalking T.B. and his companions, three of defendant's co-conspirators cornered T.B. at a crowded gas station on

the afternoon of August 19. (Id. at Overt Act 23). There, the co-conspirators ambushed T.B.'s vehicle and fired multiple rounds towards T.B.'s car, striking and killing S.R. (Id.) Later that afternoon, five of defendant's co-conspirators flew back to Chicago. (Id. at Overt Act 27.)

### C. The Indictment and Defendant's Attempt to Flee the Country

On October 17, 2024, the grand jury returned an indictment charging five of defendant's co-conspirators with crimes arising from the murder, including murder-for-hire and conspiracy to commit murder-for-hire resulting in death, in violation of 18 U.S.C. § 1958(a). (See Dkt. 1.) Although defendant was not yet named or charged in the original indictment, he was referenced throughout the indictment as Co-Conspirator 1. Specifically, the original indictment alleged that: (i) defendant was a member or associate of OTF (id. at Introductory Allegation ¶ 1); (ii) defendant placed a bounty on T.B. following D.B.'s murder (id. at ¶ 2; see also id. at Count One, Overt Act One); and (iii) defendant "would place bounties on individuals that [he] and other OTF members wanted to kill" (id. at Count One, ¶ B.1).

In the early hours of October 24, 2024, federal and local law enforcement executed multiple search warrants at locations associated with members of OTF in the Chicago area and arrested the five charged co-conspirators. (See Criminal Complaint[3] at 4.)

Soon after law enforcement executed the warrants, the FBI learned that defendant had been booked on three international

---

[3] The Criminal Complaint charging defendant Banks was filed in Case No. 2:24-MJ-065, which has since been merged into the criminal case.

4

flights, including at least one to a non-extradition country. Defendant skipped the first two flights, and was arrested when he showed up to board a private jet scheduled to leave the United States a short time later. (Id. at 9-10.)

### D. The First Superseding Indictment

On November 7, 2024, the grand jury returned the FSI against defendant and his co-conspirators. (Dkt. 27.) The FSI identified defendant as Co-Conspirator 1 and alleged that he formed and was the leader of OTF --- a group of "individuals who engaged in violence, including murder and assault, at the direction of defendant BANKS and to maintain their status in OTF." (Id. at Introductory Allegations, ¶ 1.)

In addition to the allegations set forth in the original indictment, the FSI also specified that defendant orchestrated the murder plot. Among other things, the grand jury alleged that: at defendant's direction, his co-conspirators traveled from Chicago to Los Angeles to murder T.B. (id. at ¶ 4; Count One, ¶ B.2); at defendant's direction, his co-conspirators used two cars to track, stalk, and attempt to kill T.B. (id. at ¶ 5); and at defendant's direction, defendant Grant obtained the cars, ski masks, and firearms that the killers used to stalk and attempt to kill T.B. (id. at Count One, ¶ B.3.)

The FSI also included an introductory allegation that defendant commercialized his violence through rap lyrics about greenlighting a murder. (Id. at Introductory Allegations, ¶ 6.) That allegation stated the following:

> Following the attempted murder of T.B. and the murder of S.R., defendant BANKS sought to commercialize S.R.'s death by rapping about his revenge on T.B. with music that explicitly references

5

audio from a news clip taken shortly after S.R.'s murder where T.B. screamed "no, no!" after seeing S.R.'s dead body:

> Told me they got an addy (go, go)
> Got location (go, go)
> Green light (go, go, go, go, go)
> Look on the news and see your son,
> You screamin', "No, no" (pussy)

### E. The Government Obtained the Second Superseding Indictment After Defendant Attempted to Promote a False Narrative that He Was Indicted and Detained Because of His Music

On April 18, 2025, defendant filed his motion to dismiss the FSI, claiming that the rap lyrics at issue were authored before S.R.'s murder and thus he alleges he could not have been rapping about greenlighting *this murder*. (Dkt. 135.) Shortly after filing the motion, defendant and others attempted to promote a false narrative that defendant had been indicted because of his music --- not because he allegedly spearheaded the violent murder plot at issue here.[4]

As a result, the government removed the disputed introductory allegation and obtained the SSI on May 1, 2025. However, just like every iteration of the indictment before it, the SSI alleges that defendant caused, directed, and orchestrated the execution-style murder of S.R. on a busy street corner in Los Angeles.[5] (See, e.g., id. at Introductory Allegations, ¶¶ 1-5; Count One, ¶¶ B.1-3 and Overt Acts 1-4, 6.)

