10:17:10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. )
) 2:24-CR-621-MWF
DEONDRE DONTRELL WILSON, )
DAVID BRIAN LINDSEY, )
ASA HOUSTON, )
DURK BANKS, )
)
Defendants. )
______________________________)

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Tuesday, November 18, 2025

______________________________________

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here: www.amydiazfedreporter.com*

APPEARANCES OF COUNSEL:

For the Plaintiff:

Office of the United States Attorney
By: Ian Yanniello
Assistant United States Attorney
Daniel Weiner
Assistant United States Attorney
312 North Spring Street
Los Angeles, California 90012

Office of the United States Attorney
By: Gregory Staples
Assistant United States Attorney
411 West 4th Street, Suite 8000
Santa Ana, California 92701

For the Defendants:

Defendant Wilson:

HARBAUGH LAW, PC
By: Craig Harbaugh, Attorney at Law
360 E. 2nd Street, Suite 800
Los Angeles, California 90012

Defendant Lindsey:

LAW OFFICE OF TILLET J. MILLS, II PLLC
By: Tillet Mills, Attorney at Law
Robert A. Jones, Attorney at Law
4101 Greenbriar, Suite 210
Houston, Texas 77098

Defendant Houston:

MOEEL LAH FAKHOURY LLP
By: Shaffy Moeel, Attorney at Law
2006 Kala Bagai Way
Berkeley, California 94704

Attorney appearances, continued:

Defendant Banks:

THE FINDLING LAW FIRM PC
By: Drew Findling, Attorney at Law
Marissa Goldberg, Attorney at Law
3575 Piedmont Road NE, Tower 15, Suite 1010
Atlanta, Georgia 30305

LAW OFFICE OF CHRISTY O'CONNOR
By: Christy O'Connor, Attorney at Law
360 E. 2nd Street, Suite 800
Los Angeles, California 90012

BREEN AND PUGH
By: Jonathan Brayman, Attorney at Law
53 West Jackson Boulevard, Suite 1550
Chicago, Illinois 60604

THE CLERK: Calling item number one, case number CR-24-621-MWF, United States of America vs. Deondre Dontrell Wilson, David Brian Lindsey, Asa Houston, and Durk Banks.

Counsel, please state your appearance for the record.

MR. YANNIELLO: Good morning, Your Honor. Ian Yanniello, Danny Weiner and Greg Staples on behalf of the United States, and with us at counsel table is FBI Special Agent Jaron Farmdy.

MR. FINDLING: Good morning, Your Honor. Drew Findling, Marissa Goldberg, Jonathan Brayman, Christy O'Connor on behalf of Mr. Banks, who is present in court today.

THE COURT: All right. Good morning, Counsel, good morning, Mr. Banks.

MR. HARBAUGH: Good morning, Your Honor. Craig Harbaugh on behalf of Mr. Wilson, who is present.

THE COURT: Mr. Harbaugh, Mr. Wilson.

MS. MOEEL: Good morning, Your Honor. Shaffy Moeel on behalf of Mr. Houston, who is present in custody.

THE COURT: All right, Counsel, Mr. Houston.

MR. MILLS: Good morning, Your Honor. Tillet Mills and Robert Jones on behalf of Mr. Lindsey.

THE COURT: Good morning, Mr. Lindsey, good morning, Counsel.

10:18:11 We are here for a hearing on the pretrial motions which were filed. After they were filed, a further flurry arose from the filing the motion for recusal, or disqualification and dismissal, and then the ex parte applications related to that.

10:18:37 Having received the first motion and the request that certain exhibits be filed under seal, which I granted, I thought it would be useful to discuss a scheduling -- a schedule for that motion. And because certain things were being filed under seal, perhaps that discussion should be under seal, as well.

10:19:07 Since then, the Government filed its initial opposition. And I think it's correct that there are two issues raised by that motion: The first, the recusal and its related request to stay, and then the actual relief.

10:19:24 The Government did file its opposition to recusal and a stay; and therefore, we can discuss that this morning.

10:19:38 And after that, I think we can then turn to the other motions.

10:19:44 So the -- I think the Government frankly laid out why -- I just don't understand the request for the recusal, either of me or any other judge on this court. I just -- I just don't understand what the basis for that would be. It could be that if someone were ever brought to justice for the threats that were made to the magistrate judge, assuming a

crime occurred, and assuming there was a prosecution, then perhaps it would be appropriate for not just -- for all judges on this court, not just myself, to recuse themselves in that.

But here, regardless of what threats would be made to me or to anybody else, there would be no basis for a recusal, especially here where it's understood that those threats, and one presumes any future threats, would not be at the instigation of these defendants.

So again, I know the request has been made, so I want to hear your argument, but I just don't understand what the basis is for any recusals of any Central District judges.

So, Counsel, do you want to be heard on that?

MR. FINDLING: Your Honor, I'll start, and then -- Drew Findling on behalf of Mr. Banks -- and then I'll kick it off to cocounsel on this issue.

First, let me start by telling Your Honor that the Government's response does adhere to the briefing schedule. So we believe that this needs to be addressed in a -- we appreciate the opportunity to initially address it today.

THE COURT: No. Well, I think there is two issues. The merits that -- of what you are requesting, that there should be either disqualification of the prosecutors or dismissal, that I think does -- that we'll take up at a future date after the briefing is complete. There will be an

opposition, you will file a reply, we'll find a time to hear it. What I'm addressing now is just the request for a recusal and a stay.

MR. FINDLING: Sure.

So, Your Honor, let me first talk about the glaring omission in the Government's response that you make notice of is, first of all, there is a little bit of inconsistency, because on the one hand, my colleagues will be arguing at some point about the anonymous jury in which the Government relies on these calls as a reason for that. So they place great weight on it there, but as you recall from the filing that they just did on this issue, they merely call it a few calls.

The calls that they reference, the big issue that we are most concerned about, is entirely left out of the Government's filing.

If you will recall, respectfully, Your Honor, if you will recall, one of the exhibits in our motion that we filed on this issue was a letter we received from the Government when we sent them a letter about our concerns about the revelation that there had been threats to Judge Donahue going back to February, to Mr. Yanniello in April, but the central issue was that we were never told.

In fact, we don't even know to this day, it may be that Judge Donahue, respectfully, thought we were told and

decided to waive the issue and not bring it up. As our attachments show, there was communications with Your Honor's chambers, whether it's Your Honor, or other people in your chambers, may have thought the Government did what I will call, as an officer of the court, the right thing, and let us know. You may have thought that, or your chambers may have thought that, Judge Donahue may have thought that. I would fathom they did think the Government notified us as counsel in this case, and we waived the issue.

The central issue that is omitted from the attachment we gave you, which is the Government's letter to us, is they literally never reference May of 2025. They never reference in that letter that we did a detention hearing for Mr. Banks in which, amongst other things -- and it was a hearing that was substantive. It was a change of circumstances hearing.

In fact, if you look at Judge Donahue's order in it, it is a substantive review of everything that took place in that hearing. So it wasn't a quick 15-minute hearing.

And what we did not know at the time when we were saying that Mr. Banks should be released on bail, that he was not a danger to the community, that he was not a threat to anybody in the case, witnesses or anything like that, we did not know, the Government did not let us know as counsel for Mr. Banks, as honorable members of the bar, that had been

subjected to protective orders, and for attorney eyes only orders, so we have shown, don't conflate us with allegations you are making against people on this table. We are members of the bar. You did not bother to let us know that we were going in front of Judge Donahue, who had herself been threatened by a third-party.

So to think that we got a fair and impartial hearing at that time is faux. It is make-believe. And it is -- it is really, Your Honor, as somebody that has been doing this a long time -- and let me say, actually, loves being a lawyer, and you will never hear me saying anything adverse in the public about the people that represent the United States of America and their job -- but to think so little of us, that you would not let us know that we had a truly a ridiculous hearing.

And then for that, to go from there, and to be reviewed by Your Honor. Your Honor had the position in June when we -- to review not only what we said, but in looking at your order, your order fastidiously studied the order that was issued by Judge Donahue.

And so everything at that point was tainted. And what we didn't know, as our exhibits show, is the extent of this investigation that was done by the lead FBI agent, that a decision was made that the lead FBI agent in the case against Mr. Banks and these codefendants, was the lead

10:26:38 investigator in these threats.

10:26:42 And all that communication is in our exhibits, was shared with Your Honor's chambers. And the threat to destroy the building, or whatever, we just assume everybody -- I mean, assume -- and I'll let -- cocounsel is going to address this issue, because it was a collaborative effort, the writing, as you would imagine -- but our thought process collectively was that this threat was taken very seriously, because the documents that we have submitted to Your Honor show that the U.S. Marshals Service, shows the FBI, and the Department of Justice didn't look at it, like the most recent filing, a few phone calls; they looked at it as a serious threat. And we would imagine that that was disseminated. People should know in this courthouse that somebody is making this, what was deemed a viable threat.

10:27:39 And so that is the cause of what we consider at this point to have been tainted proceedings. These have been a direct threat to the constitutional rights of Mr. Banks, his due process rights.

10:27:54 I say it again, Your Honor, I'm in total disbelief. Forty years, forty years, and there is not one part of me that can imagine a rationale for letting us walk honestly in front of Judge Donahue and make fools of ourselves.

10:28:16 As I said to my cocounsel, talking -- a lot of us have children, when we raise kids, particularly teenagers,

you say there is a point and a counterpoint when you have a debate. But sometimes I said to my kids, there is no counterpoint. When I say to be in by 11, don't come back and say you can get in by 11:05.

To me, respectfully, there is no counterpoint in this. There is no rationale, there is no rationale that you let defense counsel, that is trying to protect the constitutional rights of our client, to try to make sure he has a fair and impartial determination as to whether in this critical stage in the proceedings, he should be released, so that he can be free and operate from the outside under the stringent conditions, and that he's not going to be a threat to the community, there is no rationale for not saying, we know that you all have really honored the protective order. We know you all have really protected the attorney's eyes only. You have shown us, okay, we want you to know -- and maybe they said it a -- we can't let anybody else know, but you should know before you argue, there is no rationale that the Government can come up here and say, as my colleague Mr. Brayman said, who has been a bird dog on case law around the country, he says over and over again, "Find me a case where a judge has told the Government, whether it be a state sovereign or the United States of America, it's okay to keep secrets and make fools of your opposing counsel," because such a case does not exist.

