**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DEANDRE DONTRELL WILSON,**<br>**DAVID BRIAN LINDSEY,**<br>**ASA HOUSTON, and**<br>**DURK BANKS,**<br><br>**Defendants.** | **Case No. CR 24-621 MWF** |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**PRETRIAL CONFERENCE and MOTIONS HEARING**
**WEDNESDAY, JANUARY 7, 2026**
**10:10 AM**
**LOS ANGELES, CALIFORNIA**

**MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR**
FEDERAL OFFICIAL COURT REPORTER
3470 TWELFTH STREET
RIVERSIDE, CALIFORNIA 92501
(949) 328-4414

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

BILAL A. ESSAYLI
Acting United States Attorney
BY: IAN V. YANNIELLO
BY: DANIEL H. WEINER
BY: GREGORY W. STAPLES
Assistant United States Attorneys
312 North Spring Street
Los Angeles, California 90012

**FOR DEFENDANT DEANDRE DONTRELL WILSON:**

HARBAUGH LAW, PC
BY: CRAIG A. HARBAUGH
Attorney at Law
360 East 2nd Street, Suite 800
Los Angeles, California 90012

**FOR DEFENDANT DAVID BRIAN LINDSEY:**

LAW OFFICE OF TILLET J. MILLS, II, PLLC
BY: TILLET J. MILLS, II
Attorney at Law
4101 Greenbriar, Suite 210
Houston, Texas 77098

**FOR DEFENDANT ASA HOUSTON:**

MOEEL, LAH & FAKHOURY LLP
BY: SHAFFY MOEEL
Attorney at Law
2006 Kala Bagai Way, Suite 16
Berkeley, California 94704

**APPEARANCES OF COUNSEL, CONTINUED:**

**FOR DEFENDANT DURK BANKS:**

LAW OFFICE OF CHRISTY O'CONNOR
BY: CHRISTY O'CONNOR
Attorney at Law
360 East 2nd Street, Suite 800
Los Angeles, California 90012

THE FINDLING LAW FIRM PC
BY: DREW FINDLING
BY: MARISSA H. GOLDBERG
Attorneys at Law
3575 Piedmont Road, NE, Tower 15, Suite 1010
Atlanta, Georgia 30305

BREEN & PUGH
BY: JONATHAN M. BRAYMAN
Attorney at Law
53 West Jackson Boulevard, Suite 1550
Chicago, Illinois 60604

**ALSO PRESENT:**

JARRON FARMBY, FBI Special Agent

WEDNESDAY, JANUARY 7, 2026; 10:10 AM

LOS ANGELES, CALIFORNIA

-oOo-

THE COURTROOM DEPUTY: Calling Item Number 1, Case Number CR 24-621 MWF, United States of America versus Deandre Dontrell Wilson, David Brian Lindsey, Asa Houston, and Durk Banks.

Counsel, please rise and state your appearance for the record.

MR. YANNIELLO: Good morning, Your Honor. Ian Yanniello, Danny Weiner, and Greg Staples for the United States. And with us at counsel table is FBI Special Agent Jarron Farmby.

THE COURT: Good morning, counsel.

Good morning, Special Agent.

MR. FINDLING: Good morning, Your Honor. Drew Findling, Marissa Goldberg, Jonathan Brayman, and Christy O'Connor on behalf of Mr. Durk Banks who is present.

THE COURT: Good morning, counsel.

Good morning, Mr. Banks.

MS. MOEEL: Good morning, Your Honor. Shaffy Moeel for Mr. Asa Houston who is present before the Court.

THE COURT: Good morning, counsel.

Good morning, Mr. Houston.

MR. HARBAUGH: Good morning, Your Honor.

Craig Harbaugh on behalf of Mr. Wilson who is present.

THE COURT: Good morning, Mr. Wilson.

Good morning, Mr. Harbaugh.

MR. MILLS: Good morning, Your Honor. Tillet Mills on behalf of David Lindsey who is present before the Court.

THE COURT: Good morning, Mr. Lindsey.

Good morning, counsel.

And let me wish all of you a happy new year and a happy new year to those in the courtroom.

Let's start, I guess, in reverse order of what we did last time, going from things that are procedural to things that are more legal. Let's talk about the continuance.

I -- you've submitted a proposed date of May 4th. I will note that, as always, these matters involve communications with the Court's courtroom deputy who told you that May 4th was not a good date for me. Apparently it's a date that you want, but -- since you chose to submit it despite that.

But, first of all, of course, there's the issue of the Henley case in front of Judge Aenlle-Rocha. What happened yesterday in regard to that?

MR. HARBAUGH: Yes, Your Honor. So yesterday we had a hearing regarding the motion to continue filed by two of the defendants. The Court --

THE COURT: Excuse me, counsel. Let me get my notes.

All right. Go ahead.

MR. HARBAUGH: Of course, Your Honor.

The Court went through with each defendant's counsel with regard to alternative dates generally in September or January 27. The Government maintained its opposition.

I will note, as I've noted in my filing and my representation to the Government, that Mr. Henley -- my client does not waive his speedy trial rights. However, we did very clearly state on the record that, if we were forced to proceed on May 4th, that we would be providing ineffective assistance of counsel.

The Court took the matter under submission and indicated he would provide a ruling expeditiously, but we don't have any word yet.

THE COURT: Then -- thank you.

Let's assume, then, in light of that representation for the moment that you would be available in this range of time. I -- I -- it seems to me that the reason which is being given for this trial to not start earlier than May 4th, which, of course, would have the advantage of minimizing the delay from Mr. Banks' point of view, since he didn't join in the stipulation, was the Stokes trial in Texas.

So, counsel, tell me about the Stokes trial as in what's happening with it, why do you think it's going to go, how long is it supposed to take. What's happening with that?

And for all of you, you can speak from where you are, assuming the court reporter can hear you. So -- but if you wish to approach the lectern, you're certainly free to do so.

10:14AM All right. Counsel.

MR. MILLS: Good morning, Your Honor. In this case, it's in front of a judge who doesn't typically grant continuances that often. In fact, he told us that there would be no further continuances.

10:15AM I spoke with my client. And I'm not sure if he's inclined to plead or proceed to trial. However, as you know, we have to be prepared for whatever may come our way.

As far as that goes, I am amenable to other dates. Apparently -- I mean, it's four sets of lawyers, so dates are 10:15AM hard to coordinate. But we've spoken. And the May 4th date works for me as well, Your Honor.

THE COURT: How long would the trial in Stokes take if the case were, in fact, to go to trial?

MR. MILLS: It's a medical pill mill case. It would 10:15AM take about a week and a half, two weeks.

THE COURT: Then this is subject to a lot of caveats, obviously. But what I am going to do is -- and I'll issue an order, but I'm going to move up your proposed May 4th date by -- to the 28th or the 21st since it seems that, even if 10:16AM the Stokes case should go, it would be finished.

And I realize, counsel, you're going to need some time, then, to prepare for this. But what that means is you're just going to have to be preparing for this while you're trying the Stokes case, if that should happen.

10:16AM But I'll -- I'll issue an order that -- and then, of course, this also depends, then, what happens in the Henley case. So I'm going to hold off until I have a chance to talk to Judge Aenlle-Rocha about Henley and find out what's going on there.

10:16AM But, counsel, you should presume, then, that this trial will start on the 21st or the 28th. And then that will, to some degree, lessen the amount of time which is occurring when Mr. Banks did not join in the stipulation.

And I'm going to ask the Government to prepare a
10:17AM proposed findings of fact and conclusions of law as to why it is appropriate to continue the case as to all defendants when Mr. Banks did not join in the stipulation.

The fact is the Ninth Circuit case law on this point is very clear that, when there is a conspiracy that involves
10:17AM all of a number of defendants, that it not only is permissible but, in fact, it's desirable to have there be one trial and to have all of the defendants be joined in that trial. And, of course, this is not -- this is not to prejudice for -- for now the request for the severance, which we'll get to later.

10:18AM Anyway, counsel, any -- any questions for me?

MR. MILLS: No, Judge.

THE COURT: Thank you, then.

MR. MILLS: Thank you, Judge.

