UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. )
) 2:24-CR-621-MWF
DEONDRE DONTRELL WILSON, )
DAVID BRIAN LINDSEY, )
ASA HOUSTON, )
DURK BANKS, )
)
Defendants. )
______________________________)

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Monday, February 9, 2026

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here: www.amydiazfedreporter.com*

APPEARANCES OF COUNSEL:

For the Plaintiff:

Office of the United States Attorney
By: Ian Yanniello
Assistant United States Attorney
Daniel Weiner
Assistant United States Attorney
312 North Spring Street
Los Angeles, California 90012

Office of the United States Attorney
By: Gregory Staples
Assistant United States Attorney
411 West 4th Street, Suite 8000
Santa Ana, California 92701

For the Defendants:

Defendant Wilson:

HARBAUGH LAW, PC
By: Craig Harbaugh, Attorney at Law
360 E. 2nd Street, Suite 800
Los Angeles, California 90012

Defendant Lindsey:

LAW OFFICE OF TILLET J. MILLS, II PLLC
By: Tillet Mills, Attorney at Law
4101 Greenbriar, Suite 210
Houston, Texas 77098

Defendant Houston:

MOEEL LAH FAKHOURY LLP
By: Shaffy Moeel, Attorney at Law
2006 Kala Bagai Way
Berkeley, California 94704

Attorney appearances, continued:

Defendant Banks:

THE FINDLING LAW FIRM PC
By: Drew Findling, Attorney at Law
Marissa Goldberg, Attorney at Law
3575 Piedmont Road NE, Tower 15, Suite 1010
Atlanta, Georgia 30305

LAW OFFICE OF CHRISTY O'CONNOR
By: Christy O'Connor, Attorney at Law
360 E. 2nd Street, Suite 800
Los Angeles, California 90012

THE CLERK: Calling item number three, case number CR-24-621B-MWF, United States of America vs. Deondre Don Wilson, David Brian Lindsey, Asa Houston and Durk Banks.

Counsel rise and state your appearance for the record.

MR. YANNIELLO: Good afternoon, Your Honor. Ian Yanniello, Danny Weiner and Greg Staples on behalf of the United States. And with us at counsel table is FBI Special Agent Farmby.

THE COURT: Good afternoon, counsel.

MR. FINDLING: Your Honor, Drew Findling, Marissa Goldberg and Christy O'Connor on behalf of Mr. Banks. Mr. Brayman could not be with us. Last week he lost his father.

THE COURT: I'm so sorry. Please give him my condolences.

MR. FINDLING: We will, Your Honor.

THE COURT: Good afternoon, Mr. Banks. Good afternoon, counsel.

MR. HARBAUGH: Craig Harbaugh on behalf of Mr. Deandre Wilson, who is present.

THE COURT: Good afternoon, Mr. Wilson. Good afternoon, Mr. Harbaugh

MS. MOEEL: Good afternoon, Your Honor. Shaffy Moeel for Mr. Houston, who is also present in custody.

THE COURT: Mr. Houston, and good afternoon, counsel.

MR. MILLS: Good afternoon, Judge. Tillet Mills on behalf of Mr. Lindsey.

THE COURT: Good afternoon, Mr. Lindsey. Good afternoon, counsel.

We are here to discuss the Rule 404(b) evidence, which is obviously somewhat convoluted, and there is some overarching themes. And there then are some very specific points for the various pieces of evidence, especially under Rule 403.

The one question I had for counsel is on the protective order here, obviously we have a courtroom full of people, as the First Amendment contemplates, but how do you -- how should some of the specifics be addressed in, to the extent that they are arising from information which is viewed as being subject to the protective order?

Mr. Yanniello?

MR. YANNIELLO: Yes, Your Honor. I think the parties have been fairly careful about not stating specific information that could identify a particular person, and put that person or their family members in harm's way.

THE COURT: Well, if that is what it consists of, that is fine.

For instance, just on the one point, there is the --

to refer to it very, very broadly, the 2020 incident, is that -- the 2020 incident, the Chicago incidents, saying what the crime was? I mean, how -- how specific do the -- do the parties view here as that we get into in referring to that, say, that particular issue?

MR. YANNIELLO: Your Honor, I think if we are talking about specifics related to what a particular witness will say, that that could either be raised at side bar with the Court, or the Government would defer to the Court on how best to deal with that.

THE COURT: Then here, I'm just basically saying, look, do the parties anticipate that we would be making reference to the crime which is involved or not? The nature of the crime?

MR. YANNIELLO: Yes, Your Honor, I think that is fair.

THE COURT: All right. Then so, for instance, the Chicago murder is okay to say then, in the Government's view?

MR. YANNIELLO: Our view, it would, yes, Your Honor.

THE COURT: And anyone on the defense disagree with that? All right. I see no one disagreeing. So that is probably the most important single piece of evidence, and also potentially the one that would be the most time-consuming. So --

MS. GOLDBERG: Your Honor, if I may? I apologize.

I do not disagree, I just want to make sure -- and I did speak with counsel for the Government before we started today about being careful about the protective order today -- but I do want to make sure that we are not in any way hamstrung from discussing any specifics related to those incidents, particularly in regard to discovery that we received, or not received, related to those incidents. I will do my best to be very careful. If we approach something where I think is going to be an issue, I can address it with the Court.

THE COURT: And then just -- or approach. Let me know what your concern is, or we can approach side bar.

MS. GOLDBERG: Okay. Thank you, Your Honor.

MR. HARBAUGH: The same for Mr. Wilson. We don't want to be hamstrung, and we understand, we will be very careful.

I do want to point out that it's my understanding we are also addressing the motion to sever, which is tied to the 404(b).

THE COURT: If we have time today, and if there is a sufficient knowledge of what is happening with these things to get a sense. And we can discuss -- if there is time, we can discuss some of the broad issues that are being raised here, although ultimately a final ruling on that would depend on my getting out the order on these. And my intention would be to do that later this week after we've had this hearing.

13:46:32 It's just a question of whether, then, we've had enough of a
13:46:35 discussion today that we would need to have a different
13:46:38 hearing in regard to Mr. Wilson's motion. But of course
13:46:41 other defendants have joined in that motion, which also is
13:46:46 something for us to talk about.

13:46:48 The -- getting, then, to the November 2020 crime, I
13:46:57 think it's fair to say that the Government's position is that
13:47:08 it shows OTF being used for certain -- having a criminal
13:47:13 nature, as well as its undoubted musical nature, a witness
13:47:19 who would otherwise testify would be testimony about this --
13:47:25 I'm sorry, this is -- we'll discuss that last. This is in
13:47:27 regard to November 2020 is obviously what happened with DB.
13:47:31 So it's setting up what the motive was in regard here for
13:47:36 everything that then transpired.

13:47:39 I think it's, to summarize very briefly, that
13:47:44 somebody else was ultimately seen as being involved in this,
13:47:51 and there would be -- it would really be a mini trial within
13:47:56 a trial.

13:47:58 So let me hear first from Mr. Banks's counsel in
13:48:02 regard to DB's murder, and also the surveillance video, and
13:48:08 the witness testimony.

