DREW FINDLING
MARISSA GOLDBERG
The Findling Law Firm PC
3575 Piedmont Road
NE Tower 15, Suite 1010
Atlanta, GA 30305
Telephone: (404) 460-4500
Email: drew@findlinglawfirm.com
marissa@findlinglawfirm.com

BRIAN STEEL
The Steel Law Firm
1800 Peachtree Street NW, Suite 300
Atlanta, GA 30309
Telephone: (404) 605-0023
Email: thesteellawfirm@msn.com

CHRISTY O'CONNOR (Bar No. 250350)
The Law Office of Christy O'Connor
360 East 2nd Street, Suite 800
Los Angeles, California 90012
Telephone: (323) 716-5959
Email: christy@christyoconnorlaw.com

Attorneys for Defendant
DURK BANKS

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES,

Plaintiff,

v.

DURK BANKS,

Defendant.

Case No. 2:24-cr-00621-MWF

**DEFENDANT DURK BANKS' BRIEF IN SUPPORT OF RELEASE ON BOND; EXHIBITS**

Defendant Durk Banks, through his attorneys, Drew Findling, Marissa Goldberg, Brian Steel, and Christy O'Connor, hereby files this brief in support of his release on bond. By this memorandum, we urge the Court to consider the changed circumstance of Mr. Banks' recent acquittal by a jury of his peers. In support of his release, we offer a bond package so robust that should Mr. Banks violate his release conditions, both he and his family would be left destitute indefinitely. And we ask the Court to consider the

person that Mr. Banks became, leading up to his arrest in this case, when he chose sobriety, regular therapy, and growth in his Muslim faith.

Mr. Banks' motion for reconsideration of the detention order is based on the attached memorandum and exhibits, and any other such evidence or argument that the Court should deem appropriate.

The government opposes Mr. Banks' request for bond, but the family of Saviay'a Robinson does not. *See* Exhibit A (letter from A. Robinson, mother of decedent).

Respectfully submitted,

Dated: October 27, 2026 BY: /s/ *Christy O'Connor*
Drew Findling
Marissa Goldberg
Brian Steel
Christy O'Connor
*Attorneys for Durk Banks*

## Memorandum of Points and Authorities

### I. Introduction.

Mr. Banks seeks the Court's reconsideration of its detention order. Dkt. No. 202. Since that order, a jury of his peers acquitted Mr. Banks of participating in Saviay'a Robinson's murder. The Court's previously-expressed concerns about the risk of flight and danger to the community (potential witnesses in particular) have been assuaged. And now, Mr. Banks offers to the Court a bond package that includes his future earnings, ensuring that that should he violate his bond, he and his family would remain penniless going forward. Mr. Banks, who following the time period surrounding these charges radically transformed his life, should be released on a bond.

### II. A Jury Found Mr. Banks Not Guilty of Murdering Saviay'a Robinson.

As early as 1951, the Supreme Court recognized the interconnectedness of the right to bail and the presumption of innocence. "Unless the right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle*, 341 U.S. 1, 4 (1951) (Vinson, C.J.). As a "corollary" to the presumption of innocence, the Ninth Circuit has affirmed that "the right to bail should be denied only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985). Doubts about the propriety of release must be resolved in favor of the defendant. *Id.* at 1405.

As are all criminal defendants, Mr. Banks is presumed innocent pending trial. Beyond the presumption of innocence, though, the community has weighed in on the strength of the evidence against Mr. Banks after evaluating it fully and completely.[1] Following eleven days of evidence and argument and three days of deliberation, the jury

---

[1] The evidence the jury considered (including 404(b)) largely overlaps with the evidence a second jury would consider should there be another trial. The only evidence the first jury did not hear that a second jury would-- evidence regarding the "Chicago incident" and the Varsity shooting in Atlanta-- is not even strong enough to support charges against Mr. Banks in those jurisdictions.

unanimously found that Mr. Banks did not beyond a reasonable doubt participate in the conspiracy to stalk Mr. Bowman that ended in Mr. Robinson's death. He did not aid or abet in the stalking of Mr. Bowman or Mr. Robinson. He did not participate in any murder-for-hire plot. Under the Supreme Court and Court of Appeal's reasoning, what follows from the jury's not guilty decree should be Mr. Banks' release on bond.