---

[4] For example, defendant's public Instagram page (@lildurk) posted on April 29, 2025 that "the government presented false evidence to a grand jury to indict him . . . [t]hat isn't justice . . . We refuse to stay silent as Black artists continue to be criminalized for their creativity." See @lildurk, available at https://www.instagram.com/reel/DJCr4YEzTrA/.

[5] The SSI also added an additional charge of stalking resulting in death, in violation of 18 U.S.C. §§ 2261A(2)(A), (B), 2261(b)(1), against all defendants.

6

**III. DEFENDANT'S MOTION TO DISMISS IS MOOT AND MERITLESS**

Defendant's motion to dismiss the FSI should be denied because (i) it was mooted by the grand jury's return of the SSI; and (ii) in any event, the motion is meritless.

The Ninth Circuit has repeatedly held that dismissal of an indictment is a "drastic" and "harsh" measure that must meet an "extremely high standard" and is therefore "disfavored." United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013); United States v. Rogers, 751 F.2d 1074, 1076 (9th Cir. 1985); United States v. Owen, 580 F.2d 365, 367 (9th Cir. 1978) (cleaned up).  To warrant such dismissal, the alleged government misconduct must be "patently egregious," "flagrant," "grossly shocking," and/or "so outrageous as to violate the universal sense of justice." Black, 733 F.3d at 302; United States v. Landeros, 748 F. App'x 135 (9th Cir. 2019) (cleaned up).  In seeking dismissal, a defendant must also show that the misconduct was prejudicial or otherwise "pollute[d]" the defendant's prosecution. Owen, 580 F.2d at 367.  For the reasons set forth below, defendant's motion falls far short of establishing *any* grand jury misconduct, much less purported misconduct to justify the extreme remedy defendant seeks.

       **1.    The SSI Moots Defendant's Motion**

Here, defendant's sole claim is that the FSI should be dismissed because the government allegedly presented false testimony to the grand jury about defendant's violent lyrics. (Dkt. 139 at 7-9.)  As described below, this claim is meritless.  Nonetheless, the grand jury's return of the SSI --- which removed all references to defendant's lyrics --- moots defendant's claim for dismissal.

"A claim is moot when the issues presented are no longer live or

7

the parties lack a legally cognizable interest in the outcome." United States v. Hulen, 879 F.3d 1015, 1018 (9th Cir. 2018) (cleaned up).  Because the SSI removed the references to defendant's lyrics, defendant's motion to dismiss the FSI is no longer a live issue and should be denied.  See, e.g., United States v. Herrera, No. CR 15-315-JGB, 2016 WL 11637163, at *1 (C.D. Cal. Aug. 4, 2016) (denying as moot defendant's motion to dismiss FSI for abuse of the grand jury process upon return of SSI); United States v. Tangen, No. 2:15-CR-0073-SMJ, 2016 WL 3676451, at *1 (E.D. Wash. July 7, 2016) (denying as moot defendant's motion to dismiss indictment for deficiencies upon return of SSI); United States v. Nez, No. CR-12-08109-PCT-GMS, 2013 WL 2302036, at *1 (D. Ariz. May 24, 2013) (similar); United States v. Baver, No. 2:21-CR-00520-JNP, 2023 WL 3022495, at *1 (D. Utah Apr. 20, 2023) (similar).