Because the one thing that we have, and more importantly, Mr. Banks has, is the Constitution. And so we operate under the thought process with this threat to the courthouse, that this was taken -- and that is why we have overloaded you with exhibits, and we want -- we deeply want an evidentiary hearing, because we have talked about it, we are like, the Court may have just thought that we knew. The Court may have thought we knew, and just went ahead and thought we waived the issue. We have no doubt that is a major possibility, thought, yeah, the Government would never keep a secret like that, never. That would never happen. But we didn't know.

So that is my thought process. I know I want to give time to my colleagues who want to address the same issue with the Court's permission.

I think I'll pass to Mr. Harbaugh at this time.

MR. HARBAUGH: Your Honor, just very briefly, and I just want to address the objections that were filed.

So we appreciate the Court honoring our request to have this public, because we think it is --

THE COURT: I just want to repeat, Mr. Harbaugh, when I suggested that it might be closed, it was solely in regard to scheduling, and if the defense, which had requested that certain exhibits be filed under seal, wish to have a full discussion of those. It's -- once the Government filed

10:31:21 its opposition, it was never my intention to have anything other than a public hearing.

MR. HARBAUGH: Thank you, Your Honor. My -- our apologies. It was -- we were just going off the Court's scheduling order. So I appreciate that.

THE COURT: Which was filed about 10 minutes after I read your motion. So it's -- obviously, there is a lot of water under the bridge since then.

So go ahead.

MR. HARBAUGH: Understood, Your Honor.

So my focus here is really on the -- our request for a stay pending resolution of the recusal with full fact development.

And, Your Honor, at this -- the problem that the defense has, is we don't know what we don't know. We have very limited discovery that the Government provided to us only with the goal of relying upon that evidence in support of their motion for an anonymous jury.

It was not disclosed to us to inform us as to what is going on behind the scenes, that there are threats to the judiciary in this case. It wasn't to keep us apprised. It was solely for the Government's benefit, so they could pursue an anonymous jury. And, yes, it was maybe a few days before, but it was for the filing. Clearly, that was the sole intent.

10:32:45 And so, Your Honor, we have some piecemeal information, and the defense certainly has a reasonable basis, and at this point we would reserve on whether, and to the extent which judges knew, but it's a reasonable inference that the courthouse was informed of this threat of causing damage to the entire building.

10:33:10 And so, Your Honor, the -- the defense has been at an incredible disadvantage, which is why we think a substantive evidentiary hearing should be ordered by the Court, so we can address these issues.

10:33:32 And our concern, and I apologize for jumping the gun, is that the Court was going to summarily deny the recusal motion, and then just proceed to the merit -- the substantive pretrial motions that the parties have filed.

10:33:45 And, Your Honor, even if the evidence --

10:33:49 THE COURT: Go ahead, Mr. Harbaugh. Go ahead.

10:33:53 MR. HARBAUGH: Your Honor, even if the Court was not personally aware, the issue is what the public would perceive would be the appearance of bias based upon these looming threats, not by our clients, but in their names, specifically invoking their names.

10:34:14 And so, Your Honor, based upon that, we think the most prudent course is to schedule expeditiously a hearing on the recusal, and that the Court defer on the substantive motions today.

THE COURT: Thank you.

Do any other defense counsel wish to be heard?

Does the Government wish to be heard?

MR. YANNIELLO: Briefly, Your Honor.

We understand that the arguments that counsel is making, Mr. Findling, but that is conflating the issue. The issue before Your Honor is whether Your Honor can be perceived as a biased arbiter of fact here. Mr. Findling, his entire argument was based on what occurred before the magistrate judge.

One thing I do agree with both counsel on is that the threats here have not been linked to any of the defendants in this case. They were third-party actors. And it would be not only counterintuitive, but it would defy binding circuit law if judges could be recused based on third-parties or people, even the defendants threatening or trying to intimidate the judge.

There is binding law on this point in *Clemons vs. United States District Court*, the judge did not recuse, even though the underlying litigation was three -- a person who threatened three different Central District judges, three different judges, and the District Judge still proceeded in that case.

The Government's position is the Court can and should categorically reject and summarily deny the request to

recuse. There is no basis to perceive that this Court can proceed in any fashion other than fair and impartial.

THE COURT: Thank you.

MR. FINDLING: May I respond briefly, Your Honor?

THE COURT: You may.

MR. FINDLING: Thank you.

Your Honor, I respectfully disagree with the Government when they say that -- my words are very clear to Your Honor, and I remember very well, I believe Your Honor gave us a lengthy hearing on June 2nd. We had the grand jury hearing on the transcripts that Ms. O'Connor did, and then the detention hearing was actually a lengthy hearing.

You took that under advisement, and then you issued -- you can see your own order -- you gave a very substantive analysis, not only the hearing, but you gave a substantive analysis of the decision that was made by the magistrate in May.

And if I remember correctly, in the sheet, it references in your order, it lists like the documents reviewed, or something like that, and I want to say all of them had May dates, if my memory serves me correctly.

And so while we see the documents going back and forth to your chambers, we don't know what was communicated to you. But here is what we do know: We do know that you were analyzing the May decision by Judge Donahue, who was

well informed of this threat.

And so it wasn't just about Judge Donahue, it's that you were in a position -- and again, we say the same thing, we don't know if you or Judge Donahue thought we knew, we have no idea. And we -- and we concur on the staying the proceedings. You know, we want to move forward as hard as anybody else, but we feel that, we have fully explained to our client that we have a constitutional responsibility to stay and exhaustively look at this issue.

And as Mr. Harbaugh said, it's really clear, it's the appearance, it's the appearance of impropriety, and that is something that the Government didn't talk about, and quite frankly, they can't talk about, because there is no counterpoint, it's indefensible.

THE COURT: Well, that will be addressed later as to what the Government did, and how dire it is.

On the matter that is currently before me, the first is should the request for recusal be referred to a different judge? The rules in this district are very clear, where that it is -- it is consistent with statute that the matter should first be considered by the judge to whom the request is made.

And keeping that in mind, the request is denied. There is no basis here for either my recusal, or for that matter, Judge Donahue's recusal.

And I disagree that counsel were made fools of. I

just don't think that is true. But that is -- I know that you sincerely do believe that, and we'll discuss that at the next hearing.

For now, it simply is not the case, and the Government is correct about the case law, that actions in this case can force a judge off the case. Of course, this is never going to happen, but even if one of the defendants here were to stand up and threaten me in open court, I would hold that person in contempt, but that would not be a basis for me to be recused from the case.

Like I said, it's one thing if someone were to be indicted and separately prosecuted for threats, but that is not the situation that we have here.

Rather, the situation is, can someone unilaterally force assigned judges off a case by making threats? And the answer to that question is no. And it has to be, because otherwise, there would be a -- there would be a reason that people might want to do that.

Here, it's especially the case where at no time has anyone thought that the defendants here had any role in this. It was clearly someone who just was agitated and acted out, and did something that should never have been done, but that just has nothing to do with these defendants; and therefore, there is simply no basis for my recusal, Judge Donahue's recusal, or to stay anything.

The request for recusal is denied, and we will go forward with the current schedule.

You know, the Government raised in its opposition the thought that this is, in essence, an attempt to obtain a continuance with counsel knowing the Government would object to that.

I do take your views here, and your agitation seriously, and know that they are sincerely held, but the fact is if one of the defendants feels that there needs to be a continuance of this trial, I'm not in favor of that, clearly the Government isn't, probably many of the defendants and counsel are not, as well, then the request should just be made here, and I'll consider it. Is there -- is it necessary to have a continuance here?

But to do that gratuitously when I would either recuse myself, when there is no basis, or even refer it to another judge in this district, when there is no basis, then that just would be inappropriate, when it would likely lead to a continuance, which is something I don't want, I know the Government doesn't want it, because it said so, and it could well be that many of the defendants and counsel don't want it, either. So all the more reason that the request should be denied.

However, the second half of your motion, which is that the Government has done something which is sufficient to

10:42:24 require some other sort of relief than recusal is something that we'll take up at the appropriate time.

10:42:31 Let me now turn to the numerous motions which are here.

10:42:44 The motion in limine, properly brought, as counsel said, early enough so it can affect how a trial is prepared, is obviously tied, then, to the motion to sever.

10:42:59 And the purported 404(b) evidence is so voluminous and so many different sorts that I'm just not prepared to address that today. So we'll address that at our next hearing. And there likewise, then, is -- we will address the motion to sever after the dust settles on the 404(b) motion.

10:43:28 What we are left with, then, is the motion to dismiss for vagueness, or in the alternative, for the bill of particulars, the motion to dismiss Count 4, the motion for an early -- to suppress evidence, which might have been mooted by the Government's concessions in its opposition, I wasn't clear on that, the motion for an early return of Jencks Act material, and as was mentioned, the Government's request for an anonymous jury.

10:44:06 So let's start taking those up.

10:44:10 Let me hear counsel on Mr. Banks's motion, in which the other defendants join, to dismiss for vagueness or the bill of particulars.

10:44:21 MS. O'CONNOR: Thank you, Your Honor.

The Government made some very crucial mistakes here with the grand jury, and they are mistakes that are of constitutional proportion.

The Second Superseding Indictment is 20 pages long. It's a speaking indictment. It contains -- it's long on details that are salacious, and tell a colorful story. We have pictures of cars on Melrose Avenue, and we have pictures of gunmen with their weapons, but what it's short on are the very things that the Constitution requires.

And that is a reasonable degree of particularity about time, place and circumstances that go to the very core of the charges against Mr. Banks.

And those, of course, are the bounty, and the "at the direction of" language, that is the only link, the only alleged link that allegedly ties Mr. Banks to Counts 3, 4 and 5.

So there are four principal dangers, the Court knows, I briefed it all, there are four principal dangers presented by a vague indictment. And I want to give a kind of an on-the-ground, rubber-meets-the-road example of how all four of those dangers are now -- we are realizing them now.

So those dangers are, first -- and I'll look at my notes -- a vague indictment presents a danger that a defendant might be subjected to trial by surprise without sufficient notice for preparation.

10:46:26 Number two, it presents a danger that Mr. Banks will be brought to trial on conduct that wasn't approved of by the grand jury as the basis for the charges. Different conduct than the grand jury approved of.

10:46:42 And the third, it's kind of related to that, a vague indictment allows the Government to shift its theory as the case goes along.

10:46:51 And what is even more scary here is that this vague indictment allows the cooperating witnesses to continually shift their theory as to the core allegations against Mr. Banks as the case goes along. And they have done that, and they are continuing to do that.