THE COURT: The -- and, of course, I'll expect the Government's proposed findings of fact and conclusions of law to stay, other than what's -- I mean, really, this is apparent on the face of the Indictment -- as to why all of the cases are intertwined. I mean, you've essentially done that by opposing the severance motion.

Let me take up, then, again, on -- from a procedural point of view the request that was made about the -- the SHU. So let me -- let me find out what the situation is here.

And one thing that was unclear to me from the papers, whether the -- the concern, which is a perfectly understandable and legitimate concern, just simply from Mr. Banks on how he's being treated, where he's being housed or does counsel also feel that how he's being housed now is interfering with trial preparation because those are -- those are both important issues but they're separate issues.

MS. O'CONNOR: I -- I think both, Your Honor. And I would add, I mentioned the Eighth Amendment in my filing. And I also add the corollary -- the Fourteenth Amendment, which I believe applies in pretrial circumstances.

You know, we need -- we need a client who is healthy and well and able to contribute to his own defense. I wrote in

my papers that he's locked down for 23 hours a day -- and Mr. Banks has corrected me. It's 24 hours a day. He gets a little bit of yard time Monday through Wednesday, three days a week.

10:19AM And so you can understand what that does to a person. He's been in there four-and-a-half months with no human contact except for the guards through a small opening in his door through the bars. I'm the only person he's had human contact with really. And, you know, I go to see him as much to 10:20AM discuss this case but also just to keep him well, to the extent I can.

And it's frustrating. And it -- at times, I felt that we're in some kind of dystopian alternate system where people don't have rights, where people don't have process. We 10:20AM have speedy trial rights when it comes to trial, but the spirit of that is really not being honored in this circumstance.

The other gentleman who was caught with an Apple watch during the same sweep as Mr. Banks, he's back in -- he's been back in general population since October. He received his 10:20AM process. Mr. Banks has not.

He's trying his best to take care and to follow the administrative process within B.O.P. and by way of example, he submitted the first form, the BP-80, waited, waited, and then he was told that they didn't have the form he submitted and 10:21AM that he should resubmit. And Mr. Banks, to his credit, told

them, "I did submit it. You cannot pretend that I haven't." Then miraculously they found it.

When he received a response, finally, it's -- it's just more of the same runaround. He received a response on December 11th that says the conclusion is your case is pending investigation. And then "investigation" is crossed out and it says capped "IN REVIEW."

And this is the runaround we've been getting. Is he in there because of the investigation that the U.S. Attorney's Office has been doing as it relates to his criminal case or is the captain just keeping him there because he doesn't like that he's high profile and he feels that he should languish? And that's truly what it feels like.

So I mentioned in my papers that, um, we got this letter from the warden that made a representation that Mr. Banks has had the opportunity to be present at a monthly review. That is not true. I've been monitoring this. I've been seeing him iced on my Sundays in the SHU. That has not happened.

Only after I requested discovery to show proof of that, because I knew it was a lie, did they for the first time last week offer him the opportunity to be present at a monthly review.

And it's just -- it's really unacceptable. And taking off my lawyer hat for a moment, on a human level,

it's -- it's not morally right. And I've watched him. And he is -- I mean, you can see how he looks. And he is a calm person, he is a strong person, but I've been watching him fray.

10:23AM And so I had to raise it with the Court in good conscience. And I know that Your Honor doesn't -- you can't tell the captain what to do. I wish you could. But I think that there should be some sort of oversight here.

10:23AM After -- after -- you know, I've been sending these e-mails and I sent the e-mail requesting discovery on some of the inconsistencies and misstatements that I've noticed in the warden's response, only then did the lieutenant finally sign the incident report. He's had it on his desk since August 29th. It's been sitting there. He only signed it on January 3rd. And this is what we're dealing with, and it's

10:23AM frustrating and it's wrong.

And I -- you know, I think recognizing, you know, that Your Honor doesn't control the whole world, I think we should set this for a status perhaps in 30 days because there's -- there's got to be -- this has to move along.

10:24AM I'm informed now by the Government that now the investigation -- the disciplinary process will begin for Mr. Banks. Four and a half months. I've been doing this for 20 years. I've never seen somebody confined to the SHU as punishment for longer than 90 days. Never.

10:24AM The other gentleman, like I said, he's come and

10:24AM
gone. He's been back in general population since October. Since Mr. Banks has been in the SHU -- I'm aware of who's coming and who's going. There were a bunch of defendants who are allegedly affiliated with the Mexican Mafia. They were all caught with cell phones. They've come and gone.

And so I think the only thing I can ask of Your Honor is a status in 30 days so that at least they know that they can't just -- you can't keep somebody in solitary confinement because he's a successful artist.

10:24AM
THE COURT: I'm going to set a status conference in 30 days on this topic. Nothing else will be discussed. The other defendants don't need to be here or their counsel don't need to be here. Of course, counsel are free to be in the courtroom, if they wish.

10:25AM
But the other thing I can do is to talk to the Bureau of Prisons regional counsel. As you've acknowledged, I do not have the authority to tell the warden how to run the Metropolitan Detention Center. However, Mr. Banks is legally in the custody of the marshal who is housing him in a facility

10:25AM
of the Bureau of Prisons. So, therefore, I do have some more authority than would be the case if he had been sentenced and/or -- I should not -- he in particular but anyone that is sentenced and then is -- or remanded to the custody of the Bureau of Prisons, which is to say in the executive branch.

10:26AM
So I -- and what I've found is, if I discuss this

with the regional counsel, then finding out exactly what the concerns are or is there a way to accommodate them, then we can figure out what's going on here.

Obviously on the disciplinary matter, as to whether there should be discipline or what the punishment should be, that really is within the authority of the warden.

Therefore, the -- what we will do is set this on -- for February 9th, 2026, at 11:30 AM. As I said, the remaining defendants and counsel are not -- will not be required to be here, and we will limit the discussions solely to what is happening with Mr. Banks at MDC.

And perhaps the matter will become moot by then.

All right. Thank you, counsel.

MS. O'CONNOR: Thank you, Your Honor. I appreciate it, and Mr. Banks does too.

THE COURT: You're welcome.

Let's -- because the trial is going to be continued one way or the other, then I will have a -- I will not discuss today the Rule 404(b) and severance issues.

But what I want to ask the Government is -- I don't want this to be a moving target. Has -- is there any doubt as of right now that the evidence related to the Rule 404(b) has been provided, that the incidents -- you know, what's listed in the motion in limine are, like, ten different incidents that are disputed. Has that all -- has it been disclosed?

I don't want to go through all of this and then find out -- look, I know, Mr. Yanniello, you raised this last time. And everything we discuss here is subject to what things are now. Obviously, if the Government finds some other incident which, in its view, is appropriately admitted with Rule 404(b) or not excluded by Rule 404(b), then, of course, you're going to raise it. But then you would have to make that known promptly.

What I'm asking now is not for you to predict the future. What I'm asking is, as of right now, has the defense gotten both the notice of those incidents which would be considered 404(b) and the evidence which is backing that up so we can have an intelligent hearing on these very, you know, precise, detailed evidentiary issues.

MR. YANNIELLO: Yes, Your Honor. I think we took -- we went through great pains to provide a -- a very inclusive notice based on a meet and confer. As the Government's briefed, much of that evidence, we believe, is inextricably intertwined or direct evidence.

We took care to explain that -- just for, you know, full disclosure, a caveat that with the -- there is a review continuing, which we hope concludes soon, of digital evidence. So everything that the U.S. Attorney's Office has in connection with different events and 404(b) incidents has been produced, has been disclosed. To the extent we receive more digital

evidence that broadens the scope or raises something new, we will -- we will produce that promptly.

THE COURT: And when you produce it, highlight, then, that significance. Don't just say, okay, here's a bunch of digital data. I mean, at this point, I think it's incumbent on you, if you're giving notice pursuant to Rule 404(b), you have to say, Here's a bunch of stuff. And in this bunch of stuff, here is the stuff that relates to the Rule 404(b) for these reasons.

10:29AM

Because, otherwise, to just throw it at the defense, especially if it's voluminous, isn't really -- or it might be buried in things which have already been produced and would seem to be repetitive. It's not really fair to the defense.

10:30AM

MR. YANNIELLO: Of course, Your Honor. And I think the discovery in this case is very organized or fairly organized, I think, certainly from our vantage point. And we will do that. To the extent we are producing new 404(b), we will identify that in our disclosure -- in our cover letter referencing the discovery.