13:48:09 And of course, those two, in a sense, they turn out
13:48:12 to be different things, because the Government, it seems to
13:48:14 me, would be able potentially to show what it wants to show
13:48:20 regarding the setup of a motive, without necessarily having

13:48:24 that particular video, especially if there is the testimony
13:48:28 from the cooperating witness.
13:48:31 So anyway, counsel?
13:48:33 MS. GOLDBERG: Thank you, Your Honor. Do you want
13:48:35 me to approach the podium?
13:48:36 THE COURT: As long as the court reporter can hear
13:48:37 you from there, I certainly can, you don't need to do that.
13:48:40 But you may if you wish.
13:48:41 MS. GOLDBERG: Sure. Thank you, Your Honor.
13:48:43 In regard to this, and I appreciate the Court kind
13:48:45 of teeing it up like that, and I also appreciate the
13:48:48 information chart received from the Court.
13:48:52 That is exactly correct. So this is an incident
13:48:54 that occurred in November of 2020 in Atlanta, Georgia. None
13:48:59 of the charged defendants who are in court today were present
13:49:07 at that incident. It is a complicated incident, Your Honor,
13:49:11 as we did brief in our brief, involving multiple decedents,
13:49:20 multiple other people who were injured as a result of that
13:49:24 incident. It was -- ultimately, an individual was charged in
13:49:27 Atlanta for that -- for that incident, and was litigated
13:49:34 significantly in Georgia.
13:49:37 And our concern is, I guess, two-fold. I think one
13:49:41 is the kind of the mini trial situation, as the Court alluded
13:49:48 to. I think for full candor to the Court, I think, as the
13:49:53 Court indicated, that there could be reference to this

incident without having to get into the details and the specifics. The surveillance video is incredibly detailed, involving many individuals who are not defendants in this case, as none of these defendants were present that day, could create other issues, could get into the issues of litigating what happened without any of our -- any of the people here being parties to that incident.

And so that is our concern. It's prejudicial in the fact that a jury viewing that surveillance video, given the fact that there were multiple decedents and other injuries, there is a shootout that is involved. Police officers are involved. Police officers end up shooting individuals in that -- in that surveillance video. Those are all very hot button topics, Your Honor, and really not part of this case.

And I did want to, you know, address one thing, given the fact that -- because the Superseding Indictment here is fairly narrow in scope. The conspiracy charge is about 21 months, but the actual overt acts in the Indictment are pretty narrow. It's really over the course of a couple of days.

And so injecting incidents that happened a couple of years before, again, confuses the jury, causes prejudice, and forces us to litigate potentially a mini trial here on complex issues.

And so --

THE COURT: I'm sorry, counsel, I didn't realize you were -- go ahead and finish.

MS. GOLDBERG: Your Honor, go ahead.

THE COURT: I just wanted to ask: What is your response to the Government's, I guess I could say latest argument about there being that it's directly relevant to stalking on this, which also raises in regard to some of the other pieces of evidence?

MS. GOLDBERG: I think one of the issues here is that the alleged perpetrator of that incident in 2020 is not an alleged victim in this case.

And I think that that is an important distinction, Your Honor, although there were some overlapping people -- and I say that carefully -- that the person who is alleged to have been responsible for the decedent DB is not involved as an alleged victim in this case.

And so confusing those issues, again, creates problems for the jury, and confusion.

THE COURT: All right. Thank you.

Let me hear from the Government.

MR. YANNIELLO: Your Honor, on the point of the mini trial, I couldn't disagree more. The -- this case arises from a rivalry between Mr. Banks and OTF, on the one hand, and then a rival kind of rap group on the other hand.

One of Mr. Banks's closest allies and closest

13:52:54 friends, statements he's made was in an altercation with TB.
13:53:02 Another member of kind of TB's group came out and shot DB and
13:53:10 killed him.

13:53:10 It will not take a lot of time to present that
13:53:13 narrative. And I think the video, which I'm -- couldn't
13:53:19 imagine presenting more than maybe 30 seconds, maybe more,
13:53:22 but the video is very cabined, very narrow. My recollection
13:53:26 is it doesn't have any audio. It's not particularly
13:53:29 gruesome. But what it does show is it shows TB in this fight
13:53:33 with ultimately DB, who is gunned down shortly thereafter.

13:53:38 THE COURT: Why couldn't you just have a couple of
13:53:42 stills showing the two of them together and not play the
13:53:45 video?

13:53:46 MR. YANNIELLO: Your Honor, I don't know that the
13:53:50 stills -- we can certainly take a look at doing that. I'm
13:53:54 not sure that the stills would tell the story. Again, I
13:53:56 think you have a --

13:53:59 THE COURT: I think you have a witness who intends
13:54:00 to tell the story.

13:54:02 MR. YANNIELLO: Absolutely, Your Honor. And I think
13:54:03 that even makes the evidence more relevant and material,
13:54:06 because as the defendants have made very clear in this case,
13:54:10 they are going to -- their case is essentially going to call
13:54:14 all of the witnesses who testify against Mr. Banks and the
13:54:17 other defendants liars.

13:54:19 And so having corroborating evidence that is clear, that the jury can see with their own eyes, we would submit that that is material to introduce.

THE COURT: All right. I think -- I understand what the positions of the parties are. I have some thoughts on this, but I'm going to take it under submission, so I can make sure I'm being consistent with how I treat this with other pieces of evidence.

The social -- there are social media comments and statements on X, all of which are meant to show that there was a sense from certain rap music fans that something should be done about the murder. And that based on a couple of statements of Mr. Banks, the one in particular that he was aware of those, and again, the Government -- it's part of what the Government intends to show was the motive for the murder-for-hire in their view.

So let me hear, then, from counsel for Mr. Banks on why that should be excluded under Rule 404(b) and Rule 403, and then I'll hear from the Government.

MS. GOLDBERG: Thank you, Your Honor.

I think as far as those go, these are anonymous for, you know, lack of a better way to say that, comments from individuals who either we don't know who they are and/or may not actually be real people.

As we know, you know, in today's day, you put a post

13:56:07 on social media, and there is bots that can be put in place
13:56:12 to make these kind of robotic comments as a result.

13:56:15 So the probative value of potential bot information,
13:56:22 I mean, as we can all, you know, think about, we have seen on
13:56:26 social media, you know, bot comments, I mean, it's everywhere
13:56:30 now. And the lack of credibility and probative value to
13:56:35 these bot comments are, you know, couldn't really be
13:56:40 overstated.

13:56:40 So saying that those are important here, putting
13:56:45 these anonymous and/or bot comments into evidence, I mean,
13:56:49 this is just the -- just base level of low probative value,
13:56:53 Your Honor.

13:56:54 Additionally, I mean, how could we even investigate
13:56:59 this? How could we as defense counsel investigate who these
13:57:02 individuals were, when or why they made these comments, what
13:57:05 that means, what the intentions were behind them, or that on
13:57:10 behalf of Mr. Banks, that Mr. Banks saw these comments?

13:57:12 Now, a generalized statement that, I assume the
13:57:17 Government is going to get to, that he made a comment of
13:57:19 knowing that there was sort of a generalized pressure doesn't
13:57:23 necessarily relate to these comments.

13:57:26 So it would be at a random assortment, for all I can
13:57:31 imagine, that the Government would find to say these are
13:57:33 comments, and then you are supposed to assume that Mr. Banks
13:57:36 saw those particular comments, or just in general? It

13:57:40 just -- it really kind of goes against any sort of probative value, Your Honor, and really would make it impossible for us to defend.

13:57:48 THE COURT: All right. Thank you.

13:57:50 Let me ask the Government, well, I have a very general question on this and many other things, but for now, let me keep it the specifics. And part of it, does the Government have a witness who would say that there was this sense within OTF that this was the situation, and then offer these sort of exemplars? I would very much hope that the jury would not convict any of the defendants, including Mr. Banks, on the basis of this evidence, but if it's -- and it's subject to all of the criticisms that counsel just gave.

13:58:26 However, if it's relevant for a permissible purpose, and it's not excluded, then it could come in for all on this.

13:58:39 But on that I have two things:

13:58:42 One is, is there a witness who would say that this was -- this was how the situation was perceived withina OTF; and, second, how is it that the Government intends to show that Mr. Banks was aware of these comments? And is it just that final statement about, here we are at the end, or is there something else that the Government has?

13:59:06 What does the Government intend to do with this?

13:59:09 MR. YANNIELLO: That's a great question, Your Honor.

13:59:11 I think the best way to view this particular

evidence, the "slide for Von" commentary, and the pressure overall in terms of motive, is to look at it as a bucket of evidence. And it will be made up of testimony, including testimony that this was felt as pressure internally. It's part music lyrics, which the defendants also dispute, including audio portions that I'll quote, essentially, "Don't respond to shit with Von. I'm like fuck it, you tripping, go get your gun. They dropping locations. I'm getting it done. We sliding. The feds are coming."