The Bail Reform Act echoes that the weakness of the government's evidence against Mr. Banks should matter in the Court's bond determination. *See* 18 U.S.C. § 3142 (listing weight of the evidence as one of four factors to be considered); *Motamedi*, 767 F.2d at 1408 (the strength of the evidence may be relevant in evaluating the likelihood that the defendant will fail to appear or pose a danger). The Ninth Circuit's admonition, repeated with some frequency, that this factor should be afforded the least weight out of the four statutory factors is not applicable here. That admonition is designed to protect defendants from a pretrial determination that the defendant is guilty. *E.g., id.* at 1408 ("the statute neither requires nor permits a pretrial determination that the person is guilty"). Such a concern is not implicated in this case, where a fully-informed jury has made the opposite determination-- that Mr. Banks is *not* guilty. It is consistent with the caselaw, therefore, for this Court to assign considerable importance to the jury's determination that the government's evidence is not strong.

Indeed, common sense confirms that a rational defendant is less likely to flee or tamper with potential witnesses when he knows that the evidence against him is too weak to convict him of a charge, even where that charge carries with it a serious sentence.[2] In

---

[2] The same is true with respect to Mr. Banks' potential motion to dismiss on double jeopardy/collateral estoppel grounds, so presciently predicted by the government at the hearing on Mr. Banks' motion to sever counts. ("Your Honor, there may be collateral estoppel consequences from an initial trial." Dkt. No. 501 at 17-18.) A rational defendant who understands that the caselaw might very well foreclose a second trial altogether, *see Ashe v. Swenson*, 397 U.S. 436 (1970), is less likely to derail court proceedings by violating his bond conditions. Because it warrants a more nuanced discussion, we do not seek to address the merits of a potential double jeopardy motion here. We just note that

its previous detention order, the Court reasoned that the specter of a mandatory life sentence "would make any innocent defendant consider flight as a rational alternative." Dkt. no. 202 at 2. That worry is lessened where the likelihood of a conviction is diminished. The jury's verdict also speaks to the Court's concerns about danger--specifically, that Mr. Banks' release may allow him to endanger potential trial witnesses. *See* dkt. no. 202 at 3 (expressing concern not just for the community at large, but for the danger to "anybody who might testify against Defendant"). At trial, the government called many witnesses to testify against Mr. Banks, including three cooperating witnesses. The jury heard their testimony, unimpeded. It did not believe them. No rational defendant in Mr. Banks' shoes would risk everything for a chance at obstructing testimony that would fail to convince a jury anyway. The jury's full acquittal of Mr. Banks sends a clear message about his chances of success at a second trial, and diminishes the likelihood that he would violate his bond conditions should he be released. *Accord United States v. Gebro*, 948 F.2d 1118, 1121–22 (9th Cir. 1991) (defendant's knowledge that a jury had previously rejected his duress defense and that he had already been sentenced to lengthy period of incarceration makes it more likely he will flee); *United States v. Garcia*, 2023 2023 U.S. App. LEXIS 4743 at *2 (9th Cir. 2023) (reversing detention order "[i]n light of the district court's order granting the motion to suppress").

**III. Mr. Banks' Commitment to Change.**

To date, the Court has heard much about who Mr. Banks was surrounding the August 2022 allegations in this case-- the violent imagery in his song lyrics and videos, the unsavory voice and text messages. But the man Mr. Banks became after seeking and receiving consistent therapy, choosing sobriety, and growing in his Muslim faith bears little resemblance to the person depicted by the government's trial evidence.

---

the issue is viable and, like the weakness of the government's evidence, should affect the Court's bond determination.