    Like the original indictment and the FSI, the SSI makes clear that the grand jury indicted defendant for his conduct, not for his status as a rapper or because of the violent lyrics at issue concerning "greenlighting" rivals.  As with all prior iterations of the indictment, the SSI contains significant, material allegations that defendant directed his co-conspirators to travel across the country to stalk and kill one of his rivals.  Specifically, it alleges that defendant led OTF, a group of individuals who engaged in violence at defendant's direction.  (SSI at Introductory Allegations ¶¶ 1-2.)  After OTF member D.B. was murdered, defendant sought revenge.  (Id. at ¶ 3.)  He made to clear to co-conspirators that he would pay a bounty for the killing of T.B., who was suspected to be involved in D.B.'s killing.  (Id.)  And when defendant and his co-conspirators learned that T.B. was in Los Angeles, defendant set

8

into motion his plan to execute T.B., including by causing and financing his co-defendants to travel to Los Angeles to track, stalk, and kill T.B --- including one co-conspirator who traveled with defendant on a private jet to the Los Angeles area.  (Id. at ¶¶ 4-5; Count One ¶¶ B.1-3 and Overt Acts 1-4, 6.)  These allegations make clear that defendant used his power, his wealth, and his control over OTF to exact deadly revenge on his rival.  Accordingly, the grand jury's return of the SSI --- containing all of these material allegations and none of defendant's lyrics --- moots his motion to dismiss the FSI.

### 2. Defendant Fails to Show Any Misconduct or Prejudice

But even if the motion was not moot (it is), defendant's accusation of government misconduct and resulting prejudice is baseless.  First, the FSI's allegation that defendant commercialized S.R.'s death was neither false nor reckless.  Defendant has repeatedly used his pulpit to promote violence, publicly rapping about paying for murders, hunting opponents with machineguns, "bounty hunters" in Beverly Hills, and other lyrics that have a striking similarity to the modus operandi used to kill S.R.[6]  Whether or not defendant's lyrics about "greenlighting" a rival were written before

---

[6] For example, defendant was featured on another artist's song in which he raps, "I don't want no niggas who you catch, **I want the one I paid for** ... Trollin' ass, **we shot your homie**." "Gucci Mane – Rumors feat. Lil Durk [Official Video]", available at https://www.youtube.com/watch?v=QVn1DGgqBNo (emphasis added); see also "Scoom his Ass (ft. Boonie Moe) (Official Video)", available at https://www.youtube.com/watch?v=HXUDCW4wECY ("Popping traffic, we in Cali', ride through Beverly Hills with choppers ... dying to see the oppas"; "Bounty hunter, he ready to crack that lil' bitch down to get her off"). Although "Scoom his Ass" does not appear to have been officially released by defendant, the lyrics are authentic as the government seized the audio file from a co-conspirator's cellular phone pursuant to a federal search warrant, which has been produced to the defense. See Bates Media 638.

9

or after S.R.'s death, the release of the song after the murder gave defendant's fans fodder to associate him with the murder --- a claim that defendant himself seemed to admit during an interview on a popular podcast.[7]

As to prejudice, defendant's claim that the "lyrics were one of only two pieces of evidence that the [First] Superseding Indictment cited against" him (Dkt. 139 at p. 10) completely disregards and belittles the grand jury's findings in all three indictments that defendant was the organizer and leader of this calculated murder plot.  See Section III.1.  The FSI's single reference to defendant's lyrics in an introductory allegation caused no prejudice considering: (i) the numerous, material allegations that defendant directed this revenge killing; and (ii) the grand jury's confirmation when it returned the SSI that defendant was charged for his murderous conduct, not his lyrics.  The Court should deny the motion to dismiss.

//

//

---

[7] In May 2023, defendant appeared on a well-known podcast where he tacitly admitted his involvement in the killing of S.R. Specifically, after being asked about his rivalry with T.B. and in response to the interviewer's question about whether defendant was "triggered by the 'slide for Von' comments" --- a reference to "sliding" or exacting revenge for OTF member D.B.'s death --- defendant coyly responded, "For some reason I just don't see them comments no more . . . for some odd reason . . . might be the water . . . we here though."  See "LIL Durk Realest Interview Ever. Last Interview on Off The Record w/ Akademiks", DJ Akademiks, video clip available at https://www.youtube.com/watch?v=b92PfcokiYI, timestamp 2:23:36 - 2:24:25 (video of podcast interview, which was originally posted on or about May 23, 2023, and available at https://open.spotify.com/episode/1hCErNIXf49Jxz4yH6NuPy).