10:47:11 The fourth danger presented by a vague indictment is that it doesn't provide sufficient protection against double jeopardy.

10:47:20 So I want to give an example of how this is affecting Mr. Banks and our ability in real life, this is not theory, this is real life, this vague indictment is hindering our ability to represent Mr. Banks.

10:47:35 Last night, we got a discovery production from the Government, and I won't get into details, because it's subject to a protective order, but it was an FBI 302, and it listed about 15 different videos. And those videos involve, or depict some permutation of Mr. Banks and Mr. Wilson, or Mr. Banks and Protected Witness 1, some permutation of the

three of those people.

One example is there is a video that purports to show Mr. Banks in a room with PW1, and there are just stacks of cash everywhere. And the video is entitled Their --

MR. YANNIELLO: I object, Your Honor, to referencing something that could identify a potential cooperating witness in open court.

THE COURT: I don't think we need to have that level of detail.

MS. O'CONNOR: Okay. Then broadly, the other category of videos -- and I just did a quick review of them, because this was provided last night -- were music videos of Mr. Banks and featuring either Mr. Wilson or PW1.

And so I have been, obviously, thinking about this bounty issue, and trying to, with my cocounsel, figure out how to direct our defense to counter any allegation that Mr. Banks offered or paid a bounty to any alleged coconspirators.

And so I get this 302, and the first thing I think is, oh, there is obviously these vague allegations in the Indictment that as a bounty, Mr. Banks provided lucrative music opportunities to coconspirators, offered those, provided those lucrative music opportunities. But we are left to wonder what lucrative music opportunities is the Government alleging related -- were related to bounty?

So I'm looking at these music videos, and I'm thinking, okay, is the Government going to present these to the jury in such a way that the jury could draw an inference that Mr. Banks featuring Mr. Wilson or PW1 in a music video is a payment of a bounty? That would be a constructive amendment, or a material variance. And I -- and I just -- we don't know because we have this vague indictment.

And, you know, one of the problems with a vague indictment, is that it gives the prosecutor free hand to fill in the facts, and to fill in the gaps about which facts it wants to use to satisfy -- to meet the elements.

And I was thinking about the rest of the discovery, there is nothing in there about any, that I have seen, about any lucrative music opportunity that was provided as a bounty.

We have PW1 saying clearly, "No music collaboration with Mr. Banks of mine was ever a bounty payment." He denies it.

And then there is another 302, where he seems to kind of shift, and kind of hedge, where he says, "Well, we had a song in the works before this all got started, but I knew that if I didn't participate in the shooting, that song would be yanked from me."

So it seems like -- we just don't know. So that is an illustration of how we are two months out from trial. Our

investigation as to the bounty allegedly offered or provided should be completed by now; and instead, just last night we got 15 more tasks on our task list to investigate. We don't know which one the Government is going to ask the jury to convict Mr. Banks on.

And more importantly, and what makes this constitutional, is that the grand jury never approved of any of those music videos as evidence of bounty. They never found that. And that cannot be a basis for Mr. Banks's conviction.

And it also illustrates the Government's shifting theory, because we have a statement that there was never any music opportunity that was a bounty, and then maybe kind of there was a fear of a loss of a music opportunity that was a bounty. And now, are these new music videos going to be presented to the jury in such a way that they could draw the inference that those were a bounty?

And so this is not just theoretical case law, this is something that prevents us from doing our job, as the Constitution requires.

And the case law is clear, when you have an indictment that is vague as to the issues that strike at the core of the charges against somebody, a bill of particulars can't cure it, because after all, that is the Government filling in the gaps with allegations that the grand jury

10:53:41 didn't approve.

10:53:42 And discovery can't cure it, because again, the grand jury didn't approve of those particularities with respect to time, place and circumstances that go to the core of the charges.

10:53:56 And we see the shifting theories, and we see that the grand jury has been usurped as an intervenor here. The grand jury has a role with respect to the essential elements. And things that are at the core of the charges against the defendant, the grand jury has to approve of those. And it was not afforded that opportunity here. The Government was focused on details that don't matter really. They make for an entertaining indictment, but they missed the details that do matter.

10:54:36 And there is no cure for that, except to say to the Government, go back to the grand jury and do it right.

10:54:48 THE COURT: Thank you.

10:54:49 Let me hear from the Government.

10:54:57 MR. WEINER: Thank you, Your Honor.

10:55:13 I just want to address a couple points that Ms. O'Connor just made.

10:55:20 First, about some basics of grand jury proceedings. The role of the grand jury is to determine whether there is sufficient probable cause to indict a defendant, or defendants. It's not to approve specific testimony. It's

not to approve specific evidence. There is no requirement under any law that the grand jury must be presented with all evidence; only that evidence is sufficient enough to indict based on probable cause, and it's black letter law.

The second point I want to correct is that Ms. O'Connor referenced some discovery that was produced last night, including music videos, or YouTube videos. For example, one that shows people counting cash. That FBI serial, including that video of counting cash, was produced in discovery in December of 2024 to the defense, as were a number of those music videos. So to suggest that we are using discovery to surprise or to ambush is just incorrect. A number of those were previously produced.

And also, the fact of the music videos that some of the defendants or protected witnesses are in together, doesn't necessarily just have to be about the bounty, it can be about motive. It can be about relationships between coconspirators. It can be about the formation and organization of Only The Family. All of those points, as the Government addressed in its opposition as to 404(b) evidence, are relevant. So music videos, and presence within music videos, is not just about a bounty.

So let me turn to the law on both vagueness and bill of particulars. Unless the Court has any questions, we'll submit on the vagueness argument. I think the law is clear

that the Government's indictment here is more than sufficient to put the defendant on constitutional notice. There is no requirement, and defendants cite none, that in a 1958 murder case, that the Government has to plead the specific language of a bounty, or the specific "at the direction of" language that was included in the Government's motion.

And then the last point that I'll make is as to the bill of particulars, this Court can consider, and should consider, discovery that has been produced.

THE COURT: In the reply, the point was made forcefully that as to the two issues which have been raised here, the discovery doesn't, or at least -- or in a sense, it makes two points: One is the discovery is so voluminous that counsel simply just can't tell what theory the Government might use; or, second, that despite it being voluminous on some issues, on this, counsel have reviewed all the discovery, and they just -- they are not seeing it. They just -- according to counsel, it is preordained that there will be a Rule 29 motion -- successful motion at the end of the Government's case, because you don't have anything.

So that is -- what is your -- if -- so what is your response on that? You are saying the discovery is sufficient, but counsel are saying no, it's not. I obviously have not read 37,000 pages. I don't know one way or the other.

MR. WEINER: And you don't need to, Your Honor.

In docket 293, the Government filed a notice of lodging of six exhibits. Those exhibits, with particularity, they are 302s and other protected witness materials, that with particularity state the time, place and people who were at one of the promises that the Government alleged that Defendant Banks made. I believe that is either Exhibit 1 or Exhibit 2. I have the binders. If the Court would like to see them, we can lodge them with the Court.

THE COURT: You are saying it's docket number --

MR. WEINER: 293, Your Honor.

I mean, it's there. It is an untrue statement that the discovery does not point it out. The defense can say that they want to impeach these witnesses on it, and fine, they can do that at trial. But the discovery is there. It's not 30,000 pages, it's 100 pages of cooperator statements, multiple. They can disagree that it is a persuasive theory, but it surely is sufficient for an indictment, and to take it to the petit jury.

THE COURT: Look, the concern that the defense has that the defendants are changing their stories, that is designed to be dealt with under the Jencks Act. They will have all the statements. They will be able to cross-examine them. The jury will recognize that, if that is what is happening.

10:59:56 But what the concern is, and this sort of falls between the specific words that will be used in the opening statement, and the bill of particulars on the other, is that there are -- is the theory, more broadly.

11:00:10 So here, are you telling me that those hundred pages encompass, then, what it is that the Government would argue as to either bounty, on the one hand, or the means by which, allegedly, Mr. Banks directed that the crime occur?

11:00:29 MR. WEINER: So if I could make a couple of points on that?

11:00:34 First, is that the Government at this stage is required to present constitutional sufficient notice for the defendants to know what the basic theory is. But the Government is not required to show all of its cards right now.

11:00:49 And to answer the Court's question directly, do those hundred pages encapsulate in crystal precisely what the Government is going to argue? I don't know. The Government can make reasonable inferences from evidence that it continues to gather from witnesses, who it continues to investigate. If one of these defendants chooses to cooperate with the Government, they may have additional statements that someone made to promise.

11:01:15 So I can't say that the hundred pages are it. But what I can say is that they more than pass muster to put the

defendant on constitutional notice of what the Government's core theory is.

I mean, it's not just a promise was made for money. One of the 302s specifically gives a time, date, the language used, and the people present.

And again, I'll reiterate, to the extent defendants find that insignificant or unpersuasive or impeachable, that is the role of a jury trial.

THE COURT: We are talking about the bounty.

What about the other point that was raised in the reply, which is that there is also lack of specificity as to how it was that Mr. Banks allegedly directed that this murderous scheme take place?

MR. WEINER: And, Your Honor, could I just grab a notebook from counsel table?

THE COURT: You may.

MR. WEINER: Thanks.

So as to the "at direction" point, similar to the bounty point, the Government lodged Exhibit 5 under seal. That is an FBI 302 of a protected witness that specifies, and underlies certain of the "at direction of" allegations. It's in there. Same with Exhibit 6.

So I would direct the Court to those.

THE COURT: Thank you.

Anything else?

MR. WEINER: No, not unless the Court has any questions.

THE COURT: I don't.

MR. WEINER: Thank you.

THE COURT: Ms. O'Connor?

MS. O'CONNOR: Thank you, Your Honor.

First, with respect to docket number 293, in the Government's opposition, it pointed to no specific discovery. In my reply, I address that.

And then on Friday, just this last Friday at 5:00, that is when the Government filed what they called a supplement, but what really seemed to me as to be a sur-reply that it filed without leave of the Court, because it was responding to me calling them out on their failure to do so in their opposition, because they didn't do it.

And so to the extent that the Court is going to grant them leave to file a sur-reply, I would request the opportunity to address the specifics of that production, because again, it's been one business day since the Government culled that down, and I would ask -- I could do it by the end of the week.

THE COURT: I understand what you are asking for, Ms. O'Connor.

MS. O'CONNOR: And as to the specifics of that production, so again, I want to say that even the best, and

the most thorough, and the most internally-consistent discovery in the world cannot cure a vague indictment.