10:30AM

THE COURT: All right. Thank you.

10:30AM

Then -- all right. Mr. Banks's counsel first and then --

MS. GOLDBERG: I think you were probably going to stand up and say the same thing. Great minds think alike.

But, you know, I obviously disagree, to some degree,

10:30AM

with what Mr. Yanniello just told the Court. We do have concerns with the notice being sufficient. Particularly, I think -- you know, there's some items where I would say that, yes, you know, particular text messages, whether it's a Bates stamp and they've identified the Bates stamp, I would agree that that is sufficient.

We have a couple of incidents where -- specifically as to the songs, the lyrics that the Government has proposed to introduce. And I've addressed this with the Government. I tried to resolve this issue.

Where we're concerned, that we don't know exactly what that means. So just saying a song is very different from this portion of the song, whether it's going to be in writing, whether it's audio, whether it's the music videos. Those are all very different analyses for the Court to do when that time comes. And we're concerned that we're not given that notice and they would not provide any particularity as to that issue, even though we asked.

And so we don't think it's sufficient because I -- you know, we can't just be guessing. Those are different analyses. And the Court has to make a very thorough review of these things to determine whether these things are admissible or not. So we would ask the Government to be more specific.

Additionally, some broader incidents, there is a pending case in Chicago, *U.S. v. Montgomery Wilson* is a pending

federal matter. I think it's been severed to two matters. And we have asked in a letter to the Government to have further discovery as to that issue. We've been provided very limited discovery from that case. And they have refused thus far to give that to us.

10:32AM

So we're asking the Court to have the Government be more particular about what they intend to introduce so that we can properly address that when the Court is prepared.

THE COURT: All right. Counsel for Mr. Wilson.

10:32AM MR. HARBAUGH: Thank you, Your Honor.

Your Honor, the -- my concern is the timing and how the case is proceeding. The Government -- we worked with the Government and they agreed but with the caveat to provide the 404(b) notice, that it didn't have to be all-encompassing so we could resolve this early.

10:33AM

It's particularly critical to Mr. Banks but certainly to Mr. Wilson as to whether he's going to need to defend against, as the Court noted -- and I count at least seven types of evidence but quite extensive.

10:33AM And so, Your Honor, I -- I acknowledge the Court's concern that we want to make sure we've been provided everything so it's a -- a fruitful discussion. But what we would ask, given that the Court has already said -- and it doesn't have to be that same day -- that we schedule something for 30 days out so we can resolve this sooner rather than

10:33AM

later.

The other thing, Your Honor -- and I will confer with the Government -- after the parties had completed the full briefing on the notice, the Government provided a supplemental notice identifying four songs by Mr. Wilson. So my intention would be to file our own motion in limine to exclude it under 404(b). In addition, granted, we already joined Mr. Banks's motion.

So I will confer with them. But, Your Honor, I would ask that we set something sooner rather than later so that both parties have a clear understanding as to whether this will be a joint trial or a severed trial and what evidence is coming in.

THE COURT: Then we'll -- I'll have Ms. Sanchez work with you. It may or may -- perhaps it will be the 9th. But sometime right around the 9th, you know, around 30 days from now we'll have that hearing.

And in the meantime, I want the Government to -- and -- to make sure that it is providing everything that it currently has. And as part of that, it does seem reasonable to know, not just, oh, well, there's a song but the medium, is this the video, is this -- because, while it might not technically be part of the Rule 404(b), in fact, the way it's briefed and the way it's always ruled on, that includes Rule 403. And I need to actually know which words and which

medium is being proposed in order to make an intelligent Rule 403 ruling.

So the Government's really got to follow through on that and make sure that it's not just saying, oh, there's a song and leave it to the imagination of counsel as to what the Government intends to do with that.

Beyond that, I think it's just a little bit unfair for the Government because it could be then that defense counsel would come up with many more creative ways than the Government did. And the Government's intending to use it for one purpose and then counsel fears it might be used for a different purpose and is giving the Government suggestions, which I really don't think is appropriate.

So let the Government say exactly why it intends to -- what and why and in what medium it intends to use a song, and then defense counsel can intelligently react to that.

MR. YANNIELLO: We'll do that, Your Honor. I just want to be very clear. I don't know that was exactly accurate in how things unfolded.

We provided our updated notice on November 17th. Counsel for the first time, I believe last Friday, asked us various questions about what form the lyrics -- whether we were going to be relying on excerpts or the entire song. And what I believe I proposed in response is those are issues in which the parties should meet and confer, maybe we can find a

10:36AM

stipulation.

So we propose meeting and conferring and are certainly not going to tell the defense to pound sand with respect to those requests.

But to the Court's point, I think in the same token, we don't have to lay out our closing arguments. And we will identify precisely or reasonably precise what we intend to do in terms of medium and excerpt.

THE COURT: That will be fine.

10:36AM

Then the -- and work out, while you're meeting and conferring on this, if both parties want to submit some supplemental briefing on this issue. So -- and then just make sure that I get it -- or you can have a two -- a round and then a reply or however you decide to do it. But just make sure I

10:37AM

get it just a few days before the date that we'll select for that hearing. And then I'll read all that and we'll have -- we'll have a hearing.

And then I -- all right. That hearing will be at 1:30 PM on February 9th. So all of you will be here for that.

10:37AM

Mr. Banks and his counsel will be here for the other matter at 11:30, which I hope will be mooted before the 9th.

MR. HARBAUGH: Thank you, Your Honor.

THE COURT: The next issue, which is obviously very much a trial issue, is the anonymous jury. All I'm going to

10:38AM

say about that now is it is somewhat bound up in a

questionnaire. So counsel should be meeting and conferring about a questionnaire. And I've not made any final decisions on this.

My just gut decision from last time, which, in reviewing everything for today, remains my preliminary tentative decision, is that defense counsel should know the true names and the true employers of the jurors but that those will not be revealed in court. And I -- I think the real issue, then -- and the Government, I know, disagrees with that -- will -- all the parties will be able to be heard on that.

But the real issue, I think, which is difficult is should that information be provided to the defendants as well. And in regard to that, I think there just needs to be more briefing on when in a criminal case it is appropriate to have what in a civil case would be attorneys' eyes only. It's fairly common in civil cases to do that.

For instance, if there's a trade secret that has great competitive advantage, it's understandable that the -- perhaps both parties but certainly one party does not want the executives of the competitor to have that information. I think it's a different standard and a different concern when you have criminal defendants.

So here, that's -- that's where I am right now, but we'll resolve this in when -- closer to trial when we're

dealing with the issue of the questionnaire.

On the motion for vagueness and a bill of particulars, I last time encouraged the Government to just be -- provide anything it had, be as specific as possible to either de facto or de jure to move this motion.

So let me hear, first, from the Government. What does the Government feel has occurred since the last hearing in regard to this motion? And then I'll hear from defense counsel.

MR. YANNIELLO: Yes, Your Honor. So the -- the Court's aware of the chronology, prehearing in November, essentially the defense counsel filed a reply. We supplemented the record with a filing because there was a claim that the Government had failed to provide any discovery that addressed the issues that were part of the motion.

What's transpired -- I believe the Court during that hearing gave the Government a week to supplement what was before the Court in terms of the Government submission. The Government sent an e-mail to the Court on the deadline and said we would basically stand on our submission.

My understanding is the Government -- the Court also gave defense counsel a deadline to respond. Defense counsel did not respond, I believe, until Monday. There was a filing where it raises new legal issues, new factual arguments.

What I would suggest to the Court and what the

Government requests is we want to respond in writing to that filing. We disagree with it. And we -- we, of course, want to respond in writing. Essentially, that -- that submission was a -- what I would call a draft of what the Government's closing argument would be. We are not required to provide that. Also, it's far more limited than what we believe we produced and what we believe we can rely on. So --

THE COURT: Do this. Work out with -- in anticipation of the February 9th hearing date that there will -- that you will respond in writing and leave enough time if the defense wishes. It's not required to file an optional written reply. And then we'll have a final hearing on this matter at that time.

MR. YANNIELLO: Yes, Your Honor.

THE COURT: Thank you.