So part of it's going to be lyrics; part of it's going to be a critical mass of comments that were posted on his social media, which could be easily admitted as a summary exhibit, and then in addition to the podcast admission, and then also the testimony of cooperating witnesses.

THE COURT: And let me ask a very general question, then, but it's one that is part of a lot of these exhibits, and that is who does the Government intend to offer to show that these comments mean what the Government says they mean? As to some of them, that seems just on their face, perhaps, a reasonable inference. Some of them I'll grant that it could be that the words here will bear the weight that the Government suggests, but I personally am not aware of that.

And then on some of these comments, just hearing them or reading them, I just don't know what they mean. And I would need, it seems to me that the jury would need,

someone to offer an interpretation if the Government is making this assertion of their meaning no less than if they were written in a foreign language, or written in a different alphabet.

You know, so how is it that the Government intends for the jury to understand these comments the way that the Government is offering them? I mean, you just can't stand up and say it in your opening statement and in your closing argument. So how is that -- and of course, the defense has the right, then, to either put up a counter expert, or to have other witnesses who -- OTF members who are knowledgeable about this form of music on that to just disagree.

So what does the Government intend to do here?

MR. YANNIELLO: I think two-fold, Your Honor.

One, we have noticed what I refer to as a gang expert who will interpret some of the language. The Government is also -- there is text messages with similar language that will be interpreted by an individual who was on the text thread. And in any event, one or more witnesses who can interpret the terminology being used.

THE COURT: All right. But you -- I take it the Government then would agree that under, either for looking at this from a Rule 403 balancing test, on the one hand -- and when I say "Rule 403," for those of you who are here in the courtroom, it's the federal rule that is used to keep out

otherwise admissible evidence, either because it's unfairly prejudicial to a defendant, or because it would just take up so much trial time and delay things that it just isn't worth it to let it in.

So here, I take it, then, that the Government would agree that the defense has the right to put up a witness who would disagree with the meaning that is being ascribed of these by the Government?

MR. YANNIELLO: Sure. Yes, Your Honor. I think that is right. They can dispute the meaning of the lyrics.

THE COURT: Then I again will take this under submission, keeping in mind that the Government feels that their -- all of these things are going together, and then keeping in mind the hearsay objections of the defense.

As far as being hearsay, I don't know if it's so much technically that it's hearsay, but it's verbal acts, but certainly there would have to be, at a minimum, some sort of jury instruction letting the jury know that these are just being offered just for what effect, if any, they had on the defendants, if the defendants were aware that these comments had been made.

MR. HARBAUGH: Your Honor, on behalf of Mr. Wilson, the Government expanded their position after filing their notices to expand it to all defendants.

So I would like to be heard briefly on this point.

THE COURT: You certainly may.

MR. HARBAUGH: Thank you, Your Honor.

THE COURT: The other thing I want to say, though, I do think here that actually the Government in a sense, though, has perhaps expanded it in that sense, but generally the Government has narrowed things.

I mean, I'm not addressing here a number of things that the Government originally put forth in the notice, because I would say based on the reply, the Government's memoranda, that the Government does intend to offer several of those things.

So in that sense, I think the Government has much more given up on a number of points, but I understand your point that these things are being offered as to all of the defendants.

Go ahead, Mr. Harbaugh.

MR. HARBAUGH: Your Honor, just to that brief point, we are going to address this more fulsomely, the Government's position is really unclear, because it's a shifting narrative that with each iteration, each notice, each brief is filed, they offer a new basis after the defense, we think quite forcefully, shoots down. And so it's really hard to know what the Government's basis is.

But I just want to address this specific point, Your Honor, because the Government sort of went around the social

media post that they have identified that they want to offer, not written by Mr. Banks or anyone involved with OTF, but anonymous individuals. So their basis is effect on the listener non-hearsay.

So, Your Honor, the fundamental foundation that they have to establish is that Mr. Banks, or anyone else, was a listener to those posts. So they can try to offer other individuals that they -- witnesses that they claim to have, that there was a general pressure -- and I'm only talking foundation here, I'm not talking purpose. They cannot simply offer, well, these were out in the Twitter verse, or X verse now, and so we can presume that Mr. Banks or anyone else charged here actually read that.

So, Your Honor, the Government still -- and I invite them to come back up and lay the foundation for how they've heard, but if not, Your Honor, we are not even past *Huddleston* in admissibility. It's out.

THE COURT: Well, I certainly agree that there has to be some basis for a rational jury to conclude that the -- that Mr. Banks and others in OTF were aware of them, so that is why I asked the question that I did.

But certainly, if there -- potentially, if there is a witness who would say that within -- that within OTF, there was a sense that these were being made, and that that was how certain people were viewing the situation following DB's

14:07:13 murder, then that would -- combined with if the Government
14:07:17 can show evidence that certain comments have the meaning that
14:07:24 the Government ascribes, that is how the Government is doing
14:07:29 it. So I'll think about whether I think that's enough.
14:07:30 But I agree with you -- in a sense, that is before
14:07:32 Rule 404 -- it's just a basic thing of relevance on that. So
14:07:36 it's a -- on whether this information should come in.
14:07:42 Like I said, in that sense, I don't think it's so
14:07:44 much hearsay, because it's just -- it's just there. It's
14:07:47 just as a verbal act that either rationally the jury may or
14:07:53 may not determine had an effect on Mr. Banks or other
14:07:57 defendants, or it didn't.
14:08:01 Yes, Mr. Yanniello?
14:08:03 MR. YANNIELLO: Just briefly, Your Honor. I want to
14:08:06 just very clearly address that point that counsel made.
14:08:09 I mean, this again shows the critical nature of the
14:08:11 very -- the excerpts of the lyrics and videos that we intend
14:08:15 to use. One of those videos, or one of the lyrical excerpts
14:08:18 will say, "They be on my page like slide for Von. I know
14:08:22 they trolling me." I would submit that that would address
14:08:25 very directly the point that Mr. Harbaugh just made.
14:08:28 They were very aware. They were aware because
14:08:30 witnesses are going to say it, because Mr. Banks said it in
14:08:33 songs. So the foundational piece we think is beyond met, or
14:08:38 will be beyond met in trial.

14:08:40 MR. HARBAUGH: Your Honor, just briefly, Your Honor.

14:08:42 It is these specific posts that they have to prove. 14:08:47 Your Honor, if a tree falls in a forest and no one is there 14:08:51 to hear it, it doesn't make a sound. If this never fell on 14:08:56 their ears, if they never read these statements, the 14:08:59 Government's foundation collapses.

14:09:02 THE COURT: Well, what -- there has been at least an 14:09:04 assertion that there will be a foundation. And if there is 14:09:10 no foundation, I assure you that they will not come in.

14:09:13 On the -- let me turn, then, to certain text 14:09:23 messages. That's, "I got them hunting you," the "pipe it 14:09:29 up." Again, the Government acts as if it's known to 14:09:32 everybody that "pipe it up" is -- has a very clear street 14:09:39 meaning. That may or may not be true.

14:09:43 But the point is, I don't think it can be presumed 14:09:46 that the jury would know that. And it certainly I don't 14:09:49 think is such common knowledge that the Government can just 14:09:52 assert it. It's another example where, in addition to all 14:09:55 the other issues with these, the Government is going to have 14:09:59 to make -- have a basis for suggesting what these things mean 14:10:08 to the jurors. But the Government has said that it intends 14:10:11 to do that through witnesses and the gang expert.

14:10:14 So we'll deal with that before trial starts. For 14:10:18 now I'll accept that they are -- the Government has the 14:10:21 ability to do that.

Again, here for these things, there is -- the Government is saying that these comments, these text messages, show the relationship between Mr. Banks and other members of OTF. The traditional things that are for which such evidence is used, which is knowledge, intent, plan, and modus operandi. And then further, would be pertinent to the testimony of a particular cooperating witness.

So let me -- and then the position of Mr. Banks and the other defendants is that it really is just propensity evidence pure and simple, and also the Rule of Completeness would require in the one case just, you know, a huge amount of other evidence to come in to put it all in context.