In 2023, Mr. Banks began the journey towards changing his life. He sought out therapy in order to cope with his unprocessed trauma-- losing so many loved ones to horrific violence, growing up in dire poverty and with a father behind bars, going to school only so that he could eat something that day. He spoke publicly about seeing a therapist in attempt to erase the stigma surrounding mental health treatment, particularly in the African-American community.[3] With the encouragement of his wife, India, he also participated in a 30-day in-patient drug treatment program to address his dependence on drugs— codeine, Xanax, and Adderall, a prescription amphetamine. He has been drug-and-alcohol-free ever since, a sobriety that has allowed him to rededicate his life to faith and family, to make music that is positive and uplifting, and to serve his community.

The story behind Mr. Banks' Grammy-award-winning 2023 song, "All My Life," illustrates that the song's positive, uplifting message came from a place of sincerity and commitment to change.[4] As musical artist Jermaine Cole (professionally known as J. Cole) describes it, Mr. Cole was initially hesitant to collaborate on the song, believing it to be too squarely on-brand with his wholesome image:

> I called Durk and told him this exact thing. "Bro, please send me another option! This song is great! But it's so positive, it's too obvious for me." I was hoping he would agree with me and send me another option that was way more raw and street, something that would be more challenging for me to shine on. But instead of agreeing with me, he doubled down on his ask and explained to me why this

---

[3] *See generally*, Kenan Draughorne, *Rapper Lil Durk lost numerous friends and loved ones to violence. To cope, he turned to therapy*, L.A. TIMES (May 29, 2023), https://www.latimes.com/entertainment-arts/music/story/2023-05-29/lil-durk-therapy-almost-healed-all-my-life-morgan-wallen-j-cole (describing Mr. Banks' life transformation, his therapy attendance and newfound focus on serving underprivileged communities, including by providing college scholarships).

[4] "All My Life" features lines such as, "I know some kids wanna hurt theyself / Stop trynna take drugs, I refer to myself / Trynna better myself / Trynna better my health." The official music video can be found at https://www.youtube.com/watch?v=Z4N8lzKNfy4&list=RDZ4N8lzKNfy4&start_radio=1.

> song was so important to him. He explained that he envisioned himself promoting a different message to the world, and more importantly to the kids. He wanted to push a message of change and of peace and of growth and maturity, and he thought that if I got on this song with him it would have the greatest impact. When he broke it down to me like that, all I could do was respect it. I told him I would give it a try.

Exhibit B (letter, J. Cole). Mr. Cole observes that "[i]t speaks to the vision of Durk to mature and realize the impact his art could have, and then to be willing to fight for the chance to make that impact a positive one. Even if it meant going against the instincts of an artist he respects and looks up to." *Id.* Durk's vision about the impact of his art, and in particular "All My Life," has born fruit. During Mr. Cole's recent visit to a juvenile detention center, he tells the Court: "It is no exaggeration when I tell you that the most asked about person from nearly every one of those kids that day was Lil Durk. They relate to his story and his struggle so much, and the amount of kids that told me their favorite song was 'All My Life' would have been too many to count!"

Others who knew Durk during this time mirror Mr. Cole's impression: Mr. Banks had found true meaning in serving others. Michael Rubin is a prominent businessman and the co-chair of REFORM Alliance, an organization dedicated to creating opportunities for the formerly incarcerated.[5] He describes how he first met Mr. Banks when Mr. Banks stepped up to perform at a fundraising event for the charity, which took place in October of 2023. Exhibit C (letter, M. Rubin). "His willingness to lend his voice and platform to an issue affecting so many individuals and families demonstrated an understanding that success carries with it a responsibility to help create opportunities for others." *Id.* But what stood out to Mr. Rubin most was not Mr. Banks' public performance at the inaugural event. It was Mr. Banks' private, unsolicited offer to help when he heard

---

[5] *See generally* www.reformalliance.com. Mr. Rubin co-founded REFORM along with New England Patriots owner Robert Kraft, musicians Jay-Z and Meek Mill, and prominent hedge fund manager Daniel S. Loeb.

that Mr. Rubin was organizing a clothing drive for underprivileged kids and their families. "Durk was one of the first people to call me and ask how he could help. He didn't wait to be approached or asked to participate. He took the initiative, and he became involved in supporting those most in need." *Id.* In Mr. Rubin's opinion, "that kind of response says a great deal about someone's character. When people are facing extraordinary hardship, [Durk's] instinct is always to find a way to help." *Id.*

Similarly, Shawn "Jay-Z" Carter has penned a letter to the Court describing Mr. Banks' "deepening spirituality," a faith that was "something he wanted to grow in, not something he wore for show." Exhibit D, (letter, S. Carter). Mr. Carter explains to the Court:

> What stood out most to me was how he used his success. Durk was signing young artists from his community to recording contracts and giving them a real path into a legitimate industry. Many of us come from neighborhoods where the options are limited and the risks are high. Durk understood that, and he worked to help others find a way out of those conditions rather than leaving them behind.