10

**B.   Defendant's Request for Grand Jury Transcripts is Also Moot and Meritless**

Grand jury secrecy exists for a reason.  Indeed, the "proper functioning of our grand jury system depends" on it.  United States v. Douglas Oil, 441 U.S. 211, 218-19 (1979).  This is especially true in cases like this one where witnesses have been threatened, and protecting their safety is paramount.  The charged conduct at issue --- defendant allegedly dispatching six hitmen to kill a rival located in another part of the country --- also showcases the palpable danger to witnesses and to those the co-conspirators perceive as impediments to their freedom.  As the Supreme Court has repeatedly held, "if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony.  Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements."  (Id. at 219; see also Costello v. United States, 350 U.S. 359, 363 (1956) (explaining the impact of granting requests to challenge evidence presented to a grand jury, noting the "resulting delay would be great" and "[t]he result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury.".)

Rule 6(e)(3) provides narrow exceptions to this bedrock rule of secrecy, permitting disclosure of grand jury matters only in limited circumstances.  When a defendant requests disclosure of grand jury matters, the court may authorize disclosure upon a showing that "a

11

ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Thus, defendant's right of access to grand jury materials turns on whether he meets the standard to dismiss an indictment based on conduct occurring before the grand jury. See United States v. Murray, 751 F.2d 1528, 1533-34 (9th Cir. 1985) (defendants did not show a particularized need for grand jury materials where "the claimed misconduct would not have compelled the dismissal of the first superseding indictment").

Moreover, the Supreme Court has "consistently construed [Rule 6(e)] to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted." United States v. Sells Eng'g, Inc., 463 U.S. 418, 443 (1983). "The standards the district court should follow when lifting the secrecy of grand jury proceedings are (1) that the desired material will avoid a possible injustice, (2) that the need for disclosure is greater than the need for continued secrecy, and, (3) that only the relevant parts of the transcripts should be disclosed." United States v. Plummer, 941 F.2d 799, 806 (9th Cir. 1991).[8]

Defendant has not and cannot show particularized need for grand jury materials because the motion was mooted by the SSI and no "ground [] exist[s] to dismiss the indictment." See Rule

---

[8] Importantly, there is a presumption of regularity in grand jury proceedings. United States v. R. Enterprises, Inc., 498 U.S. 292, 300 (1991). Even in the context of an allegation of government misconduct, "[t]he presumption of regularity which attaches to Grand Jury proceedings still abides." Hamling v. United States, 418 U.S. 87, 129 n.23 (1974); United States v. Buffington, 815 F.2d 1292, 1304 (9th Cir. 1987) ("an indictment regular on its face and returned by a legally constituted and unbiased grand jury is presumed to be valid; the party challenging this presumption faces a heavy burden").

12

6(e)(3)(E)(ii); Section III.1.  And even if the motion was not moot, defendant's claims "would not have compelled the dismissal" of the FSI, given the lack of misconduct and the absence of any prejudice. See Murray, 751 F.2d at 1534; Section III.2.  Accordingly, defendant fails to meet his heavy burden to invade the grand jury's proceedings.

Finally, even if defendant could show a "particularized need" for grand jury materials (he has not), he fails to establish that any need outweighs "the need for continued secrecy," Plummer, 941 F.2d at 806.  Preserving the grand jury's secrecy and independence is paramount in this case.  Defendant has already shown he is willing to use his power to continue pursuing violence, including allegedly offering a bounty to kill a family member of a witness.  (See Dkt. 105, Ex. 2 [Under Seal] at 18-19; see also Dkt. 105, Ex. 1 at 12 (affidavit describing that defendant offered money to kill "those responsible for his brother's murder, and more specifically, offering to pay money for any Gangster Disciple that is killed".)  And evidence collected has also shown that one of defendant's OTF members has already attempted to intimidate a witness.  (See id. at 18-19.) Quite simply, the Supreme Court's warning that the release of grand jury materials may result in witness "retribution [and] inducements," Douglas Oil, 441 U.S. 219, is near certain in a calculated murder case like this.  The Court should accordingly deny defendant's request for grand jury transcripts.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny the motion to dismiss and defendant's request for the release of grand jury transcripts.

13