We have the grand jury for a reason. They have to -- and the case law is clear, especially when you have an indictment and a charge that is premised largely on a communication by a defendant, a statement or a communication, the Indictment has to state with particularity, with reasonable certainty, I believe it is, the time, and the place, and the circumstances of that statement; not the discovery, the Indictment.

But even as to the discovery, even if that weren't the law, the discovery doesn't clear things up. So the Government cherry picked one statement from PW1 that it now is telling us is going to be the theory it proceeds on at trial.

But on that issue, PW1 has been all over the map. He said repeatedly, "I didn't do this for a bounty."

Agents asked him in a recorded statement, "Did you ever discuss King Von's death or a bounty with Mr. Banks?" And he said, "I cannot lie to you, no, I did not. That conversation never happened." "Well, what did you think was the bounty he had?" "I didn't -- I didn't know."

And so he's shifting all around. And it's a moving target, and it's not fair.

But even if he weren't shifting, we still have the

problem that the grand jury never approved of the circumstances of these alleged statements. And they have to do that. It can't just track the language of the statute saying, "In this two-year period, Mr. Banks offered money or a monetary reward for the killing." That is language tracking the statute, and that is insufficient.

THE COURT: But, Counsel, the Ninth Circuit law is that it is not insufficient. That is really -- for this aspect of your motion, you are just wrong on that. And you are such a good lawyer, you have been so careful in everything you have given me, but the fact is, is if -- and that is true of 99 percent of the indictments in this district, which I have been reading for 38 years.

So I -- and as you well know, it is -- if it covers the elements, then it's sufficient.

MS. O'CONNOR: I -- I disagree respectfully, Your Honor.

I think if we are -- we are talking about a fraud case, a wire fraud or a mail fraud case, an indictment that just says, "In a two-year period, Mr. Banks made a material misrepresentation to investors to get them to buy stock," that indictment would be kicked to the curb. So I disagree.

I think that the Indictment has to say, at this meeting, in this boardroom, on January 1st, he -- and in the prospectus that was handed out to investors, these are the

statements that were made, and here is why they were false.

I don't think any good lawyer in this district would see a wire fraud or a mail fraud indictment that gives a two-year range and just alleges some misrepresentations were made, and that would be sufficient. It's not. That doesn't put us on notice. It presents all four of the dangers.

And here is also what I'll say, about even the discovery the Government produced, that one statement of PW1 with respect to this alleged conversation that he, you know, a long time later recalled after specifically denying that there was ever a bounty.

So at some point he recalls, miraculously, a meeting that happens in some studio in Atlanta. We don't know which Atlanta studio it was. We don't know when it was. He said, "It was after I got out of prison, but before August of 2022."

So we -- by my calculations, we have a date range of I think between February of 2022 and August of 2022 when this alleged statement could have been made.

Now, I will say it does -- the discovery alleges certain people who were there. So it has specifics there. But with respect to location and with respect to date, the discovery doesn't clear it up. But again, even if it did, it wouldn't make up for the vague indictment.

THE COURT: Thank you.

This motion raises a number of issues, and they have been, I think, illustrated here.

The first is the motion is attempting to dismiss the Indictment for some sort of grand jury misconduct, or the fact that the grand jury really didn't vote on what is going to be presented to the trial jury. That is, respectfully, sheer speculation on the part of the defense.

One could imagine a system where what happened before the grand jury is routinely revealed, and then counsel could make those arguments almost in the nature of summary judgment. In fact, that is precisely what happens across the street in Superior Court under Penal Code Section 995. It is not what happens in Federal Court, and there is no basis here to dismiss the Indictment on those grounds.

As to vagueness, perhaps -- it is essentially sufficient under Ninth Circuit law that an indictment tracking the language of the statute show that the elements are met.

And here, as was mentioned, it is a speaking indictment. There is a lot more than that. And the inferences from that, this is simply not a case where it was that bare bones. It is more than sufficient under the Ninth Circuit law, as the Government set forth in its opposition, to pass muster.

It is rare for a bill of particulars to be

11:10:49 requested, and even more rarely to be granted, but as counsel point out, that is generally because the Government can say all of these issues have been addressed in the discovery.

11:11:01 Here, what was said forcefully in the reply was that that is just simply not the case. The Government then does seem to be responding to that.

11:11:11 What I'm going to do is tell the Government that if the Government -- the Government can rest on what its already done, which is, as I was told, was in document number 293. The Government may supplement that between now and Friday.

11:11:30 Whenever -- Ms. O'Connor, whenever you have the chance to do it, you can respond to whatever it is the Government has filed, perhaps it will be something new, perhaps not, and then I'll read what, obviously, your supplement, I'll read the materials that were done here, and decide. It's a gray area, because on the one hand, to keep there from being the need for a bill of particulars, there does have to be some specificity.

11:11:58 On the other hand, the defense is not entitled to the -- essentially, a pre-transcript of what the Government is going to say in its opening statement.

11:12:07 And moreover, as it said, the Government correctly said, there might be more evidence. There might be different evidence. And as to that, the concern that the defense has on the moving target is, as I said, met with the Jencks Act.

You are going to have the statements of these witnesses. You will be able to cross-examine them. The jury will recognize if they have, in fact, been making different statements to please the Government, or because they are lying, or because they really don't remember, or because they are trying to please people who have this huge amount of authority over them. That is your job. I know you will do it. And the jury will be able to figure out whether that is what happened or not.

So the real issue here, that I see, is precisely what was raised in the reply, which is on those two issues, is there the need for a bill of particulars, because the discovery doesn't cut it?

And I'll give the Government another opportunity to supplement what it's done to show that that is not the case. I'll allow the defense to comment on that in writing, I'll either find that sufficient, or we'll have another hearing, and then that will be decided.

But again, it's very rare for a bill of particulars to be granted. But the request for the bill of particulars is taken under submission.

The request to dismiss the Indictment for vagueness, or really, for some alleged insufficiency before the grand jury, is denied.

Let's now go to the motion to dismiss Count 4.

The reply here was very forcefully written, and I think kind of laid it out. It's like which of two cases really controls here? And I thought the issue was extremely interesting.

On the face of it, it just sounds crazy that one -- these crimes would not be crimes of violence, but by parsing it out, and forcing the Government, as was recognized, to make a concession, we are left with a rather odd situation.

So let me hear, obviously, from Mr. Houston in regard to the dismissal of Count 4, and then I'll hear from the Government.

MS. MOEEL: Thank you, Your Honor, I appreciate it. Shaffy Moeel for Mr. Houston.

THE COURT: And let me congratulate you, again, on the reply. I enjoyed reading it.

MS. MOEEL: Oh, thank you, Your Honor.

Well, the categorical approach is a fed court special, and I know jurists especially love when lawyers dive into it.

It does -- it is interesting. And what -- what we have learned now in *Begay* and its progeny, is that what sounds like a crime of violence is often not a crime of violence. And that is exactly the situation we have here with Count 4.

So the question today, as Your Honor has noted, is

narrow: Is the Government's chosen predicate 2261A(2), stalking resulting in death, categorically a crime of violence under Section 924(c)(3)(A)?

And after the Government's concessions, this is all that remains: They have first abandoned Section 1958, murder for hire, because they had to, even though they charged it in the Indictment. They say that they have elected not to proceed on that theory, but of course they cannot, because they are foreclosed by case law.

They say now that they have elected to proceed only on what they have identified as a further narrowing, which is 2261A(2)(A).

So does A(2)(A) always require the intentional use of *Johnson* level physical force? That is the question before the Court.

And what we have described is that, no, the statute is overbroad, it's indivisible, and it fails under Ninth Circuit law.

The main point is that the statute does not require the intentional use or the threatened use of violent physical force. And under Ninth Circuit law, rather than the out-of-district cases, out-of-circuit cases, District Court opinions cited by the Government, which don't grapple with Ninth Circuit precedent, such as *Villagomez*, it's clear that a crime of violence requires an intentional deployment of

11:16:31 *Johnson* level force.

11:16:33 And further, the Supreme Court in *Borden* has indicated that, "Reckless or nondirected conduct is categorically excluded." And what we have learned from *Begay* is that the least culpable means governs.

11:16:48 So here, what we know with this approach is facts are irrelevant, elements control. And unless the least culpable way of committing 2261A(2) necessarily uses violent force, the predicate fails.

11:17:02 We have argued, and I believe this is true, and I believe that if we have to, we'll be successful before the Ninth Circuit, that 2261A(2) has an indivisible mens rea. The statute allows conviction based on intent to harass or intimidate, both nonviolent.

11:17:24 And there is no jury unanimity requirement among the four intents in the statute. The penalty does not change based on intent, which is classic alternative means under circuit precedent in *Mathis*. And we have also offered the Court the Fifth Circuit Pattern Instruction, which likewise treats intent alternatives as means, not elements.

11:17:48 Even under the Government's narrowed view, Your Honor, the statute allows conviction where the conduct merely places a person in fear of injury, a result that can arise from entirely non-violent acts.

11:18:02 And the Government -- we, for example, in the reply

describe a factual scenario, and it didn't take long to think that one up, where we have a cyberstalking statute here. That is what this statute was written for is cyberstalking. We provided a potential scenario in which an individual is harassed by the threat to share an embarrassing, humiliating video, and that the person who is threatened might be actually physically threatened, or be placed in fear by a third-party, a jealous boyfriend, a domineering, controlling, religious father. And so the individual, the victim's perceived threat, they are being placed in reasonable fear, might have nothing to do at all with the defendant. And that is just not the kind of crime of violence permitted under *Begay* and its progeny.

What we have, instead, is a statute that fails the *Johnson* level force requirement.

And the Government's arguments regarding the "resulting in death" language necessarily makes it a crime of violence, is just unavailing.

The Government leans heavily on this, but under *Mathis*, *McDuffy*, and *Vera*, which we briefed, a fact that increases penalty is not an element of the offense, it's a sentencing factor.

What the Ninth Circuit has said is, "Death results is the functional equivalent of an element only for *Apprendi* purposes, not elements clause analysis." Therefore, it

11:19:49 cannot transform a nonviolent offense into a violent one.

11:19:53 THE COURT: What about the Government's argument that it isn't the mens rea which has to be divisible, but just the actus reus?

11:20:02 MS. MOEEL: Well, but we know that that is not true, because the Ninth Circuit's categorical analysis precedent is all about the intentional use of physical *Johnson* level force.