Let's, then, take up the motion for disqualification or to dismiss the Indictment on which there has also been some -- I believe -- oh, no. That was for the dismissal of Count 4 where it was yesterday.

So for -- in regard to the motion for disqualification, here this would be for the U.S. Attorney's Office or to dismiss the Indictment as opposed to the issue that was addressed last time, which was for the recusal of either the magistrate judge or myself or other judges of the Court.

So on that, let me hear from counsel.

MR. FINDLING: Thank you, Your Honor.

Your Honor, I am actually going to pick up where Mr. Harbaugh left off on this issue, which is an order to make a decision on disqualification or dismissal. As Mr. Harbaugh stated at the conclusion of that last hearing, an evidentiary hearing is necessary.

And at the conclusion of my statements -- and I'll keep it right on point because we're only talking about the U.S. Attorney's Office in this matter. I'll reference at the end some of the cases that were cited by the Government which I think supports the proposition that we need an evidentiary hearing.

So, first, let me say that the -- as we said in our -- and I'm not going to be redundant because Your Honor has plenty of filings. And I'll concede that, between both parties, there's plenty of documents but still the need for an evidentiary hearing.

In our reply to the Government's response, I think that really sums up our position, which is, if you remember in that opening paragraph, we led with a series of questions. And the questions really center on May of 2025 in front of Judge Donahue. And the pressing question is: Why not?

Why during the course of a half a year did you not tell the defense -- and I'm going to speak for Mr. Banks at

10:44AM this point, who, as the Court will -- will, if looking at the transcripts, see that I open up with Judge Donahue by saying, in good faith, we did not turn around and do a quick change of circumstances but, rather, we waited almost a half a year for an actual change of circumstances to take place. In other words, we waited for discovery to come in, to do our own investigation, to do a good faith change of circumstances.

10:45AM So why during that six months, specifically after February of 2025, not even getting to the threat -- to the U.S. Attorney's Office in April, why not let us know?

And so I -- at that time when we argued a few weeks ago, I used the word "felt foolish." And Your Honor picked up on that. And let me just --

10:45AM THE COURT: I picked up on it and disagreed with you.

MR. FINDLING: I know you did. I know you did. Yes, you did. So I'd like the opportunity briefly to kind of paint that picture for Your Honor as a fellow -- not only on the bench but officer of the Court.

10:45AM In May of 2025, having said to Judge Donahue that we waited in good faith six months and, most importantly, cloaked with constitutional rights, our client, Mr. Banks, waited patiently for six months, wasn't the type of criminally accused that said I want to get in there again, I want to get in there

10:45AM again, but actually listened to counsel and said this is

something to be taken seriously. You just don't have a visceral reaction to losing and go back. But why not do that?

And so if you can imagine the picture of I'm at the podium on behalf of Mr. Banks, the Government is there, the U.S. Attorney's Office is there, they know about this threat. Their FBI agents who sit with them know about this threat. We now know through the filings that there were plainclothes FBI agents sitting in the gallery that knew about the threat. And, most importantly, Judge Donahue knew about the threat.

So the question becomes, I'm sitting there and my colleagues are sitting there looking for a change of circumstances, arguing that Mr. Banks is not a threat to witnesses in the case, not a threat to the community but, rather, should be released on bond. And the only people that don't know about this threat because we don't know definitively who it comes from and if in any way it's going to be attributed to him is his defense team and, more importantly, him. And that's problematic.

And so the question is -- the question is, Your Honor, whether it's a one-tenth of 1 percent chance that it impacted Judge Donahue, whether it's one-hundredth of 1 percent chance impact or 99 percent, we did not know at that time. We did not know at that time. And that's why, respectfully, I used the word "felt like a fool" looking back in that rearview mirror.

10:47AM

So the Government in their reply says to Your Honor that the defense can't cite a single case. They can't cite a single case. And -- and to a degree, they're correct because talking to my colleagues here with probably 200 years of collective experience defending cases, nobody has heard of a case where there was apparently a death threat to a sitting judge and the Government does not turn around and tell counsel, you should know before this goes forward this took place. You might want to think about it. That's -- we just can't find a case like that. So they're right.

10:48AM

Now, they do cite some cases -- and I'm going to get to them specifically -- that I do think are important. However, they're important for the reason we -- we need an evidentiary hearing.

10:48AM

So we just can't find any case like that that exists.

And so the -- I will say that the Government cites *Young*. Right? *Young versus United States*. We agree. We agree with the -- with the Government that that is the most important case when it comes to the issue of disqualification.

10:48AM

And what's interesting about -- right, that's just a law school case that we all know about, Your Honor. And that is at 481 U.S. 787. But the Government is correct, the important part for all of us is at pages 803 to 804. And it's kind of the quintessential discussion about the role of a

10:49AM

prosecutor; right?

And so I agree with the Government, we collectively agree with the Government, when we asked for these extraordinary measures, that it's important.

10:49AM So we all know it from law school. But just a reminder, that it talks about the uniqueness of the impartiality of a prosecutor whose interest is not to win a case but to see that justice is done. I'm paraphrasing a little bit but we all remember it.

10:49AM And in so doing, it reinforces the ABA's memorializing the prosecutorial function. Right? We all know, the responsibility of the public prosecutor defers from that from a usual advocate. His duty is to seek justice, not merely to convict. And so that gives us a reminder of why that was so

10:50AM important that day.

And I referenced then and I reference now, there's a common thread that runs through everybody in this courtroom, that sits in these tables, that practices law. And that is that we're members of the bar, had other matters in the Central

10:50AM District of Los Angeles. And one thing I've learned about this jurisdiction in the firms all over in these -- the beautiful background but in these cement towers sits a lot of former assistant U.S. attorneys that have now left that table and are doing this work.

10:50AM And the one thing that continues is that we're

members of the bar and there's a certain respect that takes place between counsel. And that professionalism that's talked about in *Young* and, we agree, was the obligation for an extraordinary measure, to turn to us as members of the bar and counsel on this case with a client cloaked with the United States Constitution and that due process, to say before we got in front of Judge Donahue, you should know, there may be a one-millionth of a percent chance, but you should know. You need to be notified.

Now, the Government, if we look at their exhibits and the exhibits that we offered, was rightfully concerned, Your Honor. They were rightfully concerned about the safety of their staff. They were rightfully concerned about the members of the bench in this courthouse. They were rightfully concerned about the other staff in this courthouse.

We agree with that 100 percent. They did the right thing in letting people know. But for one moment with that common thread of being members of the bar did our colleagues for the Government, mindful of *Young* and its progeny, ever think about the counsel that sit at these two tables? Did they ever think about the security and the constitutional rights of these men? Did they think about the security of these folks here that traveled from afar to support their clients and, more specifically, from our vantage point, those that traveled hundreds of miles, if not thousands, to support Mr. Banks? Did

10:52AM they think about the safety -- if there's somebody that's making threats -- who knows? We live in a world of crazy things. Did they think of letting us know so we could notify them for their own security? That is deeply concerning.

10:52AM And I will say this. And I know the members of -- of the U.S. Attorney's Office are very well aware that different circumstances -- that Ms. Goldberg and I tried a case here over a year ago. And at one point during that case a material witness for the Government was actually murdered.

10:52AM And let me tell you respectfully, with tremendous respect, we could not -- there was not a Zoom scheduled with the Government and defense counsel on that case fast enough to talk about the security issues and the concerns for all involved in the case because that's how you practice law. And

10:53AM that's how you make sure, mindful of *Young*, that you are not only respectful of your prosecutorial function but the constitutional rights that folks are cloaked with that sit at this table.

So the question is -- the question is, Your Honor,

10:53AM the reason that we have to look at whether or not there should be an evidentiary hearing -- because that is, again -- that's where Mr. Harbaugh left off and he's exactly right. We can't ask for a conclusory decision by the Court right now.

The question is -- that lingers now is what we

10:53AM opened up with in our reply: Why?

10:54AM

Now, was it merely oversight? I -- the Government says they decided to tell us on October 1st of 2025 because at that point it suited their needs because they wanted to do a meet and confer on an anonymous jury.