So let me hear from counsel for Mr. Banks, and then any other defendants who wish to be heard, and then I'll hear from the Government.

MS. GOLDBERG: Okay. Thank you, Your Honor.

I think for these, so I'll do the two text messages the Court just referenced. For both of these, I think what is really important to start with is that these both are outside of the scope of the alleged conspiracy in this case.

These both occurred in April of 2023, and so it's not even part of this timeframe in which is in this Indictment, which the grand jury has allowed the Government to go forward on. So I think that is really important.

I think secondarily, it is kind of the definition of

propensity, Your Honor. This is the Government saying that Mr. Banks and others had "beefs" with other rappers. So they are alleging that these are referencing other rappers in the Chicago area. And that there was "beefs" with those individuals. And there is a text chain between some people who are charged in this case and some people who are not, and that there is a reference to these other rappers.

I think it is important to note a couple of things there. As for one of them, the other rapper is deceased. So we would have to litigate whether or not there was actually a beef between Mr. Banks and these other rappers. And in one case, that individual is now deceased. So we could not -- we would be prevented from calling that person to the stand to say, no, there was no issue between us. So that's number one.

The second rapper has publically come out in social media and supported Mr. Banks, which is direct evidence that there was never a beef between those individuals. So, again, we would have to litigate the fact whether or not there was a beef between these groups.

But more importantly is that this is just propensity evidence, Your Honor, that the Government wants to say that these individuals were threatening violence, you know, they are violent individuals, but this is just a -- if foundation can even be made, because, you know, the individual who this

text chain got, the phone that it was derived from is not, I don't believe, going to be a witness in this case. And the Government can, you know, say otherwise.

But we've got no interviews with that individual in discovery. We've gotten no interviews with the Government and these other rappers. So I don't believe that the Government has talked to any of these people to determine whether or not this is actually true. They just simply went through a cellphone, saw text messages between friends, really just kind of, you know, talking amongst one another, and said, okay, well, this is evidence that these people are violent. And we are going to put it in this case, even though it's not part of this charged conspiracy, and we are really going to muddy the waters.

And that is exactly what 403 is designed to prevent. Those are not part of this case, and should not come in in this case. And if they do, then we would have to litigate those issues, and in some ways we would be prevented from litigating those issues.

Specifically, as for the "pipe it up," and we put that in our brief, that is taken out of context. The text chain, Mr. Banks then corrects himself a couple of texts later and says, "I'm going to speak up." So he says "I'm going to pipe up," and then later says "I'm going to speak up." And they are talking about an Instagram story. So to

say that that has any relevance to this, I mean, it's just completely misleading.

But even that aside, it's propensity evidence. It's not part of this conspiracy in the Indictment, and absolutely should not be part of this case.

THE COURT: Thank you, counsel.

Let me hear from the Government.

MR. YANNIELLO: Thank you, Your Honor.

These two text threads, they were seized from multiple cellphones; one of the cellphones, the individual whose cellphone it was, will be testifying.

These particularly, Mr. Banks very clear online discussion, and use counsel's term "beef" with another individual, where Mr. Banks tells that individual, "I got them hunting you. Better have three ski masks on."

That is a critical piece of evidence in this case. It shows that not only that Mr. Banks was the one who had somebody out looking, but you see the coconspirators, several of whom were involved in this murder, including Mr. Wilson, were also on this thread. So it's a thread of closely connected individuals.

And the response with respect to both of the text threads at issue is, "Hey, make sure you are talking on disappearing messages." They are taking steps to protect Mr. Banks.

So not only does it show the OTF power structure, so to speak, but it also shows people's willingness within OTF to respond to Mr. Banks's request for violence.

So we -- I would submit that a jury instruction could handle the propensity inference, but as the defendants have made clear in this case, they are going to say the lyrics themselves are fantasy, and they are make believe, and that is not real. But now they also want to exclude the words that came out of his mouth to his closest friends and allies. And, Your Honor, it would be deceiving to omit this core evidence from the jury's purview, is our --

THE COURT: Thank you. The motion as to these text messages is taken under submission.

Next, let me hear from the Government first in regard to this voice memo. You know, Mr. Banks, from the particular person to the cooperating witness, it -- you know, the position of the defense here is that it's just not referring to Mr. Banks; and therefore, it isn't even a matter of Rule 404(b) or Rule 403, it's just simply irrelevant.

So what is the Government's even theory here? And in light of that theory, how does the Government intend for the jury to believe that this is relating in some way to Mr. Banks?

MR. YANNIELLO: The -- this message was sent by an unindicted co-conspirator to a cooperating witness. The

14:18:14 cooperating witness will articulate why this relates to Mr. Banks. It discusses paying money to the streets, essentially for violence, and through an intermediary.

So the reference, which I can discuss at side bar if Your Honor would like, but there is a reference -- one of the defendants' arguments is that, well, this reference is somebody named something specific. Well, that person was an intermediary acting on behalf of Mr. Banks, which is essentially sum and substance what the testimony would be from what the Government expects at trial.

THE COURT: All right. I'm going to ask counsel to approach on this. But in addition, let -- let me hear from counsel for Mr. Banks as to why the voice memo is irrelevant, or should be excluded under Rule 403.

MS. GOLDBERG: Yeah, Your Honor, and also, I think not only does it not reference what the Government says it does, it references other potential criminal activities that are not charged in this case, and that have to do with other individuals not charged in this case. And I can talk at side bar about that.

But that -- if you look at the context of what it said, and look at the actual words of what it said, it's related to other uncharged criminal activities, not related to violence, Your Honor.

And the Government has made the contention that the

use of the word "blood," right, as a nickname is somehow in reference to Mr. Banks. But just looking at the actual context of the conversations between the individuals engaged in that conversation, because this was a voice note sent, you could see the text chain around that voice note, and the two individuals are referring to each other by the name Blood, as well. It's a very common name, just kind of a nickname. And many individuals associated in this case and not just use that as just kind of a, you know, term, like "brother" or something like that.

So to say that just because they use that term, that it has to be, you know, referencing Mr. Banks. And understanding that they may have a cooperator that says otherwise, the context of, you know, the cooperation has to be considered and why that person may say that. And the actual context of the conversation does not seem to indicate they are talking about him.

Also, it is hearsay. I mean, it's just kind of obviously hearsay. The person who was the speaker on the audio note is not, again --

THE COURT: Well, if it were as -- again, I'm looking on this more as what is fair for the jury, as opposed to technicalities.

But if it is a co-conspirator statement within the scope of the conspiracy -- and I know your argument is that

it's not, I get that, but that is the Government's answer to whether it's hearsay or not.

MS. GOLDBERG: And, Your Honor, this is also outside the scope of the conspiracy. So importantly, again, this is April of 2023, so it is not within the charged conspiracy.

THE COURT: All right. Counsel, if you would approach, please.

(At the bench.)

THE COURT: So let me -- tell me what PW1 is going to say in regard to this, because I really am -- my strong inclination is to keep this out, but if it is somehow -- if his testimony is such that it directly ties it to what is going on here, then I suppose the jury has the right to hear it, if just to add to a certain sense of being corroboration for what it is that he's saying more generally.

But I have grave doubts that this really ought to come in. So explain to me now here what it is that PW1 is going to say that it should come in.

MR. YANNIELLO: So what PW1 is going to say, which the landscape of this is that Mr. Banks's credit cards, his OTF credit cards, were used for payments, for various things, including another cooperator is going to say Mr. Banks financed the purchase of a, basically a burner car, a slider car at issue in this case.

What PW1 will say about this audio message is he

will say, "I received this message. This message is about Mr. Banks financing criminal activity." Specifically, it references the co-conspirator who sends this to the cooperator, which is OTF Boonie Moe. Boonie Moe is alleged to have done recruiting and tried to recruit some of the hit men in this case.

He tells the cooperator, Mr. Banks -- he uses the term "blood," the cooperator will interpret that as Mr. Banks -- and will say, "Of course Blood wants the people to be purchasing sliders," as happened in this case.