*Id.* The person Mr. Carter knows is "kind, respectful, and focused on his career," approaching his work with "seriousness and discipline." *Id.*

Part of Mr. Banks' renewed engagement with Islam during this time was his commitment to "pushing peace," as he called it, in which he made it a top priority to interrupt the cycle of violence in the streets of Chicago.[6] About two weeks before his November 2024 arrest, for example, during a "birthday bash" concert at Chicago's United Center, Mr. Banks encouraged his city to lay its guns down. He brought onto stage with him a rapper known for his songs "dissing" OTF, widely believed to be a rival. That alone was a statement not lost on his audience. He then held a moment of silence for those whose lives had been lost to violence on the streets of Chicago. It is perhaps a

---

[6] Should Mr. Banks be released, he has plans to continue his work in the community to the extent his bond conditions permit. *See* Exhibit G (letter, A. Norman, Academy of Hope).

testament to Mr. Banks' efforts in his native Chicago that twice-elected former State's Attorney Kim Foxx has written to the Court in support of Mr. Banks' bond. Exhibit E (letter, K. Foxx).

**IV. Mr. Banks' Bond Package is Robust and Encompasses Future Earnings.**

In denying Mr. Banks' previous request for bond, the Court emphasized that Mr. Banks' proposed bond package did not encompass the lion's share of his net worth, including his future earnings. It explained:

> The main problem here is that, based on the information in the sealed Pretrial Service Reports, the proffered funds are only a fraction of Defendant's net worth. Moreover, Defendant would still have his intellectual property with which to earn a handsome living abroad. Any set of conditions would need to impoverish Defendant and lead to the forfeiture of all interest in his intellectual property.

Dkt. No 202 at 3.

Mr. Banks has taken the Court's concern to heart. In concert with Mr. Banks' management team, the defense has identified four streams of future income, three of which would be still viable in the unlikely hypothetical event that he were to flee (and one of which, his income from touring, would not be):

1. Royalties: this is "neighboring rights income" from digital radio. Every time a song at issue is played publicly or broadcasted, royalties are generated, part of which go to Sony/Alamo, and part of which go to Mr. Banks.
2. Publishing rights: Mr. Banks retains publishing rights for his last two albums, Almost Healed (2023) and Deep Thoughts (2025). Every time a song from these albums is reproduced or streamed on digital platforms like Spotify or Apple Music, Mr. Banks earns money.
3. Name/image/likeness: This is income generated by things like merchandise sales, branding, products, sponsorships, commercials, or documentaries.

4. Touring: this is income generated from live performances. If Mr. Banks were hypothetically on the run from the law, he would not be touring, and so this would not be a viable future income stream.

Mr. Banks offers to encumber each of these future income streams. *E.g.,* Exhibit F (letter from Sony Music Entertainment confirming forfeiture of future earnings). Of course, this encumbrance on his intellectual property is in addition to the other significant collateral: the home that Mr. Banks' mother lives in, and a significant sum of cash and property proffered by friends who have placed their trust in Mr. Banks. If he were to flee now, he would not only steal from friends and leave his mother homeless, but he would lose his ability to earn money. He could not support himself or his family in the future. Especially given the recent trial's outcome, Mr. Banks would not do such a thing to the people he loves.

**V. Conclusion.**

Mr. Banks has been incarcerated for two years. A jury has now acquitted him of participating in the conspiracy that ended in Mr. Robinson's murder. For all of the reasons set forth above, Mr. Banks respectfully requests a bond subject to such conditions the Court feels are appropriate.