11:20:14 That is -- so they can say that. I mean, the Government focuses on the volitional conduct of placing the victim in fear, and the volitional -- they keep saying this over and over in their brief -- the volitional conduct of placing the victim in fear. That is -- the only volitional conduct that the statute actually requires the Government to prove is that the defendant used an interstate mail electronic communication. That is the only volitional conduct they would be required to prove in front of a jury.

11:20:45 The fact that the victim is placed in fear is not by volitional conduct of the defendant, which is what our hypothetical example shows. The fact that the victim could be placed in fear is, again, a means, it's a fact.

11:21:03 And what the Ninth Circuit has said is categorical analysis is not interested in facts. It's not interested in the facts that the Government could prove, but simply on the elements.

11:21:13 And whether the fact can be proven, that the victim was placed in reasonable fear, or in substantial distress, which the Government has abandoned that prong, that fact theory is simply not relevant for purposes of categorical analysis.

11:21:31 So what we have is an overbroad statute that is indivisible, that simply cannot -- cannot pass muster with respect to a *Johnson* level intent to use force that the Government would be required to show here.

11:21:56 2261A(2) is not a crime of violence, and Count 4 must be dismissed on that basis.

11:22:01 THE COURT: All right. Thank you.

11:22:02 Let me hear from the Government.

11:22:05 MR. WEINER: Thank you, Your Honor. Your Honor, may I use the Elmo to put up --

11:22:18 THE COURT: You may.

11:22:19 MR. WEINER: Thank you. I think it would be helpful to just have the statute up. It's a long statute, and when we are talking about divisibility, I would like to be able to show things. It's a little small, but I'll zoom in.

11:22:50 So just kind of taking a step back before we delve into the statute. I agree this is an interesting and complicated, and sometimes muddied area of law. I think this statute is more straightforward than a lot of others for a number of reasons.

11:23:12 As every District Court that has reviewed this statute, the current version of the statute has held that 2261A(2) is a crime of violence.

11:23:25 So there is a number of steps that the Court has to take to do this analysis. And I won't belabor the black letter law, but I think it's helpful as we go through.

11:23:34 The first is: Is the statute divisible? The answer to that is, yes. And then the question is: Okay, well, what did the Government charge here? And Ms. Moeel is correct, the Government presents the Court with a narrower question than what is contained in the Superseding Indictment -- the Second Superseding Indictment. And all the Court has to answer, because the statute is divisible, is 2261A(2)(A) categorically a crime of violence?

11:24:05 And to answer that, the Court has to inquire whether the least criminalized form of conduct requires the intentional application of *Johnson* level force.

11:24:15 Again, every District Court that has looked at -- we couldn't find any Circuit Court that has addressed this. I believe it's still pending in the Fifth Circuit in a case called *Elkins.* I am not sure whether that opinion has been -- I believe oral argument has concluded, but I'm not sure whether the opinion is out. But every District Court that has looked at this statute has determined that categorically it requires the intentional use of *Johnson*

11:24:40 level force.

11:24:41 And, again, *Johnson* level force is force capable of causing physical pain or injury.

11:24:46 So as to divisibility, so the statute is divisible in a number of respects. So the Court inquired of Ms. Moeel, you know, why does the mens rea matter here? And the answer is that it doesn't.

11:25:03 So the first way in which the statute is divisible is between big Subsection (1) and Subsection (2). So a number of District Courts, as cited in our opposition, in the plain text shows that it's just wholly different conduct. Subsection (1) criminalized cyberstalking by somebody physically traveling. Subsection (2) criminalizes cyberstalking with somebody who uses the mail or a facility of interstate commerce, texting, phone call, e-mail, something like that.

11:25:38 I think -- I don't have much else to say about that, except that the conduct is plainly different. The levels of proof are plainly different. And so the statute is divisible between (1) and (2).

11:25:49 So then we go to Subsection (2), and I'll zoom in here. Okay. And again, Defendant Houston argues that, well, because there are multiple manners in which under Subsection (2) a defendant -- alternative mens reas, this statute is not divisible.

11:26:11 Again, that is not the correct way to look at this. 11:26:14 And the reason is because the different level of proof 11:26:17 between (A) and (B) requires different conduct.

11:26:21 So if we look at (A), so I'll shorthand with the 11:26:27 intent to kill uses any interactive computer service. Let's 11:26:30 just say somebody sends an e-mail, okay? Somebody sends an 11:26:34 e-mail, if it's charged under (A), that places a person in 11:26:38 reasonable fear of death, and it also includes additional 11:26:41 victims, serious bodily injury to a person, pet or service 11:26:45 animal; whereas, (B) does not include the service animals or 11:26:50 the support animal or horse.

11:26:52 So the conduct that this statute contemplates is 11:26:56 different between Subsection (A) and Subsection (B). 11:26:59 Subsection (A) sweeps in more, as we argue, volitional, 11:27:04 intentional conduct that causes greater fear.

11:27:08 Subsection (B) applies to a more limited class of 11:27:12 people, and the conduct can be different than (A), because 11:27:16 causes, attempts to cause, or would be reasonably expected to 11:27:20 cause substantial emotional stress clearly is a different 11:27:24 form of proof than places a person in reasonable fear of 11:27:27 death.

11:27:27 So the analysis the Court needs to make here is not 11:27:29 whether the Government can prove intent to kill, injure, 11:27:34 harass, it's whether under Subsection (A) or Subsection (B), 11:27:38 the amount or level or type of proof sent to the jury would

11:27:41 be different. And here, it is.

11:27:42 If the Court has no questions on divisibility, I'll move on.

11:27:47 THE COURT: No. I don't know how I'm going to rule on this, I'm going to take it under submission, but I understand the argument.

11:27:52 MR. WEINER: Okay. Thank you, Your Honor.

11:27:53 So that brings us, then, to the next question: Whether 2261A(2)(A), so now we are just focusing on this, is a crime of violence? And the Government makes two arguments in its opposition.

11:28:14 The first argument, which we think is stronger, and a number of District Courts have agreed with, is that 22612A is categorically a crime of violence whether or not death results.

11:28:29 The reason for that is because the type of conduct that a jury would have to find in order to convict somebody under this statute is conduct that intentionally causes *Johnson* level force. That is, force capable of causing physical pain or injury.

11:28:49 And as other District Courts have reasoned, to satisfy someone -- and it's not just being in fear, it's reasonable fear of death or serious bodily injury. The intentionality that the Court should look at is the intentionality of the act that would cause a jury to find

someone was placed in reasonable fear of death? Is there a realistic universe in which that type of conduct does not involve *Johnson* level force? And the answer to that, we submit, is no, and a number of District Courts have ruled in that way.

So I would like to address head on Ms. Moeel's example. And I believe the example in the reply brief is, well, okay, let's take someone who sends a text message to a girlfriend of the defendant, a harassing text message, and the girlfriend becomes -- is very overwhelmed and believes that she's in reasonable fear of death because of something that happened in her past by a third-party.

So that example doesn't really fit here for a number of reasons:

First, I'm not sure whether that even falls under the statute. I mean, the statute requires the defendant's course of conduct to cause a reasonable fear of death to a person.

What that hypothetical posits is that the defendant's course of conduct caused a person to be in reasonable fear of death because of something else.

So the argument is that the course of conduct triggered something in that person. I think a jury would have a hard time finding that is a reasonable fear of death. And I also think there is a serious causal issue there that

it wasn't the course of conduct that caused the harm to that individual.

I don't think that is a case -- I won't speak for the Government, but I think just on those plain facts, that I think the Government would be hard pressed to charge a case like that. And I think a jury would be even more hard pressed to convict on a case like that, because it just doesn't fit the statute.

So then the last argument I'll make is that if the Court disagrees that 22612A without death is not a crime of violence, with death, it certainly is. And that is what the handful of the other District Courts have reasoned.

Again, we think the former is more persuasive. But the latter really is, as well, which is: Can the Court imagine a universe wherein somebody intentionally acts that places a person in reasonable fear of death, and leads to death?

And keep in mind that the death has to be causal. *Burrage* holds it has to be the but-for cause. This can't be some random death that happens, that it has to be as a result of the course of conduct.

And so for those reasons, the Government submits that the narrowed crime as charged is a crime of violence, and Count 4 should not be dismissed.

THE COURT: All right. Thank you.

11:31:54 MR. WEINER: Thank you.

11:31:54 THE COURT: Ms. Moeel?

11:31:56 MS. MOEEL: Just briefly, Your Honor.

11:32:31 From what I could glean of that presentation, I think the Government is resisting the idea that the case law focuses on the mens rea of the statute, which requires the intent to commit *Johnson* level force.

11:32:58 The question of what proof needs to go to a jury is specifically what the case law says this Court is not to consider. So whether or not there is more proof as to one thing or the other, that is -- that is not appropriate for the question before the Court here today.

11:33:18 And so what I would say is when you look at the statute here, and what the Fifth Circuit has clearly grappled with and come up with in preparing their jury instructions, and what I didn't hear from the Government, is how they square away what this circuit has said with respect to the difference between means and elements.

11:33:47 And when you look at the means here, sure, factually lots of things can happen. But the question is, when we are talking about overbreadth, it is simply a focus on elements.

11:34:02 And here, when you look at the Fifth Circuit's instruction, the question of whether 2261A(2) was violated because it placed someone in reasonable fear, or whether it placed them in substantial distress, are means; not elements.

And so to focus, or to create an argument that somehow this Court should focus on the actus reus of the volitional conduct of the individual, it completely misses the mark.

The question is: Can the statute be violated without a defendant employing *Johnson* level intentional force? Yes, in the hypothetical that I offered the Court; not the hypothetical that the Government made up here on the -- at the podium.

THE COURT: The District Court cases the Government referenced, I haven't read them yet, which is one of the reasons I want to take this under submission.

In your view, are they beside the point? They aren't binding on me, obviously. Are they wrong? Were they dealing with a different issue than what is precisely being done here? What is your view of that case law?

MS. MOEEL: I think that what they don't grapple with is our circuit case law, like as in *McDuffy* and *Fitzgerald*, where a fear of harm does not necessarily equate to force. Or, in *Fitzgerald*, force must be capable of causing physical pain, and words or nonviolent conduct don't qualify.

So those are among some of the problems I have with the District Court cases. And I'm happy to provide further briefing distinguishing them, if the Court orders me to.

THE COURT: Thank you.

The motion is taken under submission.

MS. MOEEL: Thank you, Your Honor.

THE COURT: The next motion -- but hold on a second.