10:54AM Quite frankly, not revisiting that issue, it didn't really make any sense. It didn't really fit into the anonymous jury. It didn't fit into the highly publicized part of it. But for some reason, they felt then, when it suited their checking off the box, that they wanted to let us know because 10:54AM they wanted to move for an anonymous jury. Then they told us. Makes no sense. If it was good to tell us on October 1st when it was good for them, why not tell us before a hearing in front of a judge that is the subject of this threat?

So the question then becomes -- and I'm not saying 10:54AM this is a fact but what will linger. And the reason -- one of the leading reasons for an evidentiary hearing was its strategy.

We don't know. We don't know. Was it a thought that, hmm, this might work to our advantage, to have a hearing 10:54AM in front of a judge that's been threatened by somebody on -- presumably on behalf -- who thinks they're acting on behalf. We don't know. But that lingering question will haunt this case like the proverbial Sword of Damocles unless we have that evidentiary hearing.

10:55AM So the issue -- the issue becomes -- I -- I've

looked to the cases that the Government cited. I agree with the Government about some of their cases.

They talked -- they referenced *U.S. v. Williams* at 68 Fed.4th 564, a 2022 case. And that Ninth Circuit case involved the disqualification of an entire U.S. Attorney's Office. And it talks about the extreme measure. Again, I agree with the Government. However, it supports the notion of the necessity of an evidentiary hearing. Because what happened in that case is that the shoe was on the other foot. Right?

10:55AM

If that case -- when you look at that case, it was defense counsel, right, that was ex parteing the Court. And it was ex parteing a magistrate in that case. And there wasn't an evidentiary hearing. And so the Court took that position.

10:56AM

And so -- because in that case there wasn't, and that case was -- was kind of thrown off balance by this initial contact that didn't make sense, an ex parte communication between a defense team and the magistrate and the lack of an evidentiary hearing, there was a problem with the wholesale recusal of an entire U.S. Attorney's Office. And importantly in that case, there was no evidentiary hearing.

10:56AM

10:56AM

The Government again cites another case that's critical in their filing but to the reasoning why there needs to be, as Mr. Harbaugh ended a month ago with the need for an evidentiary hearing. And that is *U.S. v. Bundy* at 968 F.3d 1919, a 2020 decision.

10:56AM

10:57AM In that case, Your Honor, there was the -- and that's in their section on the actual dismissal of the case. Right? And it talks about the extraordinary position of seeking a dismissal.

10:57AM And so in that case, the -- the problem in that case is there was a series of *Brady* violations. And there was a recusal in that case, but there was a series -- excuse me. There was -- it was to dismiss the Indictment. And it ultimately was affirmed, the dismissal, if I remember

10:57AM correctly. But, importantly, there was a series of evidentiary hearings about the ongoing *Brady* violations.

And so I agree with the Government in citing it -- and it talks about dismissal is an extraordinary measure, extraordinary measure. We're not unrealistic about that.

10:57AM Okay? But the case law will require, given this, to request that in our motion. But why *Bundy* is so important is because that determination was made following an evidentiary hearing.

And so I think, again, given the uniqueness of these circumstances, given the case law involved, we would ask that

10:58AM there be an evidentiary hearing on this matter.

We're not looking for a discovery session. We're not looking into finding out the -- the way that the U.S. attorneys work and try to get behind walls. We -- we are totally fine with the Court giving us a set of barriers on how

10:58AM it's to proceed. But we think the case law and the uniqueness

of this matter and the lingering questions that will haunt this case, absent that hearing, like I said, like the proverbial Sword of Damocles, requires some type of evidentiary hearing.

THE COURT: Thank you.

10:58AM MR. FINDLING: Thank you, Your Honor.

THE COURT: Let me hear from the Government.

MR. YANNIELLO: Your Honor, Mr. Weiner is going to be addressing the specifics of this argument. However, I'd ask the Court's indulgence to address the discovery issue that 10:59AM Mr. Findling raised.

Your Honor has seen the briefing on this motion. The parties have filed quite a bit of it. And to be frank, this motion itself is stunning. It's stunning in respect to its factual inaccuracy, which Mr. Weiner will address. And 10:59AM counsel is right, he is an officer of the Court and there's a duty of candor and to correct misrepresentations submitted to the Court.

It's stunning in the extraordinary relief it seeks without legal authority actually supporting that request. And 10:59AM it's stunning that the claim -- in its claim that the Government somehow concealed important information from the defense for some tactical advantage. That's false.

To be clear, the Government is fully aware of its discovery obligations, and we take them incredibly seriously, 10:59AM especially in a case that involves the charges at issue here.

Defense counsel knows that. We have met and conferred on numerous issues. And, frankly, I'd submit, the Government has been very reasonable. They've asked us for an early disclosure of *Jencks* Act material. We agreed to produce grand jury material that qualifies 45 days in advance. We've agreed at their request to provide full forensic images of files -- of electronic accounts. Again, atypical, but we did that as a -- at the defense request. We've agreed to produce jail calls that far exceed our discovery obligations early at the defense request.

So any -- any claim that the Government tactically withheld this information is false.

What happened -- and I've conferred with my colleagues -- there was no conversation about whether to produce or not produce this information before we all decided it became relevant. And the reason for that is because nobody, as the Court has already found, there's no basis for any judge to recuse.

Unfortunately in today's day and age, anybody who's worked for a judge, anybody who has been in chambers, anybody who's been a public servant, including folks on this side of the aisle, unfortunately these things happen far too often -- phone calls, inappropriate communications. But the idea that any judge, even claiming that one one-hundredth of a percent, that somehow somebody would be impartial -- a judge would be

11:01AM
impartial based on an anonymous call by some individual is just wrong.

And so with that, Your Honor, I would turn it over to Mr. Weiner to address.

11:01AM THE COURT: Thank you.

Mr. Weiner.

MR. WEINER: Thank you, Your Honor.

So, to start, I want to address a number of factual issues, and then I'll talk about the law. And as I go through, 11:01AM I think the points that I'll make will highlight the -- the lack of need for an evidentiary hearing and that the Court can categorically deny this motion, just as it did the other relief that was sought on the November 18th hearing, to recuse this court and all judges in the Central District of California.

11:02AM I want to start out with -- what the Government has attempted to do a number of times is correct the record. On multiple occasions, the Government has filed documents, including in its opposition -- that's at Docket 319 -- pointing out unambiguous specific statements that all defense counsel 11:02AM signed onto a motion and made that are categorically false.

Their motion says -- and I'll quote it. For example, at page 1 of the motion, "The United States Attorney's Office, in carrying out a secret investigation, relayed the threats to all judges in the Central District of California, 11:03AM including this Court."

I -- I really -- I -- we've said it so many times, I'm trying to find a different way to say it, that that's just wrong. This Court knows that's wrong. I won't speak for this Court, but I'll speak for these people on this side of the table, we didn't talk to this Court.

11:03AM

Peculiarly, all defense counsel won't drop this. In their reply that they filed in December, the last page, they requested an evidentiary hearing to discuss -- and they make this explicit -- what ex parte communications happened between us and this Court? It's really a bewildering request. And they won't -- they haven't addressed it. They won't retract it. They keep saying it. And it's not just that one statement.

11:03AM

The spirit of their motion -- and we cited at least ten times where they say the Government had ex parte communications with the Courts, with this Court, with every magistrate judge, with every district judge. There's over 60 of them in this district. I think it's a fantastical statement.

11:04AM

And it just -- it infects their entire motion and it's categorically wrong. And they -- they haven't retracted it.

11:04AM

And we would ask the Court, at a minimum, to make a finding on the record that the Government has not had ex parte communications with this Court, as this Court is aware, on the

11:04AM

issue.

I'll -- I'll move on to the law. And in their reply brief and up here Mr. Findling again said that, you know, the Government keeps harping on they haven't cited a case. Well, that's because it's the defendants' motion and it's their burden to cite case law. In fact, the case law for recusal is that there has to be one, either a clear basis in law or statute that misconduct occurred or prejudice.

So the fact that they can't cite a case or a statute as to why there was misconduct is very telling. It's not because this is unique. This is not a unique situation.

As Mr. Yanniello said, for those of us who have had the privilege of working in chambers, this unfortunately, especially in this time, is -- is not an uncommon thing.

But as the Court acknowledged at the November 18th hearing, what the judiciary and what case law does not allow is for outside influencers to manipulate the system by threatening judges and changing who sits on the bench in front of a trial. That's very clear. That's why this Court rejected out of hand defendants' request to recuse this Court and every judge in the Central District of California. And that's no different for a prosecutor.