So we think the connection is directly connected to the case. Although it happens a few months after, it's still a co-conspirator statement. The conspiracy doesn't need to be alleged in the Indictment for it to qualify for an exception to the hearsay rule for the co-conspirator statements, Your Honor.

THE COURT: All right. Counsel?

MS. GOLDBERG: Yes. So it does reference -- appears to reference drug trafficking. So the PW1 made pretty extensive statements regarding drug trafficking, obviously not part of this case. And talking about locations on the block that allegedly somebody is paying for related to drug trafficking, has nothing to do with this case, Your Honor, or, you know, ordering any sort of violence.

Even in the context the word "sliders" appears to

mean vehicles. So we are talking about drug trafficking and vehicles, and about somebody who is unnamed, and with a term that is very commonly used. I mean, the relevance, again, is very small, and the prejudice, the potential prejudice, is very high.

THE COURT: All right. Thank you. I'm sorry. Counsel? Yeah.

MR. HARBAUGH: Your Honor, the Government keeps highlighting that these are potentially statements of co-conspirators. There is zero evidence that it's in furtherance of the conspiracy alleged here, because it occurred so far afterwards. The Government still has not articulated a non-hearsay basis.

THE COURT: Yes. Counsel?

MS. MOEEL: Same point.

THE COURT: Okay. Thank you.

MR. YANNIELLO: While everyone is around, Your Honor. I think we would, for the final two narrow issues in terms of the Chicago murder, we would be inclined, if we are ultimately going to use that at trial --

THE COURT: Well, I can tell you right now that is very unlikely I'm going to let that in. Of all the things here on which I have an opinion right now, my strong opinion is that the Chicago murder should not come in.

So this is going to be your chance to convince me

14:25:14 I'm wrong about that, but good luck, because I just think
14:25:17 it's -- well, I'll state on the record and in writing why I
14:25:20 feel that way -- but it's -- I have no intention of letting
14:25:24 it in based on my views right now. But the reason we are
14:25:29 having a hearing, is so you can convince me that I'm wrong.
14:25:32 MR. YANNIELLO: We are not inclined at this time to
14:25:36 introduce that evidence, so I think we are going to make it
14:25:40 an easy issue.
14:25:41 THE COURT: Okay. Good.
14:25:42 (In open court:)
14:25:56 THE COURT: Here, the next issue is the May 2021
14:26:06 shooting of TB. Let me -- both the surveillance video, and
14:26:14 then the witness testimony. The Government views this as
14:26:18 being inextricably intertwined with the conspiracy charges,
14:26:27 in that sense similar to the November 2020 incident, but then
14:26:34 also that it's direct evidence of the stalking charge.
14:26:39 And then the defense feels that both case law is
14:26:47 against it, the inextricably intertwined is not really true
14:26:52 here, and it's inherently prejudicial.
14:26:56 So let me hear, then, from defense counsel as to why
14:27:04 this -- this video and testimony should not be admitted.
14:27:12 MS. GOLDBERG: Thank you, Your Honor.
14:27:14 So as the Court stated, this relates to a shooting
14:27:17 that occurred in Blackshear, Georgia in May of 2021.
14:27:23 The allegations from the Government are not that any

14:27:28 of the individuals going to trial were present for that shooting. The shooting itself was investigated by the Georgia Bureau of Investigation extensively, finding no suspects and no evidence linking Mr. Banks or any of the other defendants to that shooting.

14:27:54 The only evidence that the Government has that links Mr. Banks to anything in that incident is one cooperator, Your Honor, who alleges -- and again, we have to put it in the context of these cooperators and the obvious pressure that they are facing given the weight of these charges. He is the only link. There is no other evidence. There is no text messages. There is no audio messages. There is no conversations. There is no surveillance video.

14:28:28 This particular cooperator references a meeting with a large number of people, none of which that this was discussed, that this incident was discussed. None of which has been corroborated. None of which apparently has been investigated by the Government. Certainly, if they did, you know, we assume that they would provide it to us.

14:28:51 So the link, and the of value here is very, very small. There has to be some corroboration of this cooperator. This is an incident that was caught on surveillance. There is surveillance video for this that was investigated, and nothing came up. Nothing that links Mr. Banks to this incident outside of that.

14:29:13 And so the probative value here is small. And, again, we go back to 403, but the prejudice is, again --

14:29:20 THE COURT: Counsel, look, I understand your argument; more importantly, I'm sure the jury will understand that argument. But there is the fact of the witness. And it's not for me to say whether a witness should be believed or not, that is for the jury.

14:29:33 So how -- either through case law or common sense, how do you -- how are you applying the undue prejudice to get around the fact that there is this testimony?

14:29:48 MS. GOLDBERG: Your Honor, again, it's the weight of a potential attempted murder, an uncharged attempted murder against Mr. Banks with only the connection of one cooperating witness. I think that is the problem here, Your Honor.

14:30:01 Going through, you know, whether the Government needs this evidence to tell the story, certainly not, especially without any particular evidence that proves it.

14:30:14 I mean, the Government needs evidence to prove this to make their story outside of one cooperator, Your Honor. And I think that that's the problem here. I think that the weight of this is so great, putting it on the shoulders -- and, you know, whether or not we debate the credibility of this one witness, sure, we are going to do that. I mean, that is kind of the nature of this. But we say this every time we argue these things, you can't unring the bell.

So you know, whether or not we have the opportunity to cross-examine this individual, it's already out there.

And, Your Honor, he puts himself there, but nobody else here, but nobody else, none of the other defendants. And there is just nothing else that the Government has done to investigate this to make this really a viable 404(b) addition to this case.

THE COURT: All right. Thank you.

Let me hear from the Government.

MR. YANNIELLO: Your Honor, there is no doubt that this is a witness-intensive case. The defendants in this case were very savvy. They dropped phones frequently. They took steps to communicate with Facebook Messenger, and they took steps to basically ensure that there wasn't a great paper trail.

I am a bit puzzled by this particular piece of evidence, that the defense would be seeking to exclude it, because I would imagine they would want to cross-examine this cooperating witness on this issue.

But to the Court's point, this is directly relevant to the stalking charge. As the Government's articulated, the defense will have a full and fulsome cross-examination, and ability to point out the purported lack of corroboration.

However, I think that that is another reason, and that turns on why the video itself is going to be meaningful,

14:32:08 because the investigation that was done and the video file do corroborate the individual, at least in terms of what occurred there. The cooperator will also say that there was an attempt to stalk this victim from a -- from a rap show, similar to what occurred in Los Angeles in April, or in August of 2022. And that he had a conversation with Mr. Banks and other OTF members about this -- about what they were intending to do, which was go kill TB.

14:32:44 THE COURT: The 2021 incident is taken under submission.

14:32:49 The January 2022 incident, the Government has withdrawn its intention to proffer that evidence.

14:32:57 Let's turn, then, to the music admissions, which are both the video footage and the lyrics. Here, let me raise an issue which I raised earlier in regard to the November 2020 video, is here, first of all, why does the Government believe that it has the right to show the videos, as opposed to just simply tell the jury about the lyrics, when certain elements of the videos could reasonably be viewed as unduly prejudicial?

14:33:46 MR. YANNIELLO: Your Honor, our January 16, 2026 disclosure lays out very narrow excerpts, including the example we used in our writing. Our last filing was approximately, I believe, 40 seconds of a nearly three minute and 40 second video. We took care to carve out some other --

some issues that would be potentially prejudicial like, for example, drug use, or things like that. We tried to be narrow.

What I can say is the videos that we did select, Your Honor, provide context to the words that are being used. And several of the videos, they depict kind of the core member, is what I would say, of the conspiracy, both before and after SR's murder, and the attempt to execute TB on the streets of Los Angeles.

So the video depictions are core to show the association, and that certain folks, the co-conspirators, are part of the subgroup of OTF that was engaged in criminal activity.

And as Your Honor mentioned earlier, the lyrics in isolation are potentially ambiguous at times. But what will help is, one, we are going to have somebody be able to say and interpret those lyrics; but more importantly, the context of what is being displayed visually makes clear what those lyrics are about.