Let's break for 10 minutes. We'll give the -- let's break for 10 minutes and give the court reporter a break, and then we'll start again at 11:45.

(Thereupon, there was a brief recess.)

THE COURT: Let's now take up the motion to suppress evidence, which of course has already achieved a great deal for the defense with the Government's rejoinder.

I guess my first question on this would be, is it now mooted by the Government's concessions, or is there still something left for us to talk about?

MS. GOLDBERG: Your Honor, on behalf of Defendant Banks, I believe that the Government's response does, in fact, moot the issue, in that they have made affirmative representation that they do not intend to use any of that evidence derived from the search warrants at trial.

We do just reserve the right, if the issue does arise in the future, to argue that later.

THE COURT: Of course. So I congratulate you on the denial of the motion. The motion is denied as moot.

The next, then, is the hard line *Jencks* return.

So let me hear from counsel in regard to that

motion.

MS. GOLDBERG: Thank you, Your Honor.

Our request is detailed in the motion itself. We've conferred with the Government regarding this request, as we indicated, the Government's response was that they only intended to give over the Jencks Act and *Giglio* Act material, or *Giglio* material, one week prior to trial.

Your Honor, we make this request not as some sort of attempt for a perceived advantage or anything like that. Really, we ask for this to be ordered because we want to maintain efficiency. We want to prevent, as this Court has seen in some of the motions today, there has been arguments from the Government about concerns about delay; things like that. We are trying to prevent those things from occurring.

This has been a case involving voluminous discovery. I believe we are on production 17 at this juncture. We are also still awaiting additional productions. I spoke with the Government before we started this hearing today to ask them about additional discovery that was still outstanding. Specifically, there is an anticipated production of approximately 20 terabytes involving downloads from numerous cellphones, which have still not been provided to the defense. Twenty terabytes is an amount that really can't be understated. I mean, that is an extreme amount of potential material there.

11:51:16 Now, I don't know that that is going to be the total amount, but that is what they asked for from us in terms of a hard drive. So we are still waiting for that discovery. There is still additional discovery that we have requested that has not been provided.

11:51:28 So we are making constant, diligent attempts with the Government to maintain efficiency. We have been in constant communication with the Government regarding our requests, following up with the Government regarding those requests. And while there have been rolling productions of discovery throughout the course of this case, there is still a considerable amount outstanding. We have had delays in getting that discovery to us, and we do have concerns about those things.

11:51:55 So we make this request, really to not only promote efficiency, but really fairness. We want to make sure that we have everything we need to properly defend the case. And we need to have that in a manner and time in which we have the time to really process, if there is any investigation that might be needed that is derived from that information, we need time to do it.

11:52:18 One week prior to trial is not sufficient. I understand what the Jencks Act actually requires, and, you know, and I know courts, you know, hopefully for the most part add additional time to that, because it really is

unfeasible to get something so late in time. But one week, as the Government has suggested, is just really not -- it's not fair. It's not right. It's not efficient. We have requested 45 days, because we think that would be a sufficient amount of time for us to go through -- we don't know what the volume of this is. If it's extensive, as everything else has been, this would give us the time to do it, so that we don't have to come back before Your Honor with additional concerns.

So we make this request in notions of efficiency and fairness.

THE COURT: Thank you.

MR. STAPLES: Good afternoon, Your Honor.

THE COURT: Before you begin -- I'm sorry. Go ahead.

MR. STAPLES: I'm sorry. Go ahead.

THE COURT: What -- what is the situation as to sort of the basic statements? You know, the -- it's not written this way, the *Jencks* case wasn't dealing with this issue, but the production addresses two issues:

One is, is to give the defense an idea of who the witnesses are, and what they are going to say.

The second, fine tuning that, as I already mentioned, is to see if there is changing stories, inconsistencies. And that does require a certain amount of

time of just sitting down with all of the various statements, and seeing if there has been changes over time in drafting a cross-examination accordingly.

So here, first, is there -- are there any witnesses for whom no statements have been provided, or where if you -- you gave them a week beforehand, it would become as potentially a shock to the defense, or a surprise, or they just didn't really have an idea of what that person was going to say?

MR. STAPLES: No, Your Honor.

THE COURT: All right. Then I think -- which is good, but then going forward from that, it does seem to me that a week to even deal with the other issues that I described, you know, to just really sit down with them, and to draft, or fine tune cross-examinations when everything else is going on in preparing for trial, it just -- it really doesn't strike me as a very -- as a very long amount of time.

MR. STAPLES: And I agree. And that is not what we said.

What we said is we will not agree to an earlier cutoff date, but that we cannot agree to an earlier cutoff date, because the investigation continues, number one.

Number two, the majority of this voluminous defense they keep talking about has been produced to them, including statements identifying who the cooperating witnesses are, and

the statements they made, all right?

This supposed 20 terabyte discovery is not 20 terabytes. And what it consists of is digital devices belonging to other defendants and third-parties that are beyond the scope of the Government's obligation to produce, but which we agreed to produce in any event, so they can review them if they want.

We have not been dragging our heels. We have been going as quickly as we can. As the Court is aware, with numerous digital devices, it takes time. And we have negotiated with them, and we are dealing in good faith. We are not holding back *Jencks* statements. What we are not agreeing to is to say 45 days before trial, that is it, no more *Jencks*.

THE COURT: Well, I -- to the extent that it would have been the intention of the defense for that, or any other deadline, that if the interview takes place thereafter, if the report is prepared thereafter, that it would be barred because of that arbitrary date, I certainly -- that is not something that I would ever order.

Look, the fact is in this district, this would be an extremely, extremely, extremely unusual request. There is big cases all the time, there are cooperators all the time, and this relief is not sought, and if it's sought, then to my knowledge, it isn't granted.

11:56:50 So I'm going to deny this without prejudice. I mean, just keep on talking to each other, and just act in good faith. Get stuff out as soon as you can, but just keep in mind that other than something like, look, if you interview somebody the night before trial, and then you have the statements prepared, then hand over the statement. But it just -- just -- it's going to take defense counsel a certain amount of time from their last receipt, of either discovery or *Jencks* material, to incorporate that into a, either an opening statement or a cross-examination. So just get things done as soon as you can.

11:57:29 And if the defense feels that there is some sort of foot dragging, or stonewalling or that, then feel free to raise it with me in the future. But for now, this specific request is denied without prejudice.

11:57:43 Then I believe now that that leaves us with the final motion to consider now. As I said, at the next hearing we'll consider both the motion to disqualify or dismiss based on the putative failure to hand over the information earlier, and the associated request for an evidentiary hearing. Then we will also consider and have argument on the 404(b) evidence, and then with in regard to the severance.

11:58:28 So I believe that then what is left is the Government's request for an anonymous jury.

11:58:38 So let me hear first from the Government in regard

to that request.

MR. STAPLES: Your Honor, I'm going to try to keep this very simple. We are talking about anonymous jury. What the Government is talking about is withholding the name, address, and the name of the employer of the jurors.

And we are requesting that it be withheld from counsel, as well, and I will address that.

I want to begin just with the observation that there is nothing inherently probative, for purposes of determining bias, in someone's name, or their address, or the name of the person they work for. That identifying information does not aid in the search for bias anymore than -- or not anymore. What is more probative would be information such as Juror Number 1 is a baker who works in Culver City, or Juror Number 3 is an architect who lives in Palos Verdes.

In other words, it's general information about the person that can lead to questions concerning bias, not their name, not the fact that they live on 123 Main Street in Culver City. That does nothing to advance the investigation into bias. That is what we are talking about withholding.

Why are we talking about withholding it? There has already been threats in this case. The defense focuses on, "Well, it's not our guys who are doing it." That actually makes it more compelling to have an anonymous jury.

In this day and age, finding a juror who does not

have a social media profile would be like looking for unicorns. And if their name gets out there in the press through this courtroom, there is nothing to stop every Internet troll out there from contacting them.

And I want to address this issue of whether threats are credible or not does not apply in the case of a juror, someone who doesn't work in a courthouse, do criminal cases, all right?

They -- if a juror in this case, I want to play this out, were to get a posting, an e-mail, a tweet, whatever it is that people do these days, with a threat, how is that person going to react? They are going to go in and tell their other jurors, and we are going to have a mistrial. That is one risk.

The bigger risk is there could be an attempt to bribe, not by these defendants, but by one of their supporters, or a threat to harm, right? Those are unacceptable risks. When jurors get their summons, they don't sign up for combat duty.

So we believe there is an absolute need for an anonymous jury based on the threats, based on the -- based on the way that these threats were conducted by people from out of state, using their phones, or whatever else they use, they can use social media. That threat is unacceptable, because once the threat is there, I think the game is done. I don't

12:02:16 know how we can unwind that clock.

12:02:22 To go to the second point, which I think is really the point of contention with the defense, is, "Well, why can't we get it?" My reading of their opposition was they sort of almost concede to, "Okay, well, maybe an anonymous jury is needed, but not for us."

12:02:39 My response to that is simple: From the military to playgrounds, it's an old saying but, a secret shared is a secret lost. If you want confidentiality, you keep it confidential.

12:02:55 And given my prior statement, it's a risk evaluation. As I stated previously, there is no probative value for purposes of determining bias in knowing the name, address or employer's name of a juror, versus the risk to either the safety of a juror, or the chance they might be bribed, or us ending up in a mistrial.

12:03:27 The weight is clearly on the side of keeping it confidential from all parties, including counsel.

12:03:35 The --

12:03:35 THE COURT: You would agree that whether or not, in your view, that is preferable, that there is case law on this subject, and the case law only allows what you propose to be done in very rare circumstances?

12:03:53 MR. STAPLES: Yes. Yes. And I -- we submit that this is a rare circumstance. I have done more than 50

trials. This is the first one I have ever done with threats coming from third-parties across country to a judge, and to a prosecutor that has this level of following on social media.

Frankly, that is the concern. It's the people on social media. And again, in my mind anyway, the risk that we face from either harm to a juror, corruption of a juror, mistrial, or whatever, you know, completely outweighs the benefit from knowing a person's name, address and employer.

THE COURT: Let me just make it clear what we are talking about here. You know, as you know, as the lawyers here know, in trials in this district, the names are never used in court. They are typically known to the lawyers and to the defendants.

The occupation is known, because I inquire about that in open court.

Where -- the area in which they live is stated in open court, and also is on the sheet that comes up from the jury department, but not the exact address.

So we don't need to worry about the names being revealed in open court. We don't need to worry about the exact address, which is known to no one, including me. I could find it out if I wanted to. I never have.