There's no case law that supports this because there is no misconduct, let alone clear misconduct on the basis of law or statute. There's no discovery violation, as

Mr. Yanniello said. And I want to address very specifically the difference between -- or why the Government raised the threats in its motion for an anonymous jury and why it became relevant.

11:06AM And to be clear, this was not gamesmanship withholding it. The Government's motion for an anonymous jury listed a litany of facts in support. There's four or five factors under the Ninth Circuit to impanel an anonymous jury. And one of the factors, as Mr. Findling pointed out, is the publicity of the case. 11:06AM

And what the Government argued -- and this is, I believe, at the end of the motion. This is not the crux of the motion -- was that the publicity in this case has already garnered outside spectators who attempt to influence the proceeding. 11:07AM And the Government submits that is a basis to protect the jury in this case.

The Government did not argue these were -- was not putting those threats in front of this Court to argue that they were credible death threats to anybody. It was the fact that the threats happened. 11:07AM The mere fact that they happened is what will endanger the jury. That's the Government's position. That's why they became relevant. They were not relevant before that, and the Government stands by that analysis.

But as Mr. Yanniello said, there was no conversation, you know, between counsel to -- to withhold those 11:07AM

purposefully for some gamesmanship at all.

I'll then turn to the second prong. So that's the misconduct prong.

As to prejudice, it's simply not there for a number of reasons.

Number one, there's no prejudice because Judge Donahue, the magistrate judge, detained defendant in December of 2024. Her chambers received the threats in February 2025. And in May 2025 is when the -- the hearing to reopen the detention hearing happened.

That chronology is important because at the hearing, the magistrate judge made clear that Mr. Banks presented no new evidence to reopen a hearing. The Government never relied on these outside threats in the detention hearing in December because they didn't happen and in May. Because what the Government argued was that, just as this Court found and as Judge Donahue has found twice, Mr. Banks is a flight risk and a danger to the community based on the facts in the Indictment and other issues that the Government has extensively briefed before the Court. That's number one.

And, number two, more crucially, there is no prejudice to defendant because this Court detained him on de novo review in June. And as the Court has made clear, there was no basis in law for Judge Donahue to recuse. There was no basis in law for this Court to recuse. And there's certainly

11:09AM no prejudice when a judge, an unbiased judge, you, Your Honor, who's sitting there, detained Mr. Banks on de novo review.

So what counsel, I believe, is arguing is they didn't have the opportunity to file a frivolous recusal motion in May that, as this Court recognized, would have been rejected out of hand by Judge Donahue, would have been rejected by this Court and, in any event, would have come up here in this court on de novo review would have detained Defendant Banks again. So there's no prejudice whatsoever.

11:09AM And the final point I'll make is that there's no evidentiary hearing that is required. There's no material fact that can be resolved in defendant's favor that would warrant any relief, let alone the Draconian relief that they're requesting here.

11:10AM The Government submitted, as -- or highlighted as Exhibit B to its opposition the only communication that happened between the Government and this Court, which was a perfunctory basically thank you, is nonsubstantive. To the extent it was ex parte in some sense, yes, defense counsel was not copied on that.

11:10AM But it was not a substantive communication. There were no communications thereafter. And the defendants' continued and repeated -- not even suggestion but statements that they were are categorically false and they should be retracted.

11:10AM

THE COURT: Thank you.

MR. WEINER: Thank you, Your Honor.

THE COURT: Let me hear from the defense.

MS. MOEEL: Your Honor, before Mr. Findling responds, may I make one point? Because I hear the tone of Mr. Weiner's argument. And I understand that this motion is upsetting to the Government.

And the allegations and the questions that we raise, I think, are properly submitted because everything that we say at that podium -- well, we have a duty of candor and a duty of professionalism in the court -- is not under oath. And information that we obtain -- this is just how our system works. It has to be under oath in order for everyone to rely on it and for the information to be relied on by Courts moving forward.

And so our request for an evidentiary hearing is to be able to understand under oath what happened and what didn't happen. And our questions about what are the communications are questions that we want answered under oath.

Back in April, the parties conferred by telephone -- Government counsel, all defense counsel here -- and we talked about motions that we were going to file. We were giving each other a heads-up. And Mr. Yanniello asked -- or told counsel that the Government would be seeking a motion for an anonymous jury.

11:12AM And while we processed that, I asked Mr. Yanniello, Is there any particular reason in this case that you would need that? In 20 years of -- oh, I'm sorry. It was Mr. Weiner. Pardon me.

11:12AM And I asked Mr. Weiner, Was there any particular reason that you would need that? And the Government -- Government counsel responded that they were confused by my question and that these were very serious charges and, as a result of the very serious allegations in this case, the 11:12AM Government believed that an anonymous jury was appropriate.

At that time they knew that there was a threats investigation pending, and they made a decision not to disclose it to us in that phone call.

And so I don't know whether that's gamesmanship or 11:13AM not, but I want to understand why they didn't disclose it to us at that time.

THE COURT: Counsel, which means you really want to get into the thought processes of these prosecutors who are sitting right here. I mean, let's be honest on what you want 11:13AM on this evidentiary hearing.

MS. MOEEL: As it relates to an issue of why information that the Court knew that the defense did not know at that hearing, yes, we want to understand that. That's right, Your Honor.

11:13AM THE COURT: All right. Thank you.

Counsel.

MR. FINDLING: Very briefly, Your Honor.

Again, Your Honor, first, I do -- I do want to say, respectfully, as an officer of the Court, as counsel know from citing *Bundy*, a very important part of the *Bundy* decision, to me, as an officer of the Court was -- you all will recall that footnote which the Ninth Circuit said, by the way, in rendering this decision, we're not making a professional decision about the professionalism about counsel. This is just strictly legal argument.

And I want to remind my colleagues that this is an argument, a legal argument. And we're not condemning anybody professionally. And I think the *Bundy* footnote is well stated by the Ninth Circuit with regard to that.

Now, specifically, as to the -- to the issue of -- of the May 2025 hearing. Again, respectfully, we just heard 20 minutes and no one will answer that question. So going to the query that Your Honor presents and the response by my colleague, we still don't have that answer. And that answer is critical, Your Honor, and does linger in the case.

And that's why I said under whatever guidelines that this Court would set, we seek that evidentiary hearing because the Government said we decided on October 1st of 2025 that we were concerned about the protection of the jury.

Now, mindful, these are unknown people. We don't

even know who they are. And, you know, not to do a law school quiz but maybe *Batson* and its progeny talks about the constitutional rights of jurors, but they're seated.

So I'm not quite sure what constitutional rights that -- that the Government was worried about at that time. But there were constitutional rights as to these gentlemen and, more specifically, for my purposes, to Mr. Banks.

So while we appreciate that concern about some unknown people out there, the concern is for somebody cloaked with that constitutional right.

And the issue as to whether or not there's prejudice -- I mean, Ms. O'Connor just eloquently explained to the Court the prejudice that we're enduring because detention hearings are not to be taken lightly. And we see why they're not to be taken lightly when you have a client like Mr. Banks who's at a decided disadvantage, not only being incarcerated pending trial but under the conditions he is. So that checks off that box.

And as far as the issue of it being a de novo review, I would just say, Your Honor knows your file and your office knows it better than me. But I can specifically remember Your Honor deferred your judgment. And I think it was seven days afterwards you rendered a very thoughtful decision. And I want to say four, five times -- you'll know better than me -- you made specific reference, as I can recall, to the

findings in May of 2025 of Judge Donahue. That's why it's -- that's why it's still important, albeit de novo.

Thank you, Your Honor.

THE COURT: Thank you, counsel.

11:16AM The request for an evidentiary hearing is denied and the motion is denied.

I think it's seldom that I have such a different view of a request, which clearly the defense cares very much about and takes very seriously. The motion for an evidentiary hearing is denied for two reasons. 11:17AM

The first is -- well, three reasons, really.

The first is that there are no material facts which need to be developed, which are not clear from the chronology.

Second, it would inevitably result in a probing of work product and attorney-client matters as to the thought processes of the opposing counsel, the prosecutors. 11:17AM

And, third, there is just absolutely no basis for this motion, just none, absolutely none.