When we have selected a video, we have done so because we believe the visual depictions themselves are key to the context and understanding of the musical admissions.

THE COURT: Let me hear from defense counsel.

MS. GOLDBERG: We did extensively brief this issue. I think Mr. Findling and myself have represented a lot of

14:35:36 people in the hip hop industry. This is by far the most amount of rap music lyrics that has ever been proffered. This is 12 songs.

THE COURT: Right now let's just talk about the videos. You will have plenty of time to talk to me about the lyrics, but right now I just want to focus on the videos.

MS. GOLDBERG: Yes, Your Honor.

So the videos themselves are really, as the Court understands, a separate analysis here. There is images of cash and, you know, references to whether or not they physically show firearms, but the physical motions of shooting firearms. And just really, you can't take that out of context where a potential jury, many of whom may not be well-versed in hip hop music or new kind of ways of videos, may be, you know, quite surprised by the videos themselves.

And the prejudicial nature -- and we briefed, you know, numerous studies related to this issue -- that this is something that is, you know, really hotly litigated. California has a state code that really limits the use of these videos, because there has been such a pushback in saying that this is really -- this is art. This is music.

And I think really importantly, the cases that the Government cited, so they really cited three cases, and we address it in our brief, none of which obviously are Ninth Circuit, none of which -- one of the three involves any sort

of video evidence. Two of the three were just handwritten notes, which, you know, we debate whether that is even rap lyrics and why that term was even given, given the fact it seems to be poetry or prose.

But the actual visual depictions, there is so many studies, the Government has not refuted any of those things. We offered an expert on this issue. The Government appears to be offering an agent, a gang expert perhaps, but certainly not a rap music expert.

All of the cases cited by the Government do not involve individuals who are performers who are signed to major labels. Mr. Banks had a team of people around him. He had a major label. He had infrastructure. None of the people involved in any of those cases that the Government cited were -- have any of that. We are just really in a very unique situation, Your Honor. The Government has offered no precedential support to why they should be allowed to do this in the first place.

And we can debate whether or not images of cash or firearms are prejudicial, but really, the studies are there. I mean, there is no doubt those are prejudicial. And there is a reason that the Government wants to use these things and wants to use them, I mean, really in just in amazing abundance. This is -- you know, they can say we are being very narrow and we are picking excerpts here and there, but

14:38:43 this is a lot of music, a lot of videos, and they are cherry picking.

14:38:48 I mean, there is plenty of other videos. Mr. Banks is a Grammy winner. The video that Mr. Banks won his Grammy for, he's surrounded by children. They certainly didn't use that in this case.

14:38:59 So there is a narrative they want to portray, and that really is a narrative of propensity and violence. And the prejudice cannot really be -- cannot be challenged. They have not cited any studies that said otherwise. They have not cited any cases that said otherwise.

14:39:17 And really, Your Honor, I have done a pretty deep dive into this issue, and there are so few cases, because a lot of courts on the district court level within the Ninth Circuit, they are really keeping it out.

14:39:30 We cited a couple of cases, I think there is the Arizona case *Williams*, where the District Court is saying no, so it doesn't get up to the Ninth Circuit. There has really been this bar because there has been such a push, because it really is just -- it's part of the culture.

14:39:45 And for the Government to say, and then turn it back and say, "Well, we are going to have an agent look at these things, and say what this means," is that person part of that culture? Is that person going to understand? They are going to look at it from a particular lens that is really

inappropriate. I say that to the videos. We can address the lyrics more specifically.

MR. HARBAUGH: If I can be heard on the videos, because the Government cited a specific one for Mr. Wilson, Big Threat, where they are saying essentially because he's wearing an OTF chain, that is proof that he's involved in a criminal conspiracy.

And, Your Honor, what the Government omits, and they do point out in the Indictment, is that OTF is a legitimate record, incredibly successful record label that has many, many artists.

Now, the Government, though here, for purposes of trial, which is incredibly prejudicial and deceptive, is trying to paint the picture that OTF membership establishes criminal activity. There are many artists that the Government hasn't identified. For example, Memo 600, the Government isn't alleging he's involved in any criminal activity, was an artist for a very long time.

And so, Your Honor, purely by putting up a video with Mr. Wilson wearing an OTF chain, the Government doesn't even need to say anything. The message -- because they are going to have their expert, and we'll deal with their expert later, but their expert to say that OTF is a criminal enterprise; and therefore, anyone who is wearing that chain is involved in it.

14:41:20 And so, Your Honor, the Government tries to discount the prejudice, but they can't remove the inflammatory nature of their connotation that they clearly intend for the jury to embrace.

14:41:31 THE COURT: All right. Thank you.

14:41:36 MR. YANNIELLO: May I just briefly respond to that, Your Honor?

14:41:38 THE COURT: You may.

14:41:39 MR. YANNIELLO: So the -- as the Government's articulated throughout this case, nobody has claimed that OTF is, in and of itself, a criminal enterprise; it's that a subgroup of the individuals who are part of it, including Mr. Banks, have operated in a way that has executed violence towards rivals, including what occurred on the streets of Los Angeles.

14:41:59 And so nobody is contesting that it's part of the culture, but the statements that were made that have close, very close and clear application to the facts of this case, or as, you know, even what --

14:42:17 THE COURT: Well, we'll discuss the lyrics in a moment, but right now, just in regard -- we are talking about the video, and then the issue that was raised with Mr. Wilson.

14:42:28 MR. YANNIELLO: So the videos, Your Honor, they show both immediately before the murder in Los Angeles and after.

There is videos depicting Mr. Banks with core members of the conspiracy who committed the murder. I would submit that there is -- that is incredibly powerful evidence to show close association.

If Mr. Banks was to -- if the defense says that Mr. Banks didn't know about the murder in Los Angeles, it certainly makes it less likely of that fact if he, both before and after, these are the people who he's close with. And there is going to be testimony at trial that supports that.

So not only is it relevant for those purposes, but also to corroborate the cooperating witnesses in this case.

THE COURT: And let me just stay there, because I want to raise the next issue that cuts -- in regard to the lyrics, but the videos, too, I suppose -- but cuts across them. And that is the Government's assertion that just any temporal reality just doesn't matter.

You know, it just seems plausible to me, it's been raised by the defense, that the Government is saying, oh, well, this lyric premiered as of a certain date, but as to who actually wrote it, when it was recorded, when the decision was made to release it, in the absence of that information, why does -- the Government's response seems to be, well, it doesn't really matter. And it just seems to me that it might very well matter.

14:44:00 So either, what is the Government's response to the very pointed objections that have been made by the defendants that the Government is just having frankly a somewhat naive view of how these lyrics found themselves released to the world?

14:44:23 MR. YANNIELLO: Your Honor, I think there is two points that I would like to make in response to that.

14:44:27 The first is independent of who wrote the lyrics, they came out of these defendants' mouths, and that in and of itself is the statement that was made.

14:44:37 So I guess the argument against that would be somebody else wrote them, and they were being phonies up there making these statements. And you know what, that is a fair argument to make, but they made the statements, they adopted them, and they published them commercially.

14:44:53 I think to help us hone in, I think parties collectively, on if these facts matter, if it matters who wrote it, if it matters when it was actually written, there has been ample time, and there could be more meet and confer opportunity, those are facts within the defendants' -- they obviously control those facts and have access to those facts. I assume they are going to be admitting those facts. If these videos or songs were produced, it will be part of their reciprocal discovery obligations.

14:45:25 And what we would ask if Your Honor does believe

that the specifics matter in terms of who wrote the lyrics, and exactly when they were -- when they were written, then I think I would ask that the defense be ordered to meet and confer with the Government and provide that information.

THE COURT: Well, except the Government has, arguably, a burden to put the matter in play. The defense, as you well know, doesn't have to produce that information to you or to anyone else.

So it's -- the question is in the -- the point is not being made here whether if these things are coming in, the defense has the right to counter them in the matter you suggest, of course they do. But the question is whether you have enough to get them into play in the first place. That is the argument that is being made by the defense.