So what we are really talking about here is the name of the employer and the juror's name. And when you say it isn't related to bias, it is often the case that sometimes

12:06:12 long after the fact that a juror is challenged because an investigation showed that the juror just flat out lied during voir dire. And that, for counsel at least, would be extremely difficult to find that out, or to investigate that if they, counsel, at least didn't know the names.

12:06:33 So, you know, what then in your view -- what about that? That one reason that people have to know the names, counsel at least has to know the names, so they can, if they wish, conduct some sort of investigation of that juror?

12:06:49 MR. STAPLES: The Court has the name.

12:06:53 THE COURT: I'm not going to investigate whether somebody's --

12:06:56 MR. STAPLES: No. No.

12:06:57 THE COURT: -- truthfully answering the voir dire. I mean, I'm not sure what -- yes, of course I -- yes, I know the names.

12:07:04 MR. STAPLES: What I should have said is the name can be obtained from the Court.

12:07:09 My understanding is how it is handled is that the juror questionnaires, which are provided to the Court, include the identifying information of the juror, but what comes out to the parties does not have the name.

12:07:21 THE COURT: All right.

12:07:22 MR. STAPLES: So in the -- in the circumstance the Court points out, if there is a suspicion, or an allegation

of juror misconduct or dishonesty, it is simply a matter of requesting from the Court the identity of Juror Number 7, for instance.

THE COURT: Well, I'm not exactly sure how one would ever be able to make even a preliminary showing if you didn't know who the person was, and you hadn't taken some effort to try to do it.

The other thing would be is by knowing what you do know, try to identify the person, and figure out their name, and then go ahead and do that. And if that is something that would be permissible, then why not let counsel at least, if nobody else, know the names in the first place?

The -- this, of course, presumes that there will be a questionnaire. Sounds like it would be a good idea in this case, but we have yet to discuss that.

So anyway, I'll give you a chance to respond, but let me hear from the defense.

MR. BRAYMAN: Thank you, Your Honor. John Brayman. I'm one of the lawyers that represents Mr. Banks.

The phrase that Mr. Staples used I think was, a secret not kept is a secret lost. And but for the motion to empanel an anonymous jury, the secret that had been kept from us for seven months would have never been known by us.

And because now that cat is out of the bag, there are other motions that have followed. But a secret not kept

is a secret lost. This -- this case, this investigation, and the motion itself to empanel an anonymous jury, is informed by the Internet, and by unreliable cooperators, and by associations that they want to impute to Mr. Banks, and to his codefendants.

In terms of the motion itself, the Court has our briefs, and the different arguments that we have made, but as a starting point -- and the Court remarked on this, that empaneling an anonymous jury is a drastic and exceptional procedure that must be supported by a strong showing of factual necessity.

When we look at the factors under the Ninth Circuit case law, the most prominent one is defendant's connection to organized crime, and the second one being capacity to harm jurors.

The Indictment reads in a way, it's a conspiracy indictment, that Only The Family -- Only The Family, "OTF", is a conspiracy. OTF is phrased in a way throughout this case and through the investigation that OTF is this criminal enterprise. And we have seen this throughout, but that people are OTF members and OTF "associates," and the reliance on different words and actions of third-parties that are attributed to Mr. Banks.

OTF is not a criminal enterprise. OTF is the RICO enterprise that was not in this case. And the motion itself

is animated and supported by what the Government wants the Court to afford PW2, which is credibility that he does not have in any way.

And we know this, and we have known this, but we -- we know this even more so because just Friday, we got his -- for the first time, we have been asking -- for the first time his videotape interviews from the FBI when he was -- right after he was arrested at the Waldorf Astoria in Downtown Chicago.

And they gave him a choice. They presented him with a choice, and I think this is important for the Court to know, because the Government is asking the Court to give credibility to the assertion that PW2 says that Mr. Banks made a comment to him at the MDC that, "The guys think you are weak."

And PW2 is presented with a choice after he's arrested, and the choice, and it's very stark, in the words of the supervising special agent in the case, Cody Burke, and later Sarah Corcoran, who is not here today, but has been here throughout the proceedings, the choice is: "Life in prison or give us who is behind this, because we don't think you are behind this, and you didn't pay for this."

And he very much a -- somebody who is assessing things, quickly says, "No problem. I'll play for your team."

But in -- in that interview, which spans about five

12:12:22 minutes between at the hotel and then back at FBI 12:12:25 headquarters in Chicago, it is clear that PW2 is a documented 12:12:36 liar, a manipulator, and a fraud of the highest order. And 12:12:39 that is not just one of Mr. Banks's attorneys saying that 12:12:44 because it's our constitutional duty to advocate for him, 12:12:47 that is very much what the agents intimated to him 12:12:55 throughout, including Cody Burke and the case agent, Sarah 12:12:59 Corcoran.

12:13:00 And when they pressed him about different things, 12:13:06 they asked him about -- about the guns that were used in the 12:13:14 murder, and who.

12:13:18 MR. YANNIELLO: I'm going to object, Your Honor.

12:13:20 THE COURT: Yeah. Counsel, I really -- I would 12:13:22 prefer that you focus more on why the Ninth Circuit standard 12:13:26 and Supreme Court standard has not been met, and then why -- 12:13:30 I understand you are saying that the Government is relying on 12:13:33 a particular person, this particular person is not credible 12:13:35 enough to hold up this edifice of the anonymous jury. I 12:13:42 understand that argument.

12:13:43 So what else in support of your opposition to the 12:13:47 request? And what exactly are you -- is the defense 12:13:50 proposing? That you get the names, but only for the 12:13:55 attorneys? That you get the true employers, but only for the 12:13:59 attorneys?

12:14:01 You know, what -- what -- is there a

counterproposal, or something that you could live with?

MR. BRAYMAN: I think -- and we have submitted this, I think what we can live with, is that the information that is sought to be kept secret from us through the Government's motion, that that information be shared with counsel and the accused.

The public is a different -- is a different thing, and certainly the public does not -- does not necessarily need to know who the jurors are.

In many ways, Judge --

THE COURT: Well, they don't. I mean, they won't. I'm just saying that right now. You are implying that it could be different. It will not be different. That is the way it is in any trial. I had a misdemeanor case here two weeks ago that went to trial, that was the case there. The public is not going to know the identity of the jurors.

MR. BRAYMAN: Very good, Judge. And we are not asking for the public to know.

In this case, though, you know, because this is a later factor, but we are asking that the names, the addresses and the employers --

THE COURT: Well, you are not going to have the addresses. I have told you that. No one ever has the addresses in this district. You just don't get it, okay?

So if you feel that you have some legal right to it,

which the public defender has never requested, then go ahead and ask, and I'll rule on that.

But the fact is I am telling you, the normal practice here, the universal practice here, is that neither I, nor the prosecution, nor the defense has the precise address of the jurors. There is -- obviously, the summons was sent out, somebody downstairs in the jury department has it, but none of us know what it is.

MR. BRAYMAN: Judge, and I understand the Court very well in terms of the precise address. That is our request. And the request would be that the city, the county of the potential juror be made available to not only the counsel, but also to the defendants.

The public is a different issue, but we are not here to advocate for the media or the public's right to know. We do not have -- you know, it's -- part of this is about the extensive publicity. This is not a case where the Court has media intervenors, who are seeking the public's right to know.

And this case very much in terms of the publicity that has happened, is an industry-focused publicity. It is not CNN, and it is not the *New York Times*, it's not all of those paparazzi surrounding the courthouse in a scrum that we have to get through when we are coming and going from court. It's not. It's a bunch of people that are on their phones

that look at this very specific industry-focused publicity.

But, Judge, the motion itself is animated. And, you know, there is an exhibit of Special Agent Farmdy who submits different factual things within the declaration in purported support of the motion for an anonymous jury. Some of those things, and I have referenced them, are this statement that they say that Mr. Banks made to PW2. Judge, I think -- and we can submit more on this -- but I think very much has -- PW2 has no credibility at all. But I don't want to belabor that point too much.

Also, it's based in ways also on the Internet. And you will see that based on the declaration, but it says open source intelligence and conversations with others. These are not specific factual support for the motion for anonymous jury. And in the -- in the motion itself, it talks about Mr. Banks's statements that are public about that his dislike for "rats" or cooperators or informants.

And that is very specific to Mr. Banks. And it's not -- it's not a situation where he is charged in a case, and the Government is coming to the Court with specific factual evidence that -- well, actually in this other proceeding, Mr. Banks, him and others, sought to pay off a jury, or sought to obstruct, like in R. Kelly's case in Chicago, where he was alleged to have bought off a jury through other people. And that you have very specific

factual evidence that the defendant who is before me has actually taken these steps in the past to obstruct.

And the statement that Mr. Banks made, and it's well-known, but Mr. Banks made that statement because when he was seven months old, his father was taken from him for almost 30 years. And that was after a trial where there were cooperators, and people who testified against Mr. Banks's father Dontay Banks. Through grace and perseverance and diligence, Mr. Banks came home after getting a life sentence. But very much that was a foundational memory for Durk Banks, that his father was taken away from him by what he perceived as rats, cooperators, people that were turning as government witnesses against his father.

And so it's not about this case and him talking about, you know, rats in this case. There are certainly cooperators in this case, but what they attribute to Mr. Banks in terms of the statement at the MDC, Judge, I don't think it has any credibility in terms of PW2.

But the statement itself about, you know, about cooperators and his dislike for them, that does not -- that is not a basis for the motion itself.

In terms of, you know, the motion, it is an extraordinary procedure to seek an anonymous jury. And in a way, you know, the Government, in the filings, they kind of shift the burden to us in a way saying, "Well, you guys don't

really need this information. It's not that relevant to voir dire." But it -- it absolutely is.

Who people are, and what city they live in, what county they live in, who their employer is, what their life experience is, all those things are relevant.

The names themselves could be relevant to our assessment to motions that may challenge the cross-section of the community that is going to be -- is going to be determining Mr. Banks's fate in this case, that he be judged by a jury of his peers.

And that has a lot of complexity to it, and the names go to that. They inform our decisions before trial and at trial. And all of those things are relevant to our ability to protect Mr. Banks and exercise his Sixth Amendment rights in this case.

And, Judge, I absolutely take the Court's point about the precise address, but, you know, in terms of city, county, I think that is very relevant to our ability to get a fair -- pick a fair and impartial jury in this case.

THE COURT: Well, it's not clear to me the Government -- as to that, as opposed to the names or the employers, as necessarily even disagreeing with you.