Legally, there is nothing that has happened here which could possibly approach the extremely high standard, which is established by the Supreme Court and the Ninth Circuit. 11:17AM

Next, I -- at most, what you're saying is you feel a sense of -- you think it would have been more professional to have received notice of this. Whether or not that's true, that 11:18AM

is simply not a basis to recuse anyone.

Both of you obviously, at times, have felt aggrieved at how the other lawyers have been conducting themselves. But that is hardly a basis to disqualify anyone or even necessarily disagree. It's just a matter at some -- within obviously rules. But, nonetheless, at some point, it's just simply your preference for how the prosecutors should conduct themselves because the fact is it was none of your business whether those threats were made until the Government decided that it wanted to have -- use them for a purpose in court. And then they were revealed.

And the reason why is obvious, because it cannot possibly have affected Judge Donahue or me or any other judge that some hothead, who has an interest in the music industry, did something stupid.

I just -- no -- I assure you that neither Judge Donahue nor I, while regretting that the threats were made and of -- were that, took the matter nearly as seriously as you are. It's just regrettably something that happens.

And the idea that it could have somehow affected anything occurring in this case and specifically whether Mr. Banks should receive bail when no one has ever thought for a moment that he had anything to do with that, it just -- it just simply is -- I know you believe it and you've been very passionate about it, but I just have to tell you that it's

simply not the case.

There has been no -- there has neither been anything that the Government has done that could possibly give rise to the relief that you seek. And there's been zero prejudice whatsoever. And because of that, the motion has no merit. And since the motion has no merit, there's no basis for a hearing, in addition to the other problems with a hearing that I've mentioned.

So that is my ruling as to your motion.

Let's now go to Count 4. The Fifth Circuit has regrettably chosen not to answer the question that would have most definitively been helpful, of course, which is that both prongs either are or were not crimes of violence. So in that sense -- but there's certainly need for both sides on this, as your supplemental filings make clear.

So let me hear, first, from the defense in regard to the Count 4 dismissal and the *Elkins* case.

MS. MOEEL: Sure. Thank you, Your Honor.

Well, I think that what *Elkins* actually holds -- and I think the *Elkins* holding is not narrow dicta. Obviously, it's a categorical approach analysis. And it squarely addresses whether stalking resulting in death can be a crime of violence and answers that -- that in the negative.

The Fifth Circuit explains that the statute is divisible. So on that basis, the Fifth Circuit supports the

Government's arguments because, of course, we were saying that the statute is not divisible. We still stand by that argument, but I think that --

THE COURT: Maybe one day the Ninth Circuit will accept it. But for now, we have one --

MS. MOEEL: Yes.

THE COURT: -- circuit opinion, and that's what it says.

MS. MOEEL: That's right.

So for persuasive authority purposes, I understand the Government's distinction there. And so -- and we accept *Elkins* to say that.

Now, what the Court then analyzes is whether either subsection necessarily requires force -- force. And crucially, it talks about whether the death-resulting enhancement adds a force element and whether that impacts it. And, again, it says that it does not.

But *Elkins* reasoning does not turn on emotional distress stalking alone. It turns on the absence of a force element and the mismatch in the statute, both in 2(a) and 2(b), between mens rea and -- and force. And so that reasoning, I think, equally applies to subsection (a).

So I want to address what I think is the Government's sort of core error in its analysis and why I think that our -- our argument should control.

What I think *Elkins* says is that the reasonable fear of death or serious bodily injury is not the same as threatened use of physical force. It's true that (a)(2), which is what the Government is relying on in this case, criminalizes causing fear -- but, again, it does not -- it's not the same as threatening force.

*Elkins* explains that intent to harass or intimidate is not intent to use force and that a defendant can place someone in fear through surveillance, electronic communications, reputational harm, third party conduct, or implied threats without ever threatening physical force.

And what it -- what I understand from this is that they say fear is a psychological state, force is an element. And the statute requires the former, not the latter.

The Government's response skips *Elkins*' key analytical steps. What the Government argues is that *Elkins* is a narrow holding limited to subsection 2(b) and that subsection 2(a) necessarily involves threatened force and that *Borden* doesn't apply because 2(a) requires intent.

But what they ignore is that *Elkins* explicitly rejects importing force through the death-resulting provision. And *Elkins* explains that specific intent to harass or intimidate is not intent to use force.

And *Elkins* rejects the Government's sort of common sense argument that death -- that fear of death must involve

force, warning that common sense is not the categorical approach.

11:24AM In fact, *Elkins* has this great line that I want to find where the Government says to the Court, you know, it's impossible to imagine a scenario in which someone could be -- have a reasonable fear of death and that that situation doesn't involve the threatened use of force.

11:25AM But there's this line in *Elkins* where they say right at the beginning, that commonsensical appeal has not been the defining characteristic of the categorical approach. And that's absolutely right because this idea that it's impossible to conceptualize is not a part of the analysis at all. It's that fear does not equal force, psychological intimidation, surveillance is also -- does not equal force.

11:25AM And so I think Your Honor is -- I think that, also, I would say this, off script, is that, even if you were in a position to say this is a close call, I would say it makes more sense in this case to apply the rule of lenity in the defendant's favor because of the very real consequences in this case. 11:26AM It's a mandatory life sentence if Count 4 is not dismissed. Um, and because all of the other indications, especially from a circuit like the Fifth, is tending towards the stalking resulting in death statute not being a categorical match.

11:26AM And, here, I don't think that the evidence in the

11:26AM case will change that analysis. And I think that the Court should not -- I think should decline the Government's invitation not to dismiss this charge because that would -- is really an invitation to commit reversible error in a case where there are also three other various serious charges pending.

THE COURT: Two questions. One is that *Elkins* -- and -- arose obviously sort of after the fact. And here, the very fact that you're flagging all of this means that we have the advantage of being concerned about these issues.

11:27AM Given that in this case I could draft jury instructions that would -- and, again, that doesn't deal with categorical but avoid the problem that arose in *Elkins* where there was the ambiguity and also, then, in sentencing make it very clear why I was sentencing as to why I would be, should

11:27AM sentencing ever occur. And, of course, none of us know that one way or the other.

Then wouldn't that -- in a sense, wouldn't that kind of the context in which *Elkins* arose be very different in this case because -- precisely because with -- we have this

11:27AM foresight into what the issues are on that? Do you think that makes any difference?

MS. MOEEL: Well, I think that your jury instructions would have to mirror the statute. And the problem is that we wouldn't be able to get around the element that the

11:27AM Government would have to show that the victims were placed in

reasonable fear of death.

And I really can't imagine an additional -- I mean, Your Honor can't make up elements. You can't say, well, we're going to throw in there an element regarding the threatened use of force. And, you know, of course, like what the categorical approach tells us is that the facts don't matter.

THE COURT: Right.

MS. MOEEL: So even if the witnesses were to testify, the fact is that the jury would not be asked in a verdict form anything beyond what the actual elements are. And that's why I don't see how it could survive, regardless of what happened in trial, because the problem is the element itself doesn't require the threatened use of force.

THE COURT: All right. Thank you.

And then the Government mentioned at the very end of its supplemental response -- and I'm just going to be honest, I haven't read it yet, this nonbinding Ninth Circuit opinion *Fernandez*, which the Government has said was after the -- the Supreme Court ruling had said that a certain California Penal Code section was still a crime of violence.

I don't think you've had the chance to read it either, I don't know. But I just -- as long as you were standing there, I wanted to give you the chance. If you have anything to say in regard to *Fernandez* or that argument that the Government had made, whether there was -- whether there was

anything that you wanted to say.

MS. MOEEL: I'm not prepared to address that, I'm sorry.

THE COURT: Really neither am I. That's why I was asking you.

11:29AM

All right. Thank you very much. I'll give you a chance to respond.

Let me hear from the Government.

MR. WEINER: Thank you, Your Honor. I think the Court's suggestion kind of hit the nail on the head. This Court can fashion the jury instructions and verdict form to completely avoid the issue that *Elkins* had.

11:29AM

THE COURT: Yeah. True. But also, then, the point was made -- and it's an obvious one and it's one that the Fifth Circuit recognizes as well, which is that at some point the categorical approach is unconcerned about what happened in a particular case, which is why the law on common sense are so at odds with each other in this area.