MR. YANNIELLO: I think what I would say to that, Your Honor, is when it is -- when these songs were released is a fact that is in the public domain. I think it's fair that videos were produced in short order in close timeframe to when the releases occurred, or when the premier dates happened. So the Government believes that we would be able to establish the reasonable approximate time where the videos were released and/or created.

I think more importantly, several of these videos were released to the public after the murder, and we, as the Government has articulated in briefing, there is a witness,

one of the cooperating witnesses will say that those opportunities that were provided to that witness would not have occurred had that witness not participated in the murder.

And so regardless of when the video was filmed, when the song was written, that was a benefit that was received of that individual for engaging in the violence that occurred in August of 2022.

MR. HARBAUGH: Your Honor, I could just address the point, because again, the Government is shifting explanations. But here they have combined two. So they are saying that the lyrics are critical to show alleged benefits that an artist received, but Your Honor, the Government doesn't need to admit the lyrics to any song to demonstrate what purported benefit that individual received.

But Your Honor, again, the Government simply trying to push what we think we know, and it's betrayed by the Government's shifting labels that is propensity evidence, and they know it.

THE COURT: All right. Yes, counsel?

MS. GOLDBERG: Thank you, Your Honor.

I mean, I think -- and we have briefed this issue -- this use of the word premier is just not part of the industry. We believe, and I think it's corroborated by the discovery, that the agents in this case are literally

googling this information and looking at YouTube, and seeing what date YouTube purports to say that this video was released.

And obviously, there is a host of issues, authentication and relevance, that we could go on for a long time on that. But the Government is now apparently shifting the burden on the defense, which the Court, you know, noted here. Certainly not any responsibility of the defense to give the Government information when they are the ones trying to propose these videos and these lyrics. They are completely just ignorant about this issue, Your Honor.

And we have seen this in this case, because we dealt with this issue earlier on with the Superseding Indictment, which led the Government to go back to the grand jury, because they had information, which they assumed that a music video was made on a certain date, and then were given information that that was not true, and had to go back to the grand jury and correct their mistake.

And we see this again and again. Just that really, you know, for lack of better word, lazy way of just going open source, and saying this is when it premiered.

And honestly, Your Honor, I mean, I think that is -- and I know the Court posed this issue -- but I think that is kind of a very, you know, secondary to just the prejudice. And I think that the Court, or the Government's going to have

to prove when these things were made; but also, in saying that it doesn't matter who wrote it, it doesn't matter, I mean, that is, again, belied by the case law.

So I mean, the probative value in the cases that the Government cited was really that it was found on the person of the defendant and written by the defendant. I mean, that is incredibly important. There is no case, I mean, the Government has cited no case that allows this kind of, you know, nebulous adopted admission, commercialization argument that the Government is now making.

Certainly, you know, we could parade a number of performers in here to talk about things they say publically that they don't actually do or mean. I mean, actors, musicians, all the time. We cited several of those examples in our brief.

But I mean, day in and day out we watch movies where actors are saying things and doing things that they wouldn't -- we would never say, well, because you said it, because you commercialized it; therefore, this should be used as evidence against you. We don't make those jumps.

So why do we make the jumps here? What is the difference between those things and this? Your Honor, I think we briefed this issue, it's because the Government found these things that they believed set their narrative.

We have seen through the discovery that one of the

first things that the agents did in this case was go to lyrics. When it was still, I believe, an LAPD case, they went to lyrics. And that just shows how much weight that they gave it early on in this case, but how real little weight it actually carries, because there are no cases that say this is good, credible evidence, because it's not.

This is a performer. This is somebody who, you know, is doing things because there is a demand, and there is an audience, and because of that, certain things may be said or done, because it's part of the, you know, the zeitgeist. But what probative value? And it really is the Government's burden to show that. And they keep shifting, they keep shifting back to the defense. We raise prejudice, the Government in their brief dedicated one paragraph to prejudice, basically saying, "Well, Defendant Banks said it, so we are sorry." That is not how this is supposed to be addressed, Your Honor.

THE COURT: Thank you. In regard to the specific lyrics, I identified sort of five different buckets. The final one being that a particular lyric would bolster the Government's argument that there was an intention to flee, which is traditionally viewed as consciousness of guilt. That lyric, and those that are discussed at the response at page 9, will be excluded, because they really are just sheer propensity, even the way it's phrased, it's just sheer

propensity. So that leaves us with four other kind of buckets.

There is the lyrics that assertedly are the admissions of Mr. Banks that he and OTF had a motive for seeking revenge for DB; and thus, to kill TB.

There is the lyrics demonstrating that Mr. Banks was the leader of OTF, and that in not just as a record label, but also as an organization to fund violence against rivals, including the placing of bounties.

The lyrics that assertedly demonstrate that Mr. Wilson was a trusted co-conspirator and was thus rewarded.

And then basing it on what the Sixth Circuit case, or what the Seventh Circuit case, the lyrics that show the striking similarity to the -- to what actually occurred in this case.

So let me just ask the defense -- we'll just, I guess, take them briefly in that order. I have read your briefs. Is there anything else that you wish to add in regard to the first category about the motive for seeking revenge?

MS. GOLDBERG: Yes, Your Honor.

I think, you know, and the Court noted, I believe it was the *Stuckey* case, the Sixth Circuit case, there is no direct statement in these lyrics where Mr. Banks, or anyone

14:54:04 else, is talking about the alleged victims in this case.

14:54:10 So there is no specific reference to TB, or anyone else who are alleged victims in this case, where I could see the argument then being made that this is a direct statement to those individuals. Everything is very general and generic.

14:54:26 And so, you know, specifically to that first issue, that, you know, the motive, I mean, I think the Government would have to show more. They would have to show more similarities and specificity to say, well, this is an admission of motive in this instance.

14:54:43 And I think that really isn't here at all.

14:54:47 THE COURT: Thank you.

14:54:48 And the Government's response?

14:54:50 MR. YANNIELLO: Your Honor, I touched on this earlier in the hearing. There is certain songs that are directly related to the motive that reference Mr. Banks -- people on Mr. Banks's social media patrolling him, "Slide for Von," his admissions to getting it done, figuring out addresses. So I think there is that bucket of core motive evidence.

14:55:15 Counsel just, I think, pivoted to the fourth bullet here, which was striking similarity to the conduct in this case.

14:55:23 We -- there -- the songs often are talking in coded

language. Some of them have very close similarity: Stalking somebody in a car, jumping out and basically ambushing an op. And, Your Honor, not pivoting back -- I just want to pivot back for a second. The videos were -- in the background of that video, there is -- it's essentially paying homage to DB, who we allege is the motive behind this. And so the video and the lyrics is kind of -- is inextricably intertwined, you know, not to borrow that terminology.

But there is other songs related to bounty hunters in Beverly Hills, hunting ops with machine guns. I think that is very close to what occurred here. And we would submit that is a direct admission to what occurred in Los Angeles.

THE COURT: Putting aside that specific reference, which I know you are arguing reflects what happened here, what -- what in your view are the lyrics that are most direct in regard to placing bounties? And again, in the -- is it your view that that is reflective of what was happening here? Or was it a way, in your view, of communicating to others of what the reward might be? Or, are you saying was the modus operandi of OTF to deal in that fashion?

I have to say, what specifically are your arguments in regard to the bounties, and those lyrics that you are -- that are identified on pages 6 and 7 of the response?

MR. YANNIELLO: The bounty lyrics, Your Honor, I

think would be relevant to identity who put out the hit, absence of mistake that anybody but Mr. Banks could have facilitated that intent and plan. I think those are kind of the core routes of admissibility for those specific lyrics.

THE COURT: All right. And let me hear from defense counsel.

MS. GOLDBERG: Yes, Your Honor.

And I think, and to the Court's point about similarity, a lot of the lyrics that the Government has alleged are similar -- and this is our concern in terms of confusion and prejudice -- are lyrics that were done before the incident.

So the concern we have here is if, you know, the jury hears these lyrics and talk about Beverly Hills, or shooting from cars, or things like that, they are going to make the assumption that this is an actual admission. Like the *Stuckey* case, where he says after the fact, he says, you know, this is what I did.