But thank you very much.

Let me hear the Government's response.

MS. MOEEL: Before the Government responds, can I

add just one highlight to it?

THE COURT: You may.

MS. MOEEL: Thank you.

I just want to highlight, Your Honor, what he said with respect to why it is important for us to know names.

We do have an independent duty to both sides, all sides -- in fact, I would be surprised if the Government wouldn't want to know the names of individuals -- to be able to make sure that there are -- if there are any *Batson* challenges that we need to make, we need to be able to understand if an individual is a member of a protected class.

And if an individual is a member of a protected class, that is not always obvious from what they look like, especially in today's day of mixed identities.

So if I want to understand if somebody is white presenting but has a Latino last name, a Spanish surname, or has a South Asian surname, and they are being struck in a particular pattern, that might be something that I would want to address. And I wouldn't necessarily know that based on what they look like.

And so that is, I think, an absolutely important feature of knowing who the jurors are, so that we can exercise that constitutional duty; in fact, so the Court, and so that the Government, and in fact, anyone in the courtroom can raise a *Batson* challenge. And that is -- it's an

12:23:15 important consideration, I think, for the Court to know when thinking about whether or not --

12:23:21 THE COURT: I disagree that an observer could raise a *Batson* challenge, but otherwise I understand that.

12:23:27 MS. MOEEL: Jurors can raise *Batson* challenges themselves. A juror can raise a *Batson* challenge on their own behalf.

12:23:34 But in any event, I wanted to highlight that very important point that Mr. Brayman made.

12:23:38 THE COURT: Thank you.

12:23:39 Let me hear from the Government.

12:23:42 MR. STAPLES: The idea that the name is needed, we just do not agree with that for purposes of a *Batson* challenge. If we don't have the names and they don't have the names, I don't see how there could be a *Batson* error committed by the Government based on somebody's name if we don't know their name.

12:24:14 The argument about PW2, his credibility, it's irrelevant at this point. What we have, undisputed, are threats have been made. And the question is: What is the best way to deal with those threats?

12:24:33 And the concern that the Government has is disclosing people's names, as I've already stated. And the suggestion that they can be given to counsel and the accused is unacceptable.

12:24:51 Mr. Banks was found with a -- with an Apple watch with cellular capabilities in his possession in MDC after he had already committed numerous violations, as the Court may recall during the detention hearing, by paying others to let him use their PIN to make more calls than he was allowed to.

12:25:16 And we are supposed to take faith that someone who would do that would not do anything with a juror's name.

12:25:25 So giving it to the accused, in the Government's view, is completely unacceptable. This was a violent crime. This was a crime that reached halfway across the country, to shoot down a man in a gas station by people who have no connection, or most of the people had no connection with this district whatsoever. That is a concerning and violent crime.

12:25:50 And what is before the Court is, what is the most efficient way to protect the safety of the jurors and the integrity of the trial?

12:25:59 And we submit that the safest way to do that is to keep their names confidential to the Court, subject to disclosure to the parties when needed.

12:26:11 For instance, if they believe there was a *Batson* issue, they could ask the Court on a side bar what the person's name was.

12:26:19 THE COURT: All right. Thank you, Counsel.

12:26:20 This is taken under submission. As I said, the actual addresses will be known to no one. The names of the

12:26:32 jurors will be not revealed in court.

12:26:39 The issue -- generally, the names of the employers are revealed, but we could use questionnaires, and then the specific employers would be known either to counsel only, counsel and the parties, not known to anybody, but just their general, the nature of the employer.

12:27:04 Obviously, the -- Mr. Banks and the other defendants are going to have an interest on whether somebody lives in Beverly Hills or Compton, as any defendant would, any defense attorney would, whether they are working in the music industry or not.

12:27:21 But that doesn't necessarily mean that the specific employer has to be revealed in open court, although typically it would be, but that is not necessarily something that has to happen here.

12:27:34 I think the real question becomes, then, and the parties have focused on this, is whether the parties should know, whether counsel should know, or not. And that is something that I will -- I will need to think about.

12:27:50 So this motion is also taken under submission.

12:27:53 Let me just deal with some really basic trial mechanics here.

12:27:59 How long does the Government predict that its case in chief would last? How many trial days?

12:28:08 MR. YANNIELLO: Your Honor, we predict approximately

three to four weeks for trial. Really, a lot of that will depend on the defendants' cross-examination of witnesses, as we articulated, and we'll argue during the next hearing in connection with our 404(b), really the case, the Government doesn't anticipate much of a dispute in terms of the actual murder here; the crux will be proving up who did it and why.

We think that will take approximately three to four weeks.

THE COURT: All right. Is there any sense on the defense, obviously putting aside whether any defendant would testify or not, on how long the defense case would take, or are you just simply not in a position to even give an estimate now?

MR. FINDLING: Your Honor, respectfully, I don't want to procrastinate. I think at the conclusion of the Court's ruling on 404(b), we'll be better able to do that. I hate to procrastinate, but I just think I'm not going to be able to really give you an exact day.

THE COURT: I understand.

Then talk -- the parties should talk to each other, or counsel should talk to each other, and then talk with Ms. Sanchez. And it doesn't have -- I'm not saying right now, but figure out when the Government would be able to get in its opposition to the last motion. There was a reference to December 1st, maybe it could happen earlier than that, maybe

not, and then when the reply could be filed, and then when we could have a hearing, and then we'll address some of these other issues, as well.

And another -- the size of the jury panel for a case this long, and then also to at least make an attempt to find jurors who could serve that long, the jury department has to be apprised of that seven weeks ahead of time.

So if there is going to be a requested continuance, not because of the issues in the motions, but because of just the need of the defense to prepare, then that would obviously be appreciated sooner than later.

But again, perhaps something to discuss at the next hearing.

For now, anything else from the defense?

MR. FINDLING: Your Honor, one thing, and that is everybody has been silent, you have been bringing up the questionnaire, and you are being intuitive about that. I want to give the Court some history on that.

We brought that up first. Respectfully, to the Government, they didn't think -- this is going back a couple of months -- it was necessary. We implored them to reflect on it, and very shortly thereafter, they got back to us, and we agreed that we would do a questionnaire. So no one said anything. I felt obligated to let you know.

And I don't want to jump on the past issue, but I

mean, personally I've done cases that would need an anonymous jury a hundred times more than this case. I think through the body of the questionnaire, we can take care of that issue.

I will remind the Court that, you know, sometimes the employer is important. I can remember immediately after the Black Lives Matter issue, when we tried cases in our Northern District of Georgia, there were companies that took robust positions against BLM. And we represented African-American clients, we needed to know that those corporate entities, that were vocal in their despisal of BLM supporters, probably weren't the best fit.

And I loved what counsel brought up about *Batson* and reverse *Batson*. I have said to many a judge, I don't want to get reverse *Batson*. I need to know something about this person; otherwise, quite candidly, I'm going to violate *Batson*, because I have no other choice.

So we are in need of information. And sometimes we -- I self-identify as a lawyer, and some people self-identify with their corporation and company they have spent 40 years with. I think that could be handled in the body of a questionnaire by parties that have, the Government can't deny this, that have really abided by the protective order, and the attorney eyes only.

And I will state in my place that Mr. Banks truly

12:32:29 has understood that fact, and we adhere to that. We have internal policies at our firm, it's a small firm, five lawyers, whenever there is protective order material, someone must be in the room. We don't leave things in abandoned cars. We respect that, and we will have equal respect if the Court says, I'm going to let you know these things, unfortunately, Mr. Banks doesn't care if somebody works at Arby's, okay? He's going to rely on us to that degree.

12:32:59 And so we will give, and we assure the Government as well, tremendous respect to whatever order is given to us, but we think it could probably be done in the body of the questionnaire.

12:33:09 So I appreciate, and I felt like we needed to let you know that has already been spoken about.

12:33:12 THE COURT: All right. Then also, obviously, there is just a lot of issues on a case of this sort to decide when those would be done, would they be brought in, would they be sworn in?

12:33:21 As a defense attorney, I have dealt with a questionnaire, but not as a District Judge. Obviously, many of my colleagues have done so, so I'll get their advice.

12:33:32 All right. Anything else from the Government?

12:33:36 MR. YANNIELLO: Your Honor, I assume counsel is actually going to raise, for the first time today we heard that there may be a request for a continuance. We don't know

12:33:42 of the basis for that, but I guess we are going to hear right now.

12:33:46 MS. MOEEL: Thank you, Your Honor.

12:33:47 Well, it sounds like -- and I would be happy to provide more information by way of a written pleading, but, yes.

12:33:53 So Your Honor may not know, but I came into this case in June, eight months after it had already been indicted, and have -- and did agree to a January trial date, hoping upon hope that I would be ready, and have reviewed the 37,000 pages of discovery, and have been doing well in doing so, and preparing for today, and have made significant strides in many ways. And as Your Honor might know, I have also applied to the CJA for ancillary funds, so that I can have a paralegal and investigator, so we are doing our best.

12:34:30 But discovery keeps on coming. And what we know, we are going to anticipate, is a bulk of material that we'll need to review, some of that is the phone discovery that may or may not be 20 terabytes. We were asked to provide a 20 terabyte hard drive. And much of that will also be jail calls of the cooperators and the codefendants themselves.

12:34:51 And so while I don't anticipate listening to every minute of a jail call, I will have to do my best to review all of that, while also preparing for in-limine motions, while also preparing for examinations.

Previously, we had been told repeatedly that the Government's case would be two weeks long. Now we learn that it's -- for the first time today, that it's three to four weeks long. That may be impacted by the 404(b) evidence that Your Honor rules on. But that is -- that would be -- that is good to know, as an out-of-town lawyer with two small children, what I am getting myself into.

But I think that I will be making a record, I know that I'm joined by Mr. Wilson and Mr. Lindsey with respect to a continuance request, and it is going to be a reasonable one.

THE COURT: All right. Counsel, let me just say, when I asked, I would rather know it sooner than later, I didn't mean right now.

MS. MOEEL: Okay. Great. Thank you. That is all I have to say.

THE COURT: Talk to all of your colleagues, and obviously Mr. Banks has an interest in this, and then talk to the Government, and then put something in writing, and we'll deal with it.

MS. MOEEL: Thank you. I will, Your Honor.

THE COURT: All right. Thank you, Counsel. I will see you, then, at the next hearing. All right. Thank you, Counsel. Thank you, gentlemen.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR November 20, 2025

S/ Amy Diaz