11:30AM

So what's your response to that germane point that was just raised?

11:30AM

MR. WEINER: So -- yes. Let me explain why *Elkins* does not apply here and why the reasoning is not -- I don't think the Government is contending that it's dicta. It just doesn't support this subsection.

So *Elkins* --

11:30AM

THE COURT: Recognizing, obviously, that the Fifth Circuit specifically said it was not answering the question which we are debating now.

MR. WEINER: Yes.

11:30AM THE COURT: It's clearly an open question in the Fifth Circuit right now.

MR. WEINER: Absolutely. And in every other circuit too.

And one point that I want to make clear, the 11:31AM Government's brief argues that subsection 2(a) -- so that's -- I'll just call it the reasonable death prong, I think that's easier -- is categorically a crime of violence whether or not death results. And I want to explain why that is the Government's primary argument. And this dovetails into the 11:31AM reasoning of *Elkins*.

*Elkins* was only examining the substantial emotional distress prong. And what we read that Court to hold -- and which is why the Government, after Defendant Houston filed this motion, elected not to proceed on that subsection -- is that, 11:31AM yes, it's not categorically a crime of violence because somebody can -- with the intent to stalk, harass, or the other verbs, can cause substantial emotional distress without the use, attempted use, or threatened use of force.

The Government submits that is not the case with the 11:32AM reasonable fear of death prong. And this is why.

Any of those verbs -- the intent to stalk, harass, place under surveillance -- of course, are an element of the offense. But -- and it's not common sense, it's that there is no scenario in which -- and this is what the Government submits -- that somebody with the intent -- I'll just use stalk for shorthand -- with the intent to stalk that causes -- and a reminder that under *Burrage*, it's a Supreme Court case, this is as to the but-for cause. So the intent to stalk engages in a course of conduct that causes a reasonable fear of death, a reasonable fear of death.

There is no world in which that conduct -- and this is the Government's position -- does not involve the -- at least the attempted use or threatened use of force because the victim has to feel a reasonable articulable fear of death because of that conduct.

So I think that the -- the different intents that are required under the statute, the alternative intents -- the intent to stalk, harass, place under surveillance -- that really is that kind of menu of things that a jury could find does not change the Government's analysis.

The Government's contention is that any of those, because someone has to engage in a course of conduct that causes a reasonable fear of death, that involves a *Johnson* -- *United States versus Johnson* level of force. At a minimum, the threatened use of force so, categorically, whether or not death

results is alleged.

THE COURT: The argument that you're making pays at least lip service or respects the oddities of the categorical approach. But the problem with it is that you have to be right, that it is just inherent in the statute, if not necessarily expressly stated, that there is this *Johnson* level of force, which means even if a handful of hypotheticals which might be very far-fetched in the real world could be conceived of, then the argument, it seems to me, doesn't work.

11:34AM So what -- why are you so just certain as just -- that it really is just inherent in the nature of the statute that you couldn't possibly think of other maybe weird, maybe implausible hypotheticals where that would not be the case?

MR. WEINER: And I think we talked about one of those hypotheticals at the November 18th hearing. And the government's position is that that just wouldn't satisfy the statute because of *Burrage* and the but-for cause.

So the -- and the Government, if the Court is interested, would be happy to submit supplemental briefing on this. I know sometimes doing this, *Alvarez* is raised in the context of whether or not there's a realistic probability. There's some discussion, I believe, whether the realistic probability actually applies to a federal crime or just a state crime and the categorical approach, which I think, as Your Honor highlighted, is kind of a choose-your-own adventured

11:35AM 11:35AM 11:36AM 11:36AM 11:36AM

body of law. There's so many different --

THE COURT: Yeah, the Fifth Circuit and then the concurrence, of course, did address that.

MR. WEINER: Right.

But the Government's position is that the conduct that would fall under this statute always requires a *Johnson* level force.

MS. MOEEL: Briefly, Your Honor, can I --

THE COURT: You'll have a chance to respond.

MS. MOEEL: Oh. Okay.

THE COURT: Let's let the Government finish its argument, and you'll be able to respond.

Go ahead, Mr. Weiner.

MR. WEINER: I think that's actually all I have, unless the Court has any questions.

THE COURT: In that case, then --

MR. WEINER: Sorry. I did want to make one more point, sorry, which is, to the extent the Court is inclined to dismiss the count and find that the subsection is not categorically a crime of violence, the Government would suggest that the Court do so after any conviction at trial to preserve the issue for appeal. There would be very little, if at all, any prejudice. It's the same body of evidence that goes to the firearms count.

I disagree with defense counsel on the rule of

lenity. The 924(c) count does not carry a mandatory life sentence, Count 1, and, 2, the murder-for-hire 1958 counts do. So just the rule of lenity is just not applicable here. And there's just no -- the Government submits, there's no prejudice to letting this go to the jury and then arguing on appeal.

THE COURT: Well, Mr. Yanniello made the same request of me for a lawyer who stole millions of dollars from his clients on whether a mandatory two-year count should be dismissed or not. I chose to dismiss it and it was not included. And perhaps the Ninth Circuit might have disagreed and that would have been an issue, but that's not what I chose to do.

It didn't seem fair to the defendant who, in fact, was ultimately convicted. It certainly doesn't seem very fair to the defendant here to proceed in that fashion if, in fact, there's a basis to dismiss it.

But I understand the request that you're making.

MR. WEINER: And if I could just make one point about the mandatory minimum, Your Honor, on that point and compare it to Mr. Yanniello's case, which I was not a part of.

But in this case, the first count of conviction would be a mandatory life sentence. And so the -- the 924(c) count would be, you know, a consecutive on top of a life sentence. So it is -- in terms of equities and fairness, I think -- I understand the Court's position, but I think there

is some daylight there or some difference.

THE COURT: All right. Thank you.

Let me hear from counsel.

MS. MOEEL: Thank you, Your Honor.

11:38AM I just -- you know, you actually -- so this is a cyberstalking statute, cyberbullying. And you really don't have to think that hard about a scenario in which this could be violated. We did talk about it last time.

The *Elkins* Court came up with a very similar

11:38AM scenario. What I suggested is that --

THE COURT: Still in the context of 2(b) and not 2(a).

MS. MOEEL: Yes.

And so for 2(a), the question is what could put

11:38AM somebody in a reasonable fear and whether the intent to do that rises to the *Borden* requirement that it has to be an intent to cause -- the intent to threaten force.

And the scenario we talked about was, you know, somebody putting up very humiliating nudes online of someone,

11:39AM like maybe a jilted ex-boyfriend gets upset and does that. The victim of the cyberbullying is afraid, not of the jilted ex-boyfriend's conduct but perhaps she lives in a very religious community and she knows that, by having these nudes or sexually explicit material, that she's afraid of what

11:39AM someone else might do to her, either a possessive brother or

father.

That is a scenario in which 2(a) would be violated. The defendant engaged in a course of conduct that put the victim in reasonable fear of death but not because he intended to cause the harm but because somebody else, a third party did. That person, the defendant, the jilted ex-boyfriend, would be guilty under this statute.

And that's why *Borden* says that the intent to cause -- the intent -- the threatened use of force has to be the defendant's intention. And that's the missing element here.

And so that's why we're -- we feel very strongly that there's nothing that Your Honor could do with the jury instructions that could change the fact that this is not even under the modified categorical approach, a crime of violence requiring *Johnson* level force in the context of *Borden*.

THE COURT: Thank you.

The motion is taken under submission.

Again, I wish counsel and the defendants a happy new year. Happy new year to all of you here in court. And I will see you back here on February 9th, 2026.

Mr. Banks, counsel, I hope I will not see you -- at 1:30, rather, for all of you. I hope I will not see you at 11:30 because the matter would have gotten resolved.

Thank you, counsel.

THE COURTROOM DEPUTY: All rise. Court's in recess.

(Proceedings concluded at 11:40 AM.)

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES )
)
STATE OF CALIFORNIA )

I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS 10TH DAY OF JANUARY, 2026.

/S/ MYRA L. PONCE

MYRA L. PONCE, CSR NO. 11544, CRR, RDR
FEDERAL OFFICIAL COURT REPORTER