THE COURT: After the fact.

MS. GOLDBERG: After the fact. That's the most important thing, it's an after-the-fact admission in that case, and that is sort of the standard there. That this is almost, you know, a confession, right, a confession to music. But that is not here. That is not what we have here.

We have, you know, some songs that were written a

14:58:18 year before, or that were produced and out in the public a year before. And, you know, talking about, you know, and we put it in the brief, that, you know, "I shot your homie," and "The one I paid for," and things like that, the jury could easily make the distinction and say, oh, well, he's talking about this. But obviously, an impossibility, right? It's a year before.

14:58:41 So, you know, having to go through and parse out each of these things would be, you know, it's really not what this trial is supposed to be about, Your Honor.

14:58:51 I mean, we really talk about, you know, the Government says core of this trial, and the core of this trial is this Indictment. The core of this trial is this time period that they have alleged, this is what the Indictment says. And the Government is going to inject all these other things, and we are going to have to go back and forth and back and forth to what each of these lyrics mean. And then the confusion is going to be abound. We are going to have the trial turning into this side show that is going to take forever, going back and forth over, you know, which of each of these lyrics, and what does this one mean? And who wrote that and why? And that's just, again, not what this case is supposed to be about.

14:59:31 You know, again, if they had something where it was specifically after the fact, like the *Stuckey* case, where

saying, you know, these are things that we did, or I did, we just don't have that here.

And we have language that is inflammatory. We have use of, you know, the "N" word. We have use of profane language. We have talks about firearms, all these things. And it talks about in the lyrics, Mr. Banks talks about another case he had. He talks about another individual with a murder case, which could be one of the other codefendants, you know, injecting those things, and then having to address them, again, those are prejudicial elements, having to address them in this trial, again, not what this is supposed to be about.

So aside from that, you know, not meeting the requirements of one of the only, you know, cases on point, you know, we really don't need to have a side show here.

THE COURT: All right. Thank you.

Mr. Harbaugh, in regard to the lyrics regarding Mr. Wilson, what do you have to add?

MR. HARBAUGH: Yes, Your Honor. Thank you.

Your Honor, I think we have to go back to the threshold. The reason that we have the notice requirement is to ensure that the defense is on -- is prepared to defend against, and explain, and the Court is aware. The Government loses at the threshold for all of the lyrics, but certainly for the ones for Mr. Wilson.

The Government in its notice, in its 404(b) notice, the latest iterations, the third one, they state that this is inexplicably intertwined. That is their theory. And then they throw in simply, and if not, then it's admissible under 404(b), without any indication as to what the 404(b) basis is.

And, Your Honor, I appreciate the Court identifying the grounds, but it's significant, the Government's assertion that Mr. Wilson was one of Mr. Banks's trusted co-conspirators, and rewarded hit man, is the definition of propensity evidence. Your Honor, there is no way around it.

And significantly, the Government didn't even try to address, which was fully laid out in our brief, with regard to whether it was inextricably intertwined. They never say it's necessary to tell the story, nor could they, because it's not necessary; nor is it part of the charged conduct.

So it's not admissible for that. They don't identify -- at one point they give a laundry list of all potential grounds under 404(b) for every potential prior bad act that they identify without articulating a non-propensity basis for admissibility, which is required under the new 404(b).

But, Your Honor, the -- moving aside from notice, and I just want to focus on Mr. Banks, or excuse me, Mr. Wilson, is they -- you know, as Mr. Banks's counsel has

pointed out, they have not established authorship, and so they can't attribute it as an admission.

But the one that is particularly inflammatory that they want to offer is that in "Block is Hot, God Dede with me. Threat, no Big Threat." And then talking about 10,000K just to get someone knocked off.

Your Honor, they don't establish any specific facts that this is related to in the case, they just offer it as general background.

Your Honor, the second point is with -- under 403, as we pointed out, and we asked the Court -- and we appreciate the Court ordering the Government to supplement -- but they still then hedged their explanation for 403. We still don't have every word that they are relying upon, nor every song, because there is several reservations, caveats in their latest.

So, Your Honor, based solely on that, they fail under 404(b), they fail under 403. But, Your Honor, even the specific songs they can't establish the probative value; much less overcoming the unduly prejudiced component.

And just the one point that we could emphasize where it is certainly prejudicial to Mr. Banks, but Mr. Wilson does not have the same notoriety as Mr. Banks, and so the prejudice to him is immensely greater. Where the jury may be aware of Mr. Banks's fame and his Grammy award, Mr. Wilson

doesn't have that same notoriety. And so the jury may think, oh, well, maybe that is literal. He's in the video with him. He's -- these lyrics are spoken about him. And so, Your Honor, the prejudice is amplified for him.

And so, Your Honor, on that basis, the Government fails at the threshold. They shouldn't be allowed to introduce any of these songs.

Thank you.

THE COURT: Thank you.

And the Government's response?

MR. YANNIELLO: Your Honor, I don't think we can view this issue through the narrow lens of just cases dealing with the admissibility of rap lyrics.

I would actually submit that the better cases to evaluate this under -- this is a case involving what is essentially a gang murder. A subgroup of OTF got a location from one of their rivals, somebody who they wanted dead, and they traveled across the country to commit that murder.

So who committed this murder and why is critical, and really the fundamental issues that the jury will consider.

With respect to Mr. Harbaugh's objection to the notice, I would submit to the Court it's a very detailed notice, the Court has it, it's 11 pages. Page 3 lists out specifically what these admissions show.

15:05:49 And turning back to essentially my first point, the cases involving conspiracies, involving organized hits, that are organized conspiracy cases involving people who developed a relationship over time, and why a leader of those enterprises, or leaders of those conspiracies trusted the people who came in. That is the *Jones* case, that is the *Sarang* case, the other cases that the Government cited under that, the *Smith* case. Those cases show -- I think are a better lens to view all of this evidence in.

15:06:25 Because if we are looking just at the lyrics, then that is a siloed approach, but we are looking at are these benefits that they received downstream as part of their participation in this killing? Is to -- you know, Mr. Harbaugh referenced Big Threat. Is Mr. Banks's admission that Dede is one of his main guys, that is highly relevant to why he chose Mr. Wilson to participate in this scheme, and why Mr. Wilson did it.

15:06:52 And so I think with that, Your Honor, without -- unless there is any specific questions, I want to be clear that the -- those cases, I believe conspiracy cases, are probably a better lens to review this evidence through.

15:07:05 THE COURT: All right. I will -- thank you.

15:07:09 The issues of the lyrics are taken under submission, except for that lyric which assertedly showed Mr. Banks's willingness to flee, which will be excluded from the trial.

I will get an order out to you very soon. I will then want you to discuss when the trial should take place. For the moment, assuming -- well, you can do it in, I guess in the alternative of Mr. Wilson being -- having been severed out, but of course, the other two codefendants have likewise requested that.

So I think there should just be a real discussion between the parties as to what a realistic trial date is. And if you want to know my schedule, of course you can reach out to Ms. Sanchez.

If the Government gets what it wants, which is that there not be the severance, then Mr. Harbaugh has his trial in May, a very significant trial in which the date was set for this date would have been set, and he can't be two places at once. And I have discussed that with Judge Aenlle-Rocha, so that is a matter that is going to have to be dealt with.

So we'll have a hearing in two weeks or so, in which case we'll -- I'll have further evidence on the severance, and then we will set the trial date.

If there were a severance, that trial date could be in as early as in April, and if there is no severance, I don't see how it can possibly occur until sometime mid-June at the earliest.

So we -- the parties should be discussing it in light of those alternatives.

15:09:15 All right. Thank you, counsel, thank you for your many briefs, thank you for your arguments today. Gentlemen. As I said, other than the exclusion of the January 2022 incident, based on the Government's withdrawal, and the lyric that I previously identified, the Rule 404 Motion in Limine is taken under submission.

15:09:41 Thank you.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR February 15, 2026

S/ Amy